# Exhibit A

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

AMERICAN GENERAL LIFE          :
INSURANCE COMPANY,            :
                                    :

          **Plaintiff,**         :

v.                            :     **CASE NO.: 8:15-CV-00192-EAK-AEP**
                                    :

KEVIN H. BECHTEL and LIFE       :
BROKERAGE PARTNERS, LLC,     :
                                    :
              **Defendants.**        :

## AMERICAN GENERAL LIFE INSURANCE COMPANY'S
## FIRST AMENDED COMPLAINT

Plaintiff American General Life Insurance Company ("American General"), by and through its attorneys, files this First Amended Complaint against defendants Kevin H. Bechtel and Life Brokerage Partners, LLC, and alleges as follows:

### THE PARTIES

1.    American General is a life insurance company organized under the laws of the State of Texas and it maintains a principal place of business in the State of Texas. American General is a citizen of the State of Texas within the meaning and intent of 28 U.S.C. § 1332.

2.    Defendant Kevin H. Bechtel ("Bechtel") is a citizen and resident of the State of Florida. Bechtel, therefore, is a citizen of the State of Florida, within the meaning and intent of 28 U.S.C. § 1332.

3.    Defendant Life Brokerage Partners, LLC ("LBP") is a limited liability company organized under the laws of the State of Florida with its principal place of business located in Palm Harbor, Florida. LBP, therefore, is a citizen of the State of Florida within the meaning of 28 U.S.C. § 1332.

## JURISDICTION AND VENUE

4.      Plaintiff and Defendants are citizens of different states, and as is more fully set out below, the matter in controversy exceeds the sum of $75,000, exclusive of interest, attorney's fees and costs. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

5.      This Court is a proper venue for this declaratory judgment action pursuant to 28 U.S.C. § 1391 because a both defendants reside in Pinellas County, Florida, which is in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 89(c).

6.      American General seeks, among other relief, a declaratory judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, which grant the United States District Courts jurisdiction to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

## FACTUAL BACKGROUND

7.      American General is, and during all relevant times has been, in the business of underwriting and issuing policies of insurance.

8.      Defendant Bechtel was appointed as a representative of American General on or about February 24, 2003. Pursuant to the Agency Agreement entered into between Bechtel and American General, Bechtel was authorized to solicit applications for insurance on behalf of American General. A copy of the "Agency Agreement" is attached as Exhibit A hereto.

9.      Non-party Stephen Wechsler ("Wechsler") was appointed as a representative of American General on or about May 17, 2006. Pursuant to the contract entered into between Wechsler and American General, Wechsler was authorized to solicit applications for insurance on behalf of American General.

10. On or about March 1, 2007, American General entered into an Agency Agreement with Bechtel's single member LLC, Life Brokerage Partners, LLC. A copy of the signature page along with a specimen copy of the terms of the "Agency Agreement" is attached as Exhibit B hereto.[1]

11. At the time the 2007 Agency Agreement was entered into with LBP, American General agreed to an assignment of commission request made by Bechtel whereby Bechtel assigned to LBP his right to receive commission payment he earned.

12. On or about April 27, 2007, American General also agreed to classify and recognize Wechsler as a sub-agent of Bechtel for purposes of paying bonus and/or override commissions to Bechtel / LBP for business submitted by Wechsler. For purposes of the Agency Agreement, Wechsler, as a sub-agent (also referred to as a "downline" agent), would be considered "under the jurisdiction" of Bechtel.

13. On or about August 3, 2007, American General issued policy numbers UM0044158L and UM0044159L on the life of Michael Sasoni (hereinafter the "Sasoni Policies"). The commissions paid pursuant to the sale of the Sasoni Policies were divided between Wechsler and Bechtel on a 65-35% split, with Wechsler receiving the larger portion.

14. In total, from October 2007 through October 2010, Wechsler received $252,506.80 in commission payments on each of the Sasoni policies for a total amount of $505,013.60.

---

[1] It was commonplace in 2007 for American General to only retain an electronic copy of the signature page for agency agreements. The signature page attached as Exhibit B references a form number (AGLB 1056-1105) in the bottom right hand corner. This form number corresponds with the contractual terms found in the specimen copy of the agency agreement made part of Exhibit B. Together, they accurately reflect the terms and conditions of the agency agreement entered into between American General and LBP in 2007.

15.    Similarly, from October 2007 through October 2010, Bechtel / LBP received $141,753.20 in regular commissions and an additional $152,224.00 in bonus commission payments on each of the Sasoni policies for a total amount of $587,994.40.

16.    In July 2009, American General instigated litigation against the owners of the Sasoni Policies seeking a judicial declaration that the policies be rescinded and declared void. On July 3, 2014, American General reached an agreement with the owners of the Sasoni Policies regarding the status of the policies. Pursuant to that agreement, American General rescinded the Sasoni Policies and returned all premiums paid thereunder.

17.    Under the terms of the Agency Agreements, in the event American General determines that a policy of insurance is due to be rescinded and premiums refunded, the representative is obligated to immediately return all commissions received from the rescinded policy upon demand Moreover, the Agency Agreements make Bechtel and LBP responsible for the debts of all downline representatives.

18.    On November 10, 2010, Wechsler filed a petition for bankruptcy protection in the Southern District of New York and was discharged on August 20, 2012. As a result of Wechsler's bankruptcy proceedings, commissions paid to him pursuant to the Sasoni Policies may not be now be charged back following the recent rescission. As a result, Bechtel and LBP are responsible for the entirety of the commissions paid to Wechsler on the Sasoni Policies.

19.    The Agency Agreements required Bechtel and LBP to return unearned commissions paid on the Sasoni Policies as well as unearned commissions paid to Wechsler. Despite American General's demand, Defendants have refused to repay these commissions to American General in breach of the Agency Agreements. As a result, American General is forced to bring this Complaint against Defendants seeking, among other thing, the repayment

## COUNT ONE – BREACH OF CONTRACT

20.     American General incorporates paragraphs numbered 1 through 19 as if fully set forth herein.

21.     All conditions precedent necessary for American General to recover under the Agency Agreements have occurred.

22.     Defendants' failure to repay American General for the unearned commissions received by them on the Sasoni Policies and those unearned commissions paid to Wechsler for which they have assumed responsibility constitutes a breach of contract. Defendants' breach of contract has caused American General injury in an amount of at least $1,093,008.00.

## COUNT TWO – (ALTERNATIVE) DECLARATORY RELIEF

23.     American General incorporates paragraphs numbered 1 through 19 as if fully set forth herein.

24.     In the alternative, American General is entitled to a judicial declaration stating that (1) Defendants are liable under the Agency Agreements to repay all commissions paid to Defendants on the Sasoni Policies and (2) Defendants are liable under the Agency Agreements to repay all commissions paid to Wechsler on the Sasoni Policies.

## PRAYER

For the foregoing reasons, American General respectfully requests that the Court:

(a)     enter judgment entitling American General to repay all unearned commissions it paid to Bechtel, LBP and Wechsler arising out of the sale of the Sasoni Policies, prejudgment and post-judgment interest, attorneys' fees and costs of court; and

(b)     grant such other and further relief to which American General may be entitled.

Respectfully submitted this 6th day of May, 2016.

Respectfully submitted,

/s/ David P. Donahue
David P. Donahue
(Admitted pro hac vice)

Attorney for Plaintiff American General Life
Insurance Company

**OF COUNSEL:**

**BRESSLER, AMERY & ROSS, P.C.**
2001 Park Place, Suite 1500
Birmingham, AL 35203
Tel: 205.719.0400
Fax: 205.719.0500
Email: ddonahue@bressler.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of May, 2016, the foregoing document was
electronically mailed and/or filed using the CM/ECF system and/or by U.S. mail, postage
prepaid and properly addressed, to all counsel of record as follows:

Richard C. Millian, Esq.
**The Millian Law Group**
13513 Prestige Place, Suite 101
Tampa, FL 33635
Email: rick@millianlaw.com

/s/ David P. Donahue
**OF COUNSEL**

6

Life Brokerage Equity Group

No.6388 P. 9

All American Life Insurance Company, Springfield, IL
American General Annuity Insurance Company, Amarillo, TX *
American General Life Insurance Company, Houston, TX
The Old Line Life Insurance Company of America, Milwaukee, WI

## AMERICAN GENERAL
### FINANCIAL GROUP

American General Financial Group
is the marketing name for American General
Corporation and its subsidiaries

## AGENCY AGREEMENT

Each life insurance company's products are separately underwritten and independently supported by the representative company. The above-listed companies are members of the American General Financial Group.

American General Financial Group is the marketing name for American General Corporation and its subsidiaries. American General Corporation is not responsible for financial obligations of these corporations.

FOR

Last Name __Bechtel__ First Name __Kevin__ Middle Initial __H__

If Representative is a Corporation, the full Corporate name must appear above, and an authorized officer must sign and indicate the officer's title.

Individual
Social Security Number _____

Corporation
Tax Identification Number __65 - 0972017__

Representative

Signature __NL__ Title __VP__

Primary Company

The Old Line Life Insurance Company of America, Inc.

Contract Date __2-24-03__       __A Heller__
To be completed by Home Office          Home Office Authorized Signator

* This Agency Agreement may not be used to contract banks, credit unions or thrifts to American General Annuity Insurance Company and, if submitted for that purpose, will not be accepted. This Agency Agreement may not be used to replace an in force American General Annuity Insurance Company Agency Contract and, if submitted for that purpose, will not be accepted.

AGL81858-0180

Received Time Jan 30  9:10PM

AGL / BECHTEL  000001

3/12/0 16:01P
506017 702675

## TABLE OF CONTENTS

**Paragraph**

Recitals

Definitions

| | |
|---|---|
| I. | Authorized Acts |
| II. | Limitation of Authority |
| III. | Advertising |
| IV. | Relationship |
| V. | Compensation |
| VI. | Vesting |
| VII. | General Provisions |
| VIII. | Termination |
| IX. | Amendment |
| X. | Personal Guarantee |
| XI. | Effective Date |
| XII. | Investigation Notice |
| XIII. | Federal Crime Control Act |

**Schedules**

A. Commission Schedule – Primary Company

B. Appointment Application

AGL / BECHTEL  000002

8/12/0 15:04P
506017 102676

## RECITALS

Representative ("REPRESENTATIVE") has executed an Appointment Application requesting appointments with one or more life insurance subsidiaries of American General Corporation.

The Appointment Application designates one of the life insurers as a Primary Appointing Company (the "Primary Company").

This Agreement together with the Appointment Application and Commission Schedules for each separate life insurer that appoints REPRESENTATIVE comprise the REPRESENTATIVE's contract with each of the insurers that appoints REPRESENTATIVE.

Execution of this Agreement by the Primary Company and the REPRESENTATIVE evidences their agreement to transact business in accordance with the terms and conditions set forth in this Agreement.

If REPRESENTATIVE requested appointment with one or more affiliates of the Primary Company in the Appointment Application, or a subsequent amendment to that form, REPRESENTATIVE's execution of this Agreement evidences REPRESENTATIVE's agreement to transact business with each affiliated insurer in accordance with the terms and conditions set forth in this Agreement. Each affiliated insurer that appoints REPRESENTATIVE and sends a company commission schedule to REPRESENTATIVE has agreed to transact business with REPRESENTATIVE according to the terms and conditions of this agreement.

## DEFINITIONS

A. Primary Company – the Primary Company is designated in the Appointment Application as the Primary Company. The Primary Company's responsibilities include executing the REPRESENTATIVE Agreement, performing background checks and providing convention credits and other sales incentives, if any, to REPRESENTATIVE.

B. Affiliated Company – the Affiliated Company(ies) is any other life insurance subsidiary of American General Corporation that is identified in the Appointment Application, appoints REPRESENTATIVE and provides a company commission schedule as evidence of its agreement to transact business with REPRESENTATIVE according to the terms of this Agreement.

C. Insurer – the term Insurer as used in this Agreement refers to each of the life insurance companies that appoints REPRESENTATIVE, including the Primary Company.

D. Jurisdiction – Eligibility for, or receipt of, override compensation on another Representative's business.

## I. AUTHORIZED ACTS

A. The REPRESENTATIVE is authorized to conduct Insurer's business for the Insurer's products covering such classes of risks as the Insurer may authorize and in those states where the product is approved and REPRESENTATIVE is licensed and appointed as required by state law. If REPRESENTATIVE is a corporation, then the principal(s) of such corporation must also be licensed individually, if required pursuant to appropriate state law.

B. The REPRESENTATIVE is authorized to collect and promptly remit to the Insurer the first premium on business produced by the REPRESENTATIVE in accordance with the Insurer's rules and regulations.

C. The REPRESENTATIVE will promptly deliver issued policies in accordance with Insurer's policies and procedures.

D. All monies, settlements, or documents received by the REPRESENTATIVE for, or on behalf of, the Insurer shall be received by the REPRESENTATIVE in a fiduciary capacity and immediately paid over or delivered to the Insurer, except as may be otherwise directed in writing by the Insurer.

## II. LIMITATION OF AUTHORITY

The REPRESENTATIVE is without authority to perform any act or thing other than that expressly granted in this agreement and expressly agrees not to perform any of the following acts:

1. Make, modify, alter or discharge any policy.
2. Extend the time payment of any premium.
3. Waive any forfeiture.
4. Guarantee dividends or interest rates.
5. Incur any debt or liability in the name of the Insurer.
6. Withhold, commingle or convert to the use of the REPRESENTATIVE or the benefit of others, any monies, securities, policies or receipts belonging to the Insurer, the applicant, or the insured, or fail to promptly submit to the Insurer any applications for policies.
7. Accept or deposit any check or draft for premiums made payable to other than the Insurer.
8. Unless in the best financial interest of the policyowner, directly or indirectly induce or attempt to induce any policyowners of Insurer to relinquish, surrender, replace or lapse their policies.

## III. ADVERTISING / USE OF LOGO

REPRESENTATIVE may, at REPRESENTATIVE's expense, advertise Insurer's products, provided the text of all advertising, including any form of sales/promotional material such as, but not limited to: business cards, stationery or other indications of agency under this agreement and including the use of the name "American General," the American General logo or the name of any Insurer is approved in writing by the company before use.

## IV. RELATIONSHIP

The relationship between the Insurer and the REPRESENTATIVE shall be that of principal and independent contractor, and nothing contained herein shall be construed as creating the relationship of employer and employee for any purpose, including tax purposes. REPRESENTATIVE agrees to be responsible for all taxes as a self-employed independent contractor. The REPRESENTATIVE shall be free to exercise independent judgment as to the time and manner in which the REPRESENTATIVE shall perform the services authorized under this agreement. Any material supplied by the Insurer is for the purpose of supporting the activities of the REPRESENTATIVE.

AGL / BECHTEL 000003

9/12/10 16:04P
506017 302677

## V. COMPENSATION

A. Subject to the provisions hereof and the rules of the Insurer, the full compensation of the REPRESENTA-TIVE shall be payable at the applicable rate set forth in the Schedule of Commission in effect at the date the first full premium is received by the Insurer, which Schedule of Commission and all amendments, supplements and replacements thereof and thereto are hereby made a part of this agreement.

B. Commission is subject to change at any time by written notice by the Insurer to the REPRESENTA-TIVE, but no such change shall affect commissions on any policy issued prior to the effective date of such change.

C. If commission rates are not now shown in the Schedule of Commission, including conversions, replacements or, the exercise of re-entry provisions or, if special premium rate quotations are made, commission rates shall be such as may be fixed by the Insurer as of the time when issue is effective in accordance with rates and practices of the Insurer then in effect.

D. In the event any policy on which the REPRESENTA-TIVE is entitled to commissions shall lapse because of nonpayment of premium and shall be replaced or reinstated, any commissions on the new or reinstated policy shall be payable only at the sole discretion of the Insurer.

E. To be entitled to commissions, if any, the REPRESENTATIVE's name or the name of another Representative under your jurisdiction must appear as soliciting agent on the application for insurance. Disputes respecting commissions shall be subject to decision and settlement by the Insurer and the Insurer's decision shall be final and binding upon the parties involved.

F. Whenever, in the judgment of the Insurer, it shall become advisable to recall any policy issued before delivery thereof is made, the REPRESENTATIVE shall promptly refund to the Insurer any commissions received on account of such policy. Whenever, after delivery, the Insurer shall effect or procure the surrender, rescission or cancellation of any policy and refund premiums paid thereon, the Insurer shall have the right to charge back commissions and demand that the REPRESENTATIVE repay such commissions to the Insurer. If the Insurer shall refund or waive the premium or premiums under the provisions of any disability waiver of premium rider, the REPRESENTATIVE shall lose all rights to commission and persistency fees as applied to such refunded or waived premi-ums, and shall repay any amounts advanced. An Insurer may include in its Commission Schedule, which is incorporated as a part of this agreement, guidelines describing more specifically the circum-stances under which it will charge back commis-sions on certain products. In the absence of such guidelines, the Insurer's rights shall be as de-scribed in this Section V. Compensation.

G. In the event any policy on which the REPRESENTA-TIVE is entitled to commissions shall be converted or replaced, any commissions on the new policy shall be subject to adjustment and payable only at the sole discretion of the Insurer.

H. Except where prohibited by any State, the REPRE-SENTATIVE is responsible for all license fees, including those of its Representatives. The Insurer's discretion shall govern with respect to whether the Insurer shall charge to the REPRESENTATIVE's commission or other compensation account the cost of obtaining and renewing the REPRESENTATIVE's and its Representatives' license or licenses and/or appointment fees. This practice is subject to change at the discretion of the Insurer.

I. Policy applications for any Insurer will be issued and commissions paid by the Insurer.

## VI. VESTING

A. As long as this agreement remains in effect, all first year and renewal commissions shall be paid as they accrue; however, any such payments are subject to the schedule of commissions in effect at the date the first full premium is received by the Insurer, the provisions and rules of the Insurer regarding minimum first year and renewal commis-sions required to issue a check.

B. During any consecutive 12-month period following the termination of this agreement, total renewal commissions are less than the minimum required by the Insurer, vesting automatically terminates and no additional commission payments will be due from the Insurer.

C. In the event this agreement is terminated by the death of the REPRESENTATIVE, all first year and renewal commissions shall be paid as they accrue, subject only to the terms and conditions of para-graphs A and B immediately above. In the absence of a properly executed beneficiary designation on file with the Insurer, all such payments, if any, shall be made to the surviving spouse and at the death of the surviving spouse to the estate of said spouse, If the REPRESENTATIVE dies leaving no surviving spouse, such monies will be paid to the estate of the REPRESENTATIVE; provided however, that if the REPRESENTATIVE is a corporation or a partnership, all such payments will be paid to said corporation or partnership.

## VII. GENERAL PROVISIONS

A. The Insurer may make such changes and decisions as it deems advisable in the conduct of its business, including the discontinuance of any policy form or the withdrawal from any territory, and the Insurer shall incur no liability to the REPRESENTATIVE by reason of its doing so.

B. The Insurer shall have the right to test market any of its products on a select basis and at the discre-tion of the Insurer.

C. The REPRESENTATIVE shall indemnify and hold the Insurer harmless against or from any and all ex-pense, costs, causes of action, and damages including without limitation, reasonable attorney fees, resulting from or growing out of any unauthorized or negligent act of commission or omission by the REPRESENTA-TIVE or its employees, directors, officers, or Repre-sentatives under its jurisdiction. This provision shall survive termination of this agreement.

AGL / BECHTEL  000004

3/12/10 16:04P
506017 502678

D. The Insurer shall have a prior right and offset to all commissions and fees payable hereunder toward any indebtedness and/or other obligations due from the REPRESENTATIVE or anyone under the Jurisdiction of the REPRESENTATIVE to any Primary Company and/or Affiliated Company/ies with interest at the legal rate. This prior right and offset shall not be extinguished by the termination of this agreement. Following the termination of any Representative under the Jurisdiction of the REPRESENTATIVE, should the amount in any commission account of that Representative be insufficient to repay any amount due the Insurer, the debit will become the responsibility of the REPRESENTATIVE, in accordance with the Insurer's then current debit collection procedure.

E. Neither the agreement, any duties or delegation under this agreement, nor the commissions or fees accruing hereunder, nor any interest herein, nor any right or claim created hereby or arising by reason of the REPRESENTATIVE acting hereunder, shall be assignable, except upon the written consent of the Insurer.

F. Forbearance or failure of the Insurer to insist upon performance of this agreement or to enforce its rights hereunder, shall not constitute a waiver of its rights or privileges hereunder or of its subsequent right to insist upon such performance.

G. This agreement, including the Appointment Application and any Commission Schedule(s) incorporated as part of the Agreement, contains all promises, inducements and representations between the parties. This agreement supersedes any and all previous agreements between the parties herein pertaining to the solicitation of the Insurer's products and the payment of monies to the REPRESENTATIVE provided, however, that rights or obligations which have already accrued (and would survive termination) under any previous contract between the Insurer and the REPRESENTATIVE shall not be hereby impaired.

H. The Insurer reserves the right to decline or modify any application for insurance.

I. This agreement shall not be effective until executed by the Primary Company. Once this agreement is effective with the Primary Company, it may become effective with Affiliated Company/ies as described herein.

J. Should the REPRESENTATIVE, at any time, violate any provision of Section III of this agreement, entitled Limitation of Authority, or commit any fraud upon Insurer or its policyholders; have a license as agent or broker revoked for cause after notice and hearing by a state insurance department or otherwise act to prejudice materially the interests of Insurer, the REPRESENTATIVE shall, at the option of the Insurer, forfeit any and all rights to all commissions and monies that the REPRESENTATIVE might otherwise have under this agreement, vested or not. It is expressly agreed that termination of this agreement shall not terminate this provision.

K. The REPRESENTATIVE agrees to maintain complete and accurate records of the marketing and sale of the Insurer's products. The Insurer reserves the right to inspect such records and other documents in each REPRESENTATIVE's files that relate to the marketing, attempted sale or sale of the Insurer's products. If the Insurer chooses to inspect such records, it will endeavor to do so during normal business hours and after giving reasonable notice, unless, in the judgment of the Insurer, unusual circumstances require inspection at other times or inspection without prior notice. This provision shall survive termination of this agreement for a period of two (2) years.

L. For as long as this agreement is in force, the REPRESENTATIVE will maintain Errors and Omissions (E&O) coverage and will provide the Insurer annually proof of such E&O coverage in a manner acceptable to the Insurer.

M. If the REPRESENTATIVE is served with a regulatory inquiry or legal papers involving Insurer business, the REPRESENTATIVE shall immediately notify the Insurer by sending to that Insurer's Compliance Officer, a copy of the papers, served by overnight delivery, by the end of the business day next following the day of receipt by the REPRESENTATIVE.

N. The REPRESENTATIVE is responsible for assuring that any Representative under the Jurisdiction of the REPRESENTATIVE: (1) become fully informed as to the provisions and benefits of each product offered by the Insurer for which the Representative conducts Insurer business; (2) represent such products adequately and fairly to prospective purchasers; and (3) act in compliance with the Insurer's policies and procedures as set out in the Customer Service and Compliance Manual, Operations Manual, or otherwise communicated to the REPRESENTATIVE, including, without limitation, those regarding suitability of sales inquiries and compliance with the Insurer's principles and code of ethical market conduct.

O. When the Insurer assigns to the REPRESENTATIVE any agency not recruited by the REPRESENTATIVE, then the Insurer may reassign that agency to another upline of the Insurer's choice at any time and without the necessity of a release from the REPRESENTATIVE. If the Insurer wishes to remove any agency recruited by the REPRESENTATIVE from the Jurisdiction of the REPRESENTATIVE, the Insurer will negotiate a release; however, such release will not be unreasonably withheld by the REPRESENTATIVE.

P. REPRESENTATIVE is not entitled to participate in any REPRESENTATIVE benefit programs except those which are provided by the Primary Company. REPRESENTATIVE is not eligible to participate in, or to receive any benefits from, any programs provided by the Affiliate Company/ies.

Q. Disputes arising under this Agreement shall be subject to the laws of the state where the Insurer engaged in the dispute is located.

R. The area within which the REPRESENTATIVE shall have the right to represent the Insurer is not assigned exclusively to the REPRESENTATIVE.

S. REPRESENTATIVE agrees to conform to all regulations of the Insurance Department and the insurance laws in the state(s) in which the REPRESENTATIVE is conducting Insurer's business.

AGL / BECHTEL  000005

5/12/0 18-01P
508047 102679

## VIII. TERMINATION

A. This agreement shall automatically terminate upon the death of REPRESENTATIVE if REPRESENTATIVE is an individual or upon dissolution of REPRESENTATIVE if REPRESENTATIVE is a corporation or a partnership.

B. This agreement shall terminate upon the revocation or non-renewal of the REPRESENTATIVE's license.

C. This agreement may be terminated with or without cause by any Insurer (subject to provisions D and E below) or the REPRESENTATIVE by sending written notice of such termination to the last known address of the other party.

D. Upon termination, the REPRESENTATIVE shall immediately pay in cash to the Insurer all sums that are due or become due hereunder and shall immediately deliver to the Insurer all materials connected with the business of the Insurer and belonging to the Insurer. Such materials include, but are not limited to, rate cards, letters, records, computer software, general supplies or any and all other indications of agency provided by the Insurer. It is expressly agreed that termination of this agreement does not release the REPRESENTATIVE from continuing liability to the Insurer for immediate repayment of any and all unearned first year commissions or bonuses.

E. Termination of this agreement by the Primary Company terminates all contracts with Affiliated Company/ies without specific notice to the REPRESENTATIVE required by the Insurer. However, any Affiliated Company may terminate its agency relationship with the REPRESENTATIVE, which will not, of itself, terminate the Primary Company agency relationship. Upon termination, the Insurer may assign a servicing agency; however, such assignment will not of itself affect the vesting of existing business.

F. Termination of this agreement automatically terminates any previous agreement to represent the Insurer that terminated the Agreement.

## IX. AMENDMENT

This contract cannot be changed by any oral promise or statement and no written modification will bind the Insurer unless approved by the President of the Insurer making the modification.

## X. PERSONAL GUARANTEE

Each and every individual who signs this agreement warrants that they have authority to bind the entity on whose behalf they are signing.

## XI. EFFECTIVE DATE

The agreed effective date will be the date that this agreement to represent is signed and acknowledged by the Primary Company as hereinafter specified.

## XII. INVESTIGATION NOTICE

The undersigned hereby authorizes the Primary and Affiliated Company/ies to conduct an investigation concerning character, credit reputation and personal traits and releases those contacted and the Insurer from any liability with respect to the content of the information provided and any resulting action by the Insurer including the sharing of such information or the termination of this agreement to represent.

## XIII. FEDERAL CRIME CONTROL ACT

A. Undersigned warrants it:

1. has not been convicted of any criminal felony involving dishonesty or breach of trust or

2. has obtained written authorization to engage in the business of insurance from the Insurance Department in the state where REPRESENTATIVE resides which REPRESENTATIVE agrees to produce upon Insurer request.

B. The REPRESENTATIVE agrees to update the representations in the Confidential History/Background Information Section of Part 4 of the Appointment Application by notifying the Primary Company in writing within thirty (30) days, if there should be a change in the response to any question in the Information Section of Part 4 of the Appointment Application.

AGL91056-0100

2/17/20 16:03AP.   :39AM----Life Brokerage Equity Group----          No.8874   P. 3/02

**Assignment of Agent Contract**

**AIG** AMERICAN GENERAL

☒ American General Life Insurance Company (AGL)
☒ The Old Line Life Insurance Company (OLL)
*Members of American International Group, Inc.*

For value received, _Kevin Bechtel_____ an agent under the AGFG Agency Agreement, (or its successor as defined by the company) with the primary company named in the CONSENT TO ASSIGNMENT below ("American-General-Life" / "Old Line Life") and hereinafter called Assignor, assigns Assignor's Agent Contract ("Contract") for INSURER AIG Annuity Insurance Company, formerly known as American General Annuity insurance Company, in its entirety to _Life Brokerage Equity Group_ hereinafter called Assignee. This Assignment removes from Assignor any and all rights, privileges, duties, and obligations under the Contract and places them with Assignee as if the Contract had been originally executed by Assignee. It is expressly understood among the parties to this Assignment that American General Life / Old Line Line reserves the right to offset any indebtedness now or in the future owed to it by Assignee against amounts payable to Assignee under the Primary Contract.

Assignee, under the terms of this Assignment, has received full power and authority, for Assignee's own benefit and conduct of business, all rights, privileges, duties and obligations as full as if Assignee were the original party to the Contract; provided, however, that no transfer of Assignee's rights hereunder, whether voluntary, involuntary, or by operation of law, shall be binding upon American General Life/Old Line Life until actual written notice of such transfer has been received by it.

Executed this ___24th___ day of _February_          _____
                                                     Witness
_____
Assignor

**ASSIGNEE AGREEMENT**

Assignee has received the assignment of the Agent Contract ("Contract") executed between Assignor and the Primary Company in the CONSENT TO ASSIGNMENT below ("American General Life" / "Old Line Life") in exchange for the AGL's / OLL's consent to the assignment.

Assignee is the holder of all rights, privileges, duties, and obligations under the Contract. All commissions payable under the Agreement after the effective date of this Assignment shall be paid to Assignee and will be reported under Tax Identification Number _65 - 097 2014_____, pursuant to Assignee's instructions.

Executed this ___24th___ day of _February_          _____
_____                     _Life Brokerage Equity Group_     _President_
Assignee Signature                Name  _Gary A. Richardson_        Title

**CONSENT TO ASSIGNMENT**

American General Life/Old Line Life hereby consents to the foregoing assignment, subject to the terms, provisions, and conditions above stated or referred to.

Executed this ___24th___ day of _FEBRUARY_ , _2003_

☒ AMERICAN GENERAL LIFE INSURANCE COMPANY     ☒ OLD LINE LIFE INSURANCE COMPANY

_____                     _____                     _____
Signature                         Name                              Title

AGL 160530

Received Time Feb 24   3:13PM

AGL / BECHTEL   000007



```
3/12/0 16:01P
506017 302681
```

Effective December 2002

# SCHEDULE OF COMMISSIONS



**AIG Life Brokerage**

*Distributing products issued by:*
The Old Line Life Insurance Company of America,
American General Life Insurance Company and
AIG Annuity Insurance Company.

*Old Line Life*
*First-Year Base Commissions[1] (Schedule A)*

| Brokerage Old Line Life | | Base |
|---|---|---|
| LTG Ultra/30 (2) | Level Term | 100.00 |
| LTG Ultra/20 (2) | Level Term | 100.00 |
| LTG Ultra/15 (2) | Level Term | 90.00 |
| LTG Ultra/10 (2) | Level Term | 70.00 |
| LTG Ultra-C/30 | Level Term | 100.00 |
| LTG Ultra-C/20 | Level Term | 100.00 |
| LTG Ultra-C/15 | Level Term | 90.00 |
| LTG Ultra-C/10 | Level Term | 70.00 |
| ROP Term 30 | Level Term | 90.00 |
| ROP Term 20 | Level Term | 90.00 |
| ROP Term 15 | Level Term | 90.00 |
| AG Classic + | UL | 80.00 |
| Universal Elite Plus | UL | 90.00 |
| AG Prime Survivor + | 2nd/Die UL | 75.00 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice.

(1) Table ratings are fully commissionable. Flat extra charges of less than 10 years are non-commissionable.
(2) No first-year, renewal or bonus paid on policy fee.

©2002 American International Group, Inc.

AGIED1004-1202



Effective December 2002

# SCHEDULE OF COMMISSIONS

*American General Life (Schedule A)*
*First-Year Base Commissions*(1)



AIG Life Brokerage

Distribution products issued by:
The Old Line Life Insurance Company of American,
American General Life Insurance Company and AIG
Annuity Insurance Company.

| Brokerage AGL | | Base |
|---|---|---|
| Elite Universal Life | UL | 85 |
| Elite G Universal Life | UL | 85 |
| Elite Survivor G | 2nd/Die UL | 75 |
| Elite Survivor (coming 1/03) | 2nd/Die UL | 75 |
| Platinum Income Annuity | SPIA | 3.00 |
| **Supplemental Products** | | **Base** |
| Platinum Provider Ultra | UL | 70 |
| Platinum Provider Ultra G | UL | 70 |
| Platinum Accumulator (2) | UL | 60 |
| Platinum Survivor Ultra (3) | 2nd/Die UL | 65 |
| Platinum Survivor Ultra G (3) | 2nd/Die UL | 65 |
| Platinum Provider Ultra 500 | EIUL | 70 |
| Platinum Accumulator 500 (2) | EIUL | 60 |
| Platinum Survivor Ultra 500 (3) | 2nd/Die EIUL | 65 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice.

(1) AGL pays no commission on aviation extra premiums or any temporary extra premiums of seven years duration or less.
    For table ratings above Table 6, first year commissions are paid on the basis of Table 6 premiums.
(2) Platinum Accumulator and Accumulator 500 UL commissions reduced by 1% for each year of issue age above 65.
(3) With one uninsurable life commissions for Platinum Survivor and Platinum Survivor 500 will reduce.

©2002 American International Group, Inc.

AGBAS1025-1202

AGL / BECHTEL  000009



Effective December 2002

# SCHEDULE OF COMMISSIONS



AIG Life Brokerage

*Distributing products issued by:*
The Old Line Life Insurance Company of America,
American General Life Insurance Company and
AIG Annuity Insurance Company.

## *Old Line Life*
## *Renewals and Excess Over Target*
## *(Schedule D)*

| Old Line Life | | Renewal | Excess |
|---|---|---|---|
| AII LTG Ultra   (1) (2) | Level Term | 0.00 | * |
| AII LTG Ultra-C  (2) | Level Term | 0.00 | * |
| ROP Term 30 | Level Term | 1.00 | * |
| ROP Term 20 | Level Term | 1.00 | * |
| ROP Term 15 | Level Term | 1.00 | * |
| AG Classic + | UL | 1.50 | 1.50 |
| Universal Elite Plus | UL | 1.50 | 3.00 |
| AG Prime Survivor + | 2nd/Die  UL | 1.50 | 1.50 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice.

(1)  No first-year base, renewal or bonus paid on policy fee.
(2)  Renewals only; Excess does not apply.

©2002 American International Group, Inc.

AGLEG2000-1202

AGL / BECHTEL  000010



3/12/0 16:01P
506017 102684

Effective December 2002

# SCHEDULE OF COMMISSIONS
*American General Life (Schedule D)*
**Excess over Target**
**and Renewals**[1]



AIG Life Brokerage

*Distributing products issued by:*
The Old Line Life Insurance Company of America,
American General Life Insurance Company and
AIG Annuity Insurance Company.

| American General Life | | Excess | Renewals |
|---|---|---|---|
| Elite | UL | 1.00 | 1.00 |
| Elite G | UL | 1.00 | 1.00 |
| Elite Survivor G | 2nd/Die UL | 1.00 | 1.00 |
| Elite Survivor (coming 1/03) | 2nd/Die UL | 1.00 | 1.00 |
| Platinum Provider Ultra | UL | 1.00 | 1.00 |
| Platinum Provider Ultra G | UL | 1.00 | 1.00 |
| Platinum Accumulator | UL | 1.00 | 1.00 |
| Platinum Survivor Ultra | 2nd/Die UL | 1.00 | 1.00 |
| Platinum Survivor Ultra G | 2nd/Die UL | 1.00 | 1.00 |
| Platinum Provider Ultra 500 | EIUL | 1.00 | 1.00 |
| Platinum Accumulator 500 | EIUL | 1.00 | 1.00 |
| Platinum Survivor Ultra 500 | 2nd/Die EIUL | 1.00 | 1.00 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice. Unless otherwise noted, renewals are years 2-10 with
service fees beginning in year 11.

(1) AGL pays no commission on aviation extra premiums or any temporary extra premiums of seven years duration or less.
For table ratings above Table 6, first year commissions are paid on the basis of Table 6 premiums.

©2002 American International Group, Inc.

AIGLIF2030-1202

04/24/2007 16:17 8695138 7915

## AGENCY AGREEMENT

*Each life insurance company's products are separately underwritten and independently supported by the representative company. The below listed companies are members of the American International Group, Inc.*

Life Brokerage Partners LLC

FOR

Last Name Bechtel            First Name Kevin            Middle Initial H

If Representative is a Corporation, the full Corporate name must appear above, and an authorized officer must sign and indicate the officer's title.

Individual
Social Security Number  REDACTED

Corporation
Tax Identification Number  20-8344089

Representative

Signature _____            Title  Owner

American General Life Companies

Contract Date _____
To be completed by Home Office            Home Office Authorized Signator

American General Life Insurance Company, Houston, TX
A division of the American International Companies.®

AGL01056-1105

**WE KNOW LIFE.®**



AIG Life Brokerage

AGL / BECHTEL  000057

TABLE OF CONTENTS

**Paragraph**
Recitals
Definitions

I.      Authorized Acts
II.     Limitation of Authority
III.    Advertising
IV.     Relationship
V.      Compensation
VI.     Vesting
VII.    General Provisions
VIII.   Termination
IX.     Amendment
X.      Personal Guarantee
XI.     Effective Date
XII.    Investigation Notice
XIII.   Federal Crime Control Act
XIV.    Confidentiality

**Schedules**

A. Commission Schedule – Primary Company

B. Appointment Application

AGL / BECHTEL  000058

## RECITALS

Representative ("REPRESENTATIVE") has executed an Appointment Application requesting appointments with one or more life insurance subsidiaries of American International Group, Inc.

The Appointment Application designates one of the life insurers as a Primary Appointing Company (the "Primary Company").

This Agreement together with the Appointment Application and Commission Schedules for each separate life insurer that appoints REPRESENTATIVE comprise the REPRESENTATIVE's contract with each of the insurers that appoints REPRESENTATIVE.

Execution of this Agreement by the Primary Company and the REPRESENTATIVE evidences their Agreement to transact business in accordance with the terms and conditions set forth in this Agreement.

If REPRESENTATIVE requested appointment with one or more affiliates of the Primary Company in the Appointment Application, or a subsequent amendment to that form, REPRESENTATIVE's execution of this Agreement evidences REPRESENTATIVE's Agreement to transact business with each affiliated insurer in accordance with the terms and conditions set forth in this Agreement. Each affiliated insurer that appoints REPRESENTATIVE and sends a company commission schedule to REPRESENTATIVE has agreed to transact business with REPRESENTATIVE according to the terms and conditions of this Agreement.

## DEFINITIONS

A. Primary Company – the Primary Company is designated in the Appointment Application as the Primary Company. The Primary Company's responsibilities include executing the REPRESENTATIVE Agreement, performing background checks and providing convention credits and other sales incentives, if any, to REPRESENTATIVE.

B. Affiliated Company – the Affiliated Company(ies) is any other life insurance subsidiary of American International Group, Inc. that is identified in the Appointment Application, appoints REPRESENTATIVE and provides a company commission schedule as evidence of its Agreement to transact business with REPRESENTATIVE according to the terms of this Agreement.

C. Insurer – the term Insurer as used in this Agreement refers to each of the life insurance companies that appoints REPRESENTATIVE, including the Primary Company.

D. Jurisdiction – Eligibility for, or receipt of, override compensation on another Representative's business.

E. Nonpublic Personal Information: "Nonpublic Personal Information" of customers or consumers ("NPI") includes, but is not limited to, names, addresses, account balances, account numbers, account activity, social security numbers, taxpayer identification numbers, and sensitive financial and health information. NPI in cludes information on each party's forms or in a database of any kind, information created by each party, information collected by or on behalf of a party, and personally identifiable information derived from NPI. Reference to NPI of Company or REPRESENTATIVE shall include NPI collected by or on behalf of American International Group, Inc., its successors, subsidiaries, affiliates agents or contractors. There may be instances where each party will have the same NPI which may be subject to different privacy policies and procedures according to the notices provided to the customer or consumer by the respective parties to the Agreement.

F. Protected Health Information: The terms "Protected Health Information" and "PHI" shall have the meaning set forth in 45 C.F.R. Sec. 164.501 as may be amended. Other terms shall have the same meanings as set forth in the applicable definition of the Health Insurance Portability and Accessibility Act (HIPAA), as amended, Privacy Rule or other regulations.

## I. AUTHORIZED ACTS

A. The REPRESENTATIVE is authorized to conduct Insurer's business for the Insurer's products covering such classes of risks as the Insurer may authorize and in those states where the product is approved and REPRESENTATIVE is licensed and appointed as required by state law. If REPRESENTATIVE is a corporation, then the principal(s) of such corporation must also be licensed individually, if required pursuant to appropriate state law.

B. The REPRESENTATIVE is authorized to collect and promptly remit to the Insurer the first premium on business produced by the REPRESENTATIVE in accordance with the Insurer's rules and regulations.

C. The REPRESENTATIVE will promptly deliver issued policies in accordance with Insurer's policies and procedures.

D. All monies, settlements, or documents received by the REPRESENTATIVE for, or on behalf of, the Insurer shall be received by the REPRESENTATIVE in a fiduciary capacity and immediately paid over or delivered to the Insurer, except as may be otherwise directed in writing by the Insurer.

## II. LIMITATION OF AUTHORITY

The REPRESENTATIVE is without authority to perform any act or thing other than that expressly granted in this Agreement and expressly agrees not to perform any of the following acts:

1. Make, modify, alter or discharge any policy.
2. Extend the time payment of any premium.
3. Waive any forfeiture.
4. Guarantee dividends or interest rates.
5. Incur any debt or liability in the name of the Insurer.
6. Withhold, commingle or convert to the use of the REPRESENTATIVE or the benefit of others, any monies, securities, policies or receipts belonging to the Insurer, the applicant, or the insured, or fail to promptly submit to the Insurer any applications for policies.
7. Accept or deposit any check or draft for premiums made payable to other than the Insurer.
8. Unless in the best interest of the policyowner, directly or indirectly induce or attempt to induce any policyowners of Insurer to relinquish, surrender, replace or lapse their policies.

## III. ADVERTISING / USE OF LOGO

REPRESENTATIVE may, at REPRESENTATIVE's expense, advertise Insurer's products, provided the text of all advertising, including any form of sales/promotional material such as, but not limited to business cards, stationery or other indications of agency under this Agreement and including the use of the names "American International Group, Inc.," "AIG," "American General," their logos or the name of any Insurer is approved in writing by the company before use.

## IV. RELATIONSHIP

The relationship between the Insurer and the REPRESENTATIVE shall be that of principal and independent contractor, and nothing contained herein shall be construed as creating the relationship of employer and employee for any purpose, including tax purposes. REPRESENTATIVE agrees to be responsible for all taxes as a self-employed independent contractor. The REPRESENTATIVE shall be free to exercise independent judgment as to the time and manner in which the REPRESENTATIVE shall perform the services authorized under this Agreement. Any material supplied by the Insurer is for the purpose of supporting the activities of the REPRESENTATIVE.

## V. COMPENSATION

A. Subject to the provisions hereof and the rules of the Insurer, the full compensation of the REPRESENTATIVE shall be payable at the applicable rate set forth in the Schedule of Commission in effect at the date the first full premium is received by the Insurer, which Schedule of Commission and all amendments, supplements and replacements thereof and thereto are hereby made a part of this Agreement.

B. Commission is subject to change at any time by written notice to the REPRESENTATIVE, but no such change shall affect commissions on any policy issued prior to the effective date of such change.

C. If commission rates are not now shown in the Schedule of Commission, including conversions, replacements or, the exercise of re-entry provisions or, if special premium rate quotations are made, commission rates shall be such as may be fixed by the Insurer as of the time when issue is effective in accordance with rates and practices of the Insurer then in effect.

D. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall lapse because of nonpayment of premium and shall be replaced or reinstated, any commissions on the new or reinstated policy shall be payable only at the sole discretion of the Insurer.

E. To be entitled to commissions, if any, the REPRESENTATIVE's name or the name of another Representative under your jurisdiction must appear as soliciting agent on the application for insurance. Disputes respecting commissions shall be subject to decision and settlement by the Insurer and the Insurer's decision shall be final and binding upon the parties involved.

F. Whenever, in the judgment of the Insurer, it shall become advisable to recall any policy issued before delivery thereof is made, the REPRESENTATIVE shall promptly refund to the Insurer any commissions received on account of such policy. Whenever, after delivery, the Insurer shall effect or procure the surrender, rescission or cancellation of any policy and refund premiums paid thereon, the Insurer shall have the right to charge back commissions and demand that the REPRESENTATIVE repay such commissions to the Insurer. If the Insurer shall refund or waive the premium or premiums under the provisions of any disability waiver of premium rider, the REPRESENTATIVE shall lose all rights to commission and persistency fees as applied to such refunded or waived premiums, and shall repay any amounts advanced. An Insurer may include in its Commission Schedule, which is incorporated as a part of this Agreement, guidelines describing more specifically the circumstances under which it will charge back commissions on certain products. In the absence of such guidelines, the Insurer's rights shall be as described in this Section V. Compensation.

G. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall be converted or replaced, any commissions on the new policy shall be subject to adjustment and payable only at the sole discretion of the Insurer.

AGL / BECHTEL  000060

H. Except where prohibited by any State, the REPRESENTATIVE is responsible for all license fees, including those of its Representatives. The Insurer's discretion shall govern with respect to whether the Insurer shall charge to the REPRESENTATIVE's commission or other compensation account the cost of obtaining and renewing the REPRESENTATIVE's and its Representatives' license or licenses and/or appointment fees. This practice is subject to change at the discretion of the Insurer.

I. Policy applications for any Insurer will be issued and commissions paid by the Insurer.

## VI. VESTING

A. As long as this Agreement remains in effect, all first year and renewal commissions shall be paid as they accrue; however, any such payments are subject to the schedule of commissions in effect at the date the first full premium is received by the Insurer; the provisions and rules of the Insurer regarding minimum first year and renewal commissions required to issue a check.

B. During any consecutive 12-month period following the termination of this Agreement, total renewal commissions are less than the minimum required by the Insurer, vesting automatically terminates and no additional commission payments will be due from the Insurer.

C. In the event this Agreement is terminated by the death of the REPRESENTATIVE, all first year and renewal commissions shall be paid as they accrue, subject only to the terms and conditions of paragraphs A and B immediately above. In the absence of a properly executed beneficiary designation on file with the Insurer, all such payments, if any, shall be made to the surviving spouse and at the death of the surviving spouse to the estate of said spouse. If the REPRESENTATIVE dies leaving no surviving spouse, such monies will be paid to the estate of the REPRESENTATIVE; provided however, that if the REPRESENTATIVE is a corporation or a partnership, all such payments will be paid to said corporation or partnership.

## VII. GENERAL PROVISIONS

A. The Insurer may make such changes and decisions as it deems advisable in the conduct of its business, including the discontinuance of any policy form or the withdrawal from any territory, and the Insurer shall incur no liability to the REPRESENTATIVE by reason of its doing so.

B. The Insurer shall have the right to test market any of its products on a select basis and at the discretion of the Insurer.

C. The REPRESENTATIVE shall indemnify and hold the Insurer harmless against or from any and all expense, costs, causes of action, and damages including without limitation, reasonable attorney fees, resulting from or growing out of any unauthorized or negligent act of commission or omission by the REPRESENTATIVE or its employees, directors, officers, or Representatives under its jurisdiction. This provision shall survive termination of this Agreement.

D. The Insurer shall have a prior right and offset to all commissions and fees payable hereunder toward any indebtedness and/or other obligations due from the REPRESENTATIVE or anyone under the jurisdiction of the REPRESENTATIVE to any Primary Company and/or Affiliated Company/ies with interest at the legal rate. This prior right and offset shall not be extinguished by the termination of this Agreement. Following the termination of any Representative under the jurisdiction of the REPRESENTATIVE, should the amount in any commission account of that Representative be insufficient to repay any amount due the Insurer, the debit will become the responsibility of the REPRESENTATIVE, in accordance with the Insurer's then current debit collection procedure.

E. Neither the Agreement, any duties or delegation under this Agreement, nor the commissions or fees accruing hereunder, nor any interest herein, nor any right or claim created hereby or arising by reason of the REPRE-SENTATIVE acting hereunder, shall be assignable, except upon the written consent of the Insurer.

F. Forbearance or failure of the Insurer to insist upon performance of this Agreement or to enforce its rights hereunder, shall not constitute a waiver of its rights or privileges hereunder or of its subsequent right to insist upon such performance.

G. This Agreement, including the Appointment Application and any Commission Schedule(s) incorporated as part of the Agreement, contains all promises, inducements and representations between the parties. This Agreement supersedes any and all previous Agreements between the parties herein pertaining to the solicitation of the Insurer's products and the payment of monies to the REPRESENTATIVE provided, however, that rights or obligations which have already accrued (and would survive termination) under any previous contract between the Insurer and the REPRESENTATIVE shall not be hereby impaired.

H. The Insurer reserves the right to decline or modify any application for insurance.

I. This Agreement shall not be effective until executed by the Primary Company. Once this Agreement is effective with the Primary Company, it may become effective with Affiliated Company(ies) as described herein.

J. Should the REPRESENTATIVE, at any time, violate any provision of Section II of this Agreement, entitled Limitation of Authority, or commit any fraud upon Insurer or its policyholders; have a license as agent or broker revoked for cause after notice and hearing by a state insurance department or otherwise act to prejudice materially the interests of Insurer, the REPRESENTATIVE shall, at the option of the Insurer, forfeit any and all rights to all commissions and monies that the REPRESENTATIVE might otherwise have under this Agreement, vested or not. It is expressly agreed that termination of this Agreement shall not terminate this provision.

K. The REPRESENTATIVE agrees to maintain complete and accurate records of the marketing and sale of the Insurer's products. The Insurer reserves the right to inspect such records and other documents in each REPRESENTATIVE'S files that relate to the marketing, attempted sale or sale of the Insurer's products. If the Insurer chooses to inspect such records, it will endeavor to do so during normal business hours and after giving reasonable notice, unless, in the judgment of the Insurer, unusual circumstances require inspection at other times or inspection without prior notice. This provision shall survive termination of this Agreement for a period of two (2) years.

L. For as long as this Agreement is in force, the REPRESENTATIVE will maintain Errors and Omissions (E&O) coverage and will provide the Insurer annually proof of such E&O coverage in a manner acceptable to the Insurer.

M. If the REPRESENTATIVE is served with a regulatory inquiry or legal papers involving Insurer business, the REPRE-SENTATIVE shall immediately notify the Insurer by sending to that Insurer's Compliance Officer, a copy of the papers, served by overnight delivery, by the end of the business day next following the day of receipt by the REPRESENTATIVE.

N. The REPRESENTATIVE is responsible for assuring that any Representative under the Jurisdiction of the REPRESEN-TATIVE: (1) become fully informed as to the provisions and benefits of each product offered by the Insurer for which the Representative conducts Insurer business; (2) represent such products adequately and fairly to prospective purchasers; and (3) act in compliance with the Insurer's policies and procedures as set out in the Customer Service and  Compliance Manual, Operations Manual, or otherwise communicated to the REPRESENTATIVE, including, without limitation, those regarding suitability of sales inquiries and compliance with the Insurer's principles and code of ethical market conduct.

O. When the Insurer assigns to the REPRESENTATIVE any agency not recruited by the REPRESENTATIVE, then the Insurer may reassign that agency to another upline of the Insurer's choice at any time and without the necessity of a release from the REPRESENTATIVE. If the Insurer wishes to remove any agency recruited by the REPRESENTATIVE from the Jurisdiction of the REPRESENTATIVE, the Insurer will negotiate a release; however, such release will not be unreasonably withheld by the REPRESENTATIVE.

P. REPRESENTATIVE is not entitled to participate in any REPRESENTATIVE benefit programs except those which are provided by the Primary Company. REPRESENTATIVE is not eligible to participate in, or to receive any benefits from, any programs provided by the Affiliate Company/ies.

Q. Disputes arising under this Agreement shall be  subject to the laws of the state where the Insurer engaged in the dispute is located.

R. The area within which the REPRESENTATIVE shall have the right to represent the Insurer is not assigned exclusively to the REPRESENTATIVE.

S. REPRESENTATIVE agrees to conform to all regulations of the Insurance Department and the Insurance laws in the state(s) in which the REPRESENTATIVE is conducting Insurer's business.

T. REPRESENTATIVE understands and agrees that (i) the Primary Company may amend the Agreement or the Company's policies, rules and procedures, in order to comply with changes in laws or regulations, or, as the Company deems appropriate related to changes in laws or regulations, through communication of any such amendment to REPRESENTATIVE, and (ii) For purposes of any such amendment, communication may include, but not be limited to, posting of amendment information on the Primary Company's websites or other means of making such information known or available to the agent.

## VIII. TERMINATION

A. This Agreement shall automatically terminate upon the death of REPRESENTATIVE if REPRESENTATIVE is an individual or upon dissolution of REPRESENTATIVE if REPRESENTATIVE is a corporation or a partnership.

B. This Agreement shall terminate upon the revocation or non-renewal of the REPRESENTATIVE's license.

C. This Agreement may be terminated with or without cause by any Insurer (subject to provisions D and E below) or the REPRESENTATIVE by sending written notice of such termination to the last known address of the other party.

AGL / BECHTEL  000062

D. Upon termination, the REPRESENTATIVE shall immediately pay in cash to the Insurer all sums that are due or become due hereunder and shall immediately deliver to the Insurer all materials connected with the business of the Insurer and belonging to the Insurer. Such materials include, but are not limited to, rate cards, letters, records, computer software, general supplies or any and all other indications of agency provided by the Insurer. It is expressly agreed that termination of this Agreement does not release the REPRESENTATIVE from continuing liability to the Insurer for immediate repayment of any and all unearned first year commissions or bonuses.

E. Termination of this Agreement by the Primary Company terminates all contracts with Affiliated Company/ies without specific notice to the REPRESENTATIVE required by the Insurer. However, any Affiliated Company may terminate its agency relationship with the REPRESENTATIVE, which will not, of itself, terminate the Primary Company agency relationship. Upon termination, the Insurer may assign a servicing agency; however, such assignment will not of itself affect the vesting of existing business.

F. Termination of this Agreement automatically terminates any previous Agreement to represent the Insurer that terminated the Agreement.

## IX. AMENDMENT

This contract cannot be changed by any oral promise or statement and no written modification will bind the Insurer unless approved by the President of the Insurer making the modification.

## X. PERSONAL GUARANTEE

Each and every individual who signs this Agreement warrants that they have authority to bind the entity on whose behalf they are signing.

## XI. EFFECTIVE DATE

The agreed effective date will be the date that this Agreement to represent is signed and acknowledged by the Primary Company as hereinafter specified.

## XII. INVESTIGATION NOTICE

The undersigned hereby authorizes the Primary and Affiliated Company/ies to conduct an investigation concerning character, credit reputation and personal traits and releases those contacted and the Insurer from any liability with respect to the content of the information provided and any resulting action by the Insurer including the sharing of such information or the termination of this Agreement to represent.

## XIII. FEDERAL CRIME CONTROL ACT

A. Undersigned warrants it:

1. has not been convicted of any criminal felony involving dishonesty or breach of trust or

2. has obtained written authorization to engage in the business of insurance from the Insurance Department in the state where REPRESENTATIVE resides which REPRESENTATIVE agrees to produce upon Insurer request.

B. The REPRESENTATIVE agrees to update the representations in the Confidential History/Background Information Section of Part 4 of the Appointment Application by notifying the Primary Company in writing within thirty (30) days, if there should be a change in the response to any question in the Information Section of Part 4 of the Appointment Application.

## XVI. PRIVACY CONTROL & SECURITY

A. "Protected Health Information" and "Nonpublic Personal Information" shall be collectively called the "Information" in this Section, XVI, Privacy Control and Security.

B. All Information which any party obtains as a result of this relationship shall not be collected, or used, disclosed, reused or redisclosed to any third party, except to carry out the purposes for which the Information was disclosed. The REPRESENTATIVE shall maintain the confidentiality of Information consistent with the Company's notices of privacy practices, policies and procedures, provided that such use or disclosure would not violate any applicable laws, rules or regulations if done by the Company.

C. The REPRESENTATIVE shall use commercially reasonable efforts and appropriate safeguards to maintain the integrity, confidentiality, and security of PHI and to prevent the unauthorized use or disclosure of PHI and to

AGL / BECHTEL  000063

comply with the security standards or the HIPAA security regulations. Upon Company request Agent will provide to the Company access to and documentation regarding any safeguards.

D.   Each party shall be permitted to disclose relevant aspects of the other parties' Information to its officers, agents, subcontractors and employees only to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under the Agreement; provided that such party shall take all reasonable measures to ensure that the Information of another party is not disclosed or reproduced in contravention of each of the obligations of this Agreement by such party's officers, agents, subcontractors and employees. The obligations of this Agreement are personal to each party.

E.   The REPRESENTATIVE shall report promptly within seven (7) days to the Company's Privacy Officer in writing any use or disclosure of Information that is not permitted by the Agreement or any addendum, of which the REPRESENTATIVE becomes aware. REPRESENTATIVE'S report shall identify: (i) the nature of the unauthorized use or disclosure, (ii) the Information used or disclosed, (iii) who made the unauthorized use or received the unauthorized disclosure, (iv) what REPRESENTATIVE has done or shall do to mitigate any deleterious effect of the unauthorized use or disclosure, (v) what corrective action REPRESENTATIVE has taken or shall take to prevent future similar unauthorized use or disclosure, and (vi) any other Information as reasonably requested by the Company's Privacy Officer.

F.   The REPRESENTATIVE shall require all of its employees, representatives, subcontractors or agents that receive or have access to Information to agree to adhere to the same restrictions and conditions on the use and/or disclosure of Information that apply herein, including the obligation to return or destroy the Information as provided for below.

G.   The obligations in this Agreement shall not restrict any disclosure by any party pursuant to any applicable state or federal laws, or by request or order of any court or government agency. The REPRESENTATIVE shall immediately notify Company upon receipt by the REPRESENTATIVE of any request from the Department of Health and Human Services for the REPRESENTATIVE'S internal practices, books, and records relating to the use and disclosure of Information.

H.   Within ten (10) days of receiving a written request from Company, the REPRESENTATIVE shall provide to the Company such Information as is requested by the Company, if any, to permit the Company to respond to a request by an individual for access to, an amendment of, or an accounting of the disclosures of the individual's PHI in accordance with 45 C.F.R. Secs. 164.524, 164.526, and 164.528. If an individual contacts the REPRESENTATIVE directly about access to, amendment of, or an accounting of disclosures of his/her PHI, the REPRESENTATIVE will forward such request immediately to the Company and not provide such access, amendment, or disclosure. Notwithstanding anything herein to the contrary, REPRESENTATIVE shall make reasonable efforts to cooperate with the Company in responding to any such requests and enabling the Company to comply with federal laws and regulations regarding the timing of response to such requests.

I.   This Section XVI, Privacy Protection and Security, will survive the termination or expiration of this Agreement. Upon termination of the Agreement, the REPRESENTATIVE shall return or destroy (with the Company's written permission) all Information that REPRESENTATIVE maintains in any form pursuant to the Agreement, and retain no copies of such Information. However, if the Company determines that such return or destruction is not feasible, REPRESENTATIVE will continue to extend the protections of this Addendum to such PHI and limit further use of the Information to the purposes that make the return or destruction not feasible. The respective rights and obligations of each party pursuant to this subsection shall survive the termination of the Agreement.

AGL01056-1105