# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO. 8:15-CV-00192-EAK-AEP |
| KEVIN H. BECHTEL and LIFE BROKERAGE PARTNERS, LLC, | : : : | |
| Defendants. | : | |

## AFFIDAVIT OF JALEN V. LOHMAN

STATE OF TEXAS

COUNTY OF HARRIS

Before me, the undersigned authority, personally appeared Jalen V. Lohman, who being deposed under oath, says as follows:

1.     My name is Jalen V. Lohman. I am Vice President of Licensing and Compensation for American General Life Insurance Company ("American General").   I am a resident of the State of Texas and am over 18 years of age. The following is based upon my personal knowledge and knowledge obtained in my capacity as corporate representative.

2.     Like many life insurance companies, American General uses independent agents to solicit applications for insurance.   Typically, American

1

General enters into an agency agreement with an individual or entity who operates as a general agent or broker general agent. General agents or broker general agents recruit subagents to solicit applications directly from the public. The resulting linear relationship is sometimes referred to as a "hierarchy." The subagents below a general agent are sometimes referred to as "downline" agents while a general agent above a subagent is sometimes referred to as an "upline" agent.

3. For administrative purposes, each agent and/or general agent is assigned a personalized identifier referred to as an agency number or agency code.

4. When an application is submitted and results in the issuance of a policy, American General will pay a commission to the subagent and to the general agent. Renewal commissions may also be paid on future premiums received for the same policy. Commission rates and whether renewal commissions are paid vary significantly from agent to agent and product to product.

5. Kevin H. Bechtel ("Bechtel") was appointed as a representative of American General on February 24, 2003. A true and correct copy of the Agency Agreement is attached as Exhibit A. At that time, Bechtel was assigned an agent code of OWD11.

6. On or about March 1, 2007, American General entered into a new Agency Agreement with Bechtel to recognize the recent creation of Bechtel's entity, Life Brokerage Partners, LLC ("LBP"). A copy of the signature page along

with a specimen copy of the terms of the 2007 Agency Agreement with LBP are attached as Exhibit B.[1]

7.     At the time the 2007 Agency Agreement was entered into with LBP, American General agreed to an assignment of commission request made by Bechtel whereby Bechtel assigned to LBP his right to receive commission payments he earned.  *See* Assignment of Commissions, attached as Exhibit C.  In essence, Bechtel requested that all of his commissions be paid to LBP rather than to him.

8.     After contracting with American General, LBP was assigned an agency code of 3P263 and Bechtel was assigned a new agency code of 3P264.

9.     On or about April 27, 2007, American General also agreed to a request that American General recognize Stephen Wechsler ("Wechsler") as a subagent of LBP.  *See* Exhibit D.  This classification had the effect of making Wechsler a "downline" agent of LBP and placing him "under the jurisdiction" or hierarchy of LBP for purposes of the Agency Agreement.  Wechsler had an existing contract with American General entered into in 2006 and was assigned an

---

[1] It was commonplace in 2007 for American General to only retain an electronic copy of the signature page for agency agreements.  The signature page attached as Exhibit B references a form number   (AGLB 1056-1105) in the bottom right hand corner.  This form number corresponds with the contractual terms found in the specimen copy of the agency agreement made part of Exhibit B.  Together, they accurately reflect the terms and conditions of the agency agreement entered into between American General and LBP in 2007.

agency code of 3SV36. *See* Wechsler Agency Contract, attached as Exhibit E hereto.

10. On or about August 3, 2007, American General issued policy numbers UM0044158L and UM0044159L on the life of Michael Sasoni ("Sasoni"). The commissions paid pursuant to the sale of the Sasoni Policies were split between Wechsler and Bechtel on a 65-35% split with Wechsler receiving the larger share. *See* Application for Sasoni Policies at page 5, attached as Exhibit F hereto.

11. The 35% share of commissions was generated by Bechtel's individual agent code of 3P264 but paid to LBP pursuant to the Assignment of Commissions. The sale of the Sasoni Policies also resulted in bonus commissions paid to LBP.

12. From August 3, 2007 through October 20, 2009, American General received a total of $684,000 in premium payments for each of the Sasoni Policies for a total of $1,368,000. *See* Premium History, attached as Exhibit H hereto.

13. In total, from October 2007 through October 2009, Wechsler received $252,506.80 in commission payments on each of the Sasoni policies for a total amount of $505,013.60. *See* Debt Summary at p. 2, attached as Exhibit I.

14. Similarly, from October 2007 through October 2009, Bechtel / LBP received $293,977.20 in regular and bonus commission payments on each of the Sasoni policies for a total amount of $587,994.40. *Id.*

15.     On October 15, 2008, American General terminated its Agency Agreement with Bechtel and LBP.

16.     On November 4, 2009, American General terminated its Agency Agreement with Wecshler.

17.     On December 21, 2009, the owners of the Sasoni Policies, along with Bechtel and LBP, filed a lawsuit in the District Court of Delaware seeking a declaration that the Sasoni Policies were valid and enforceable.[2]  *See* Complaint, Attached as Exhibit J hereto.   American General filed an answer and counterclaim seeking a judicial finding that the Policies were void at their inception.  *See* Answer and Counterclaim, attached as Exhibit M hereto.

18.     On July 3, 2014, American General and the owners of the Sasoni Policies entered into a Rescission and Release Agreement whereby the Sasoni Policies would be rescinded an amount in excess of the premiums received would be paid to the owners.

19.     A total settlement amount of $2,175,000 was thereafter paid to the owners of the Sasoni Policies.  In September 2014, American General processed $1,368,000 of the total settlement amount  as a refund of premiums paid under the Sasoni Policies.   The settlement amount – which included a full refund of the

---

[2] On July 31, 2009, American General filed a lawsuit in the Circuit Court of Dade County, Florida against the owners of the Sasoni Policies and others (including Bechtel and LBP) challenging the validity of the policies. *See* Dade County Complaint, attached as Exhibit K.  That case was dismissed without prejudice in favor of the Delaware case. *See* Dismissal, attached as L.

$1,368,000.00 in premiums received for the Sasoni Policies, was processed as a premium refund in September 2014. On January 22, 2015, the court in Delaware issued a final order rescinding the Sasoni Policies. Order attached as Exhibit N hereto.

20. Pursuant to Section V (F) of the Agency Agreements, in the event that a policy of insurance is rescinded and premiums are returned, the agent / agency must immediately return any commissions paid pursuant to such policy. *See* Exhibits A and B at Section V(F).

21. Further, the Agency Agreements also make Bechtel and LBP responsible for the debts of their downline line agents. *See* Exhibits A and B at Section VII (D).

22. On November 10, 2010, Wechsler filed a petition for bankruptcy protection in the Southern District of New York. *See* Exhibit O. As a result of Wechsler's bankruptcy proceedings, commissions paid to him pursuant to the Sasoni Policies may not now be charged back following the rescission.

23. Wechsler was a downline agent under the LBP hierarchy. Because American General is unable to seek repayment from Wechsler, it "rolled" the debt owed by Wechsler to LBP pursuant to Section V(F) of the Agency Agreement.

24. On February 5, 2015, American General, through counsel, sent a letter demanding that Bechtel and or LBP immediately return all commissions paid to or earned by Wechsler, Bechtel and LBP for the Sasoni Policies. *See* Exhibit P.

25. As of this date, American General has applied $22,320.30 in renewal commissions payable to Bechtel and/or LBP to the amount owed to American General under the Agency Agreements. *See* Debt Summary, Exhibit I. Otherwise, no payments have been received by Bechtel or LBP for this debt.

**Further the affiant sayeth not.**

_____
Jalen V. Lohman

Sworn to and subscribed before me
this the _19_ day of January, 2016:


Notary Public

My Commission expires: _06-26-2016_

DEVON L. HENSON
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-26-2016

Case 8:15-cv-00002-AEP Document 48-1 Filed 02/04/16 Page 9 of 149 PageID 699



Case 8:15-cv-00102-AEP   Document 123-1   Filed 05/04/17   Page 10 of 148 PageID 4700

# EXHIBIT A

**(to Exhibit 1: Lohman Affidavit)**

3/12/0 8:01P  3  5:46PM   Life Brokerage Equity Group         No.6388  P. 9
50593300441P12 271m   FL10                                    No.3202  P. 9
505933004431

## AMERICAN GENERAL FINANCIAL GROUP

All American Life Insurance Company, Springfield, IL
American General Annuity Insurance Company, Amarillo, TX *
American General Life Insurance Company, Houston, TX
The Old Line Life Insurance Company of America, Milwaukee, WI

*American General Financial Group
is the marketing name for American General
Corporation and its subsidiaries*

### AGENCY AGREEMENT

*Each life insurance company's products are separately underwritten and independently supported by the representative company. The above-listed companies are members of the American General Financial Group.*

*American General Financial Group is the marketing name for American General Corporation and its subsidiaries. American General Corporation is not responsible for financial obligations of these corporations.*

FOR

Last Name  Bechtel          First Name  Kevin          Middle Initial  H

If Representative is a Corporation, the full Corporate name must appear above, and an authorized officer must sign and indicate the officer's title.

Individual
Social Security Number _____

Corporation
Tax Identification Number _____ REDACTED 2017 _____

Representative

Signature _____          Title  VP

Primary Company

The Old Line Life Insurance Company of America, Inc.

Contract Date  2-24-03
To be completed by Home Office

Home Office Authorized Signator

* This Agency Agreement may not be used to contract banks, credit unions or thrifts to American General Annuity Insurance Company and, if submitted for that purpose, will not be accepted. This Agency Agreement may not be used to replace an in force American General Annuity Insurance Company Agency Contract and, if submitted for that purpose, will not be accepted.

AGL-51856-0100

Received Time Jan 20  9:49PM

AGL / BECHTEL  000001

3/12/0 16:01P
506017 102675

TABLE OF CONTENTS


**Paragraph**

Recitals

Definitions

I.      Authorized Acts
II.     Limitation of Authority
III.    Advertising
IV.     Relationship
V.      Compensation
VI.     Vesting
VII.    General Provisions
VIII.   Termination
IX.     Amendment
X.      Personal Guarantee
XI.     Effective Date
XII.    Investigation Notice
XIII.   Federal Crime Control Act

**Schedules**

A. Commission Schedule – Primary Company

B. Appointment Application

AGL / BECHTEL  000002

3/12/0 16:01P
506017 102676

## RECITALS

Representative ("REPRESENTATIVE") has executed an Appointment Application requesting appointments with one or more life insurance subsidiaries of American General Corporation.

The Appointment Application designates one of the life insurers as a Primary Appointing Company (the "Primary Company").

This Agreement together with the Appointment Application and Commission Schedules for each separate life insurer that appoints REPRESENTATIVE comprise the REPRESENTATIVE's contract with each of the insurers that appoints REPRESENTATIVE.

Execution of this Agreement by the Primary Company and the REPRESENTATIVE evidences their agreement to transact business in accordance with the terms and conditions set forth in this Agreement.

If REPRESENTATIVE requested appointment with one or more affiliates of the Primary Company in the Appointment Application, or a subsequent amendment to that form, REPRESENTATIVE's execution of this Agreement evidences REPRESENTATIVE's agreement to transact business with each affiliated insurer in accordance with the terms and conditions set forth in this Agreement. Each affiliated insurer that appoints REPRESENTATIVE and sends a company commission schedule to REPRESENTATIVE has agreed to transact business with REPRESENTATIVE according to the terms and conditions of this agreement.

## DEFINITIONS

A. Primary Company – the Primary Company is designated in the Appointment Application as the Primary Company. The Primary Company's responsibilities include executing the REPRESENTATIVE Agreement, performing background checks and providing convention credits and other sales incentives, if any, to REPRESENTATIVE.

B. Affiliated Company – the Affiliated Company(ies) is any other life insurance subsidiary of American General Corporation that is identified in the Appointment Application, appoints REPRESENTATIVE and provides a company commission schedule as evidence of its agreement to transact business with REPRESENTATIVE according to the terms of this Agreement.

C. Insurer – the term Insurer as used in this Agreement refers to each of the life insurance companies that appoints REPRESENTATIVE, including the Primary Company.

D. Jurisdiction – Eligibility for, or receipt of, override compensation on another Representative's business.

## I. AUTHORIZED ACTS

A. The REPRESENTATIVE is authorized to conduct Insurer's business for the Insurer's products covering such classes of risks as the Insurer may authorize and in those states where the product is approved and REPRESENTATIVE is licensed and appointed as required by state law. If REPRESENTATIVE is a corporation, then the principal(s) of such corporation must also be licensed individually, if required pursuant to appropriate state law.

B. The REPRESENTATIVE is authorized to collect and promptly remit to the Insurer the first premium on business produced by the REPRESENTATIVE in accordance with the Insurer's rules and regulations.

C. The REPRESENTATIVE will promptly deliver issued policies in accordance with Insurer's policies and procedures.

D. All monies, settlements, or documents received by the REPRESENTATIVE for, or on behalf of, the Insurer shall be received by the REPRESENTATIVE in a fiduciary capacity and immediately paid over or delivered to the Insurer, except as may be otherwise directed in writing by the Insurer.

## II. LIMITATION OF AUTHORITY

The REPRESENTATIVE is without authority to perform any act or thing other than that expressly granted in this agreement and expressly agrees not to perform any of the following acts:

1. Make, modify, alter or discharge any policy.
2. Extend the time payment of any premium.
3. Waive any forfeiture.
4. Guarantee dividends or interest rates.
5. Incur any debt or liability in the name of the Insurer.
6. Withhold, commingle or convert to the use of the REPRESENTATIVE of the benefit of others, any monies, securities, policies or receipts belonging to the Insurer, the applicant, or the insured, or fail to promptly submit to the Insurer any applications for policies.
7. Accept or deposit any check or draft for premiums made payable to other than the Insurer.
8. Unless in the best financial interest of the policyowner, directly or indirectly induce or attempt to induce any policyowners of Insurer to relinquish, surrender, replace or lapse their policies.

## III. ADVERTISING / USE OF LOGO

REPRESENTATIVE may, at REPRESENTATIVE's expense, advertise Insurer's products, provided the text of all advertising, including any form of sales/promotional material such as, but not limited to: business cards, stationery or other indications of agency under this agreement and including the use of the name "American General," the American General logo or the name of any Insurer is approved in writing by the company before use.

## IV. RELATIONSHIP

The relationship between the Insurer and the REPRESENTATIVE shall be that of principal and independent contractor, and nothing contained herein shall be construed as creating the relationship of employer and employee for any purpose, including tax purposes. REPRESENTATIVE agrees to be responsible for all taxes as a self-employed independent contractor. The REPRESENTATIVE shall be free to exercise independent judgment as to the time and manner in which the REPRESENTATIVE shall perform the services authorized under this agreement. Any material supplied by the Insurer is for the purpose of supporting the activities of the REPRESENTATIVE.

3/12/0 13:01P
.506017 302677

## V. COMPENSATION

A. Subject to the provisions hereof and the rules of the Insurer, the full compensation of the REPRESENTATIVE shall be payable at the applicable rate set forth in the Schedule of Commission in effect at the date the first full premium is received by the Insurer, which Schedule of Commission and all amendments, supplements and replacements thereof and thereto are hereby made a part of this agreement.

B. Commission is subject to change at any time by written notice by the Insurer to the REPRESENTATIVE, but no such change shall affect commissions on any policy issued prior to the effective date of such change.

C. If commission rates are not now shown in the Schedule of Commission, including conversions, replacements or, the exercise of re-entry provisions or, if special premium rate quotations are made, commission rates shall be such as may be fixed by the Insurer as of the time when issue is effective in accordance with rates and practices of the Insurer then in effect.

D. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall lapse because of nonpayment of premium and shall be replaced or reinstated, any commissions on the new or reinstated policy shall be payable only at the sole discretion of the Insurer.

E. To be entitled to commissions, if any, the REPRESENTATIVE's name or the name of another Representative under your jurisdiction must appear as soliciting agent on the application for insurance. Disputes respecting commissions shall be subject to decision and settlement by the Insurer and the Insurer's decision shall be final and binding upon the parties involved.

F. Whenever, in the judgment of the Insurer, it shall become advisable to recall any policy issued before delivery thereof is made, the REPRESENTATIVE shall promptly refund to the Insurer any commissions received on account of such policy. Whenever, after delivery, the Insurer shall effect or procure the surrender, rescission or cancellation of any policy and refund premiums paid thereon, the Insurer shall have the right to charge back commissions and demand that the REPRESENTATIVE repay such commissions to the Insurer. If the Insurer shall refund or waive the premium or premiums under the provisions of any disability waiver of premium rider, the REPRESENTATIVE shall lose all rights to commission and persistency fees as applied to such refunded or waived premiums, and shall repay any amounts advanced. An Insurer may include in its Commission Schedule, which is incorporated as a part of this agreement, guidelines describing more specifically the circumstances under which it will charge back commissions on certain products. In the absence of such guidelines, the Insurer's rights shall be as described in this Section V. Compensation.

G. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall be converted or replaced, any commissions on the new policy shall be subject to adjustment and payable only at the sole discretion of the Insurer.

H. Except where prohibited by any State, the REPRESENTATIVE is responsible for all license fees, including those of its Representatives. The Insurer's discretion shall govern with respect to whether the Insurer shall charge to the REPRESENTATIVE's commission or other compensation account the cost of obtaining and renewing the REPRESENTATIVE's and its Representatives' license or licenses and/or appointment fees. This practice is subject to change at the discretion of the Insurer.

I. Policy applications for any Insurer will be issued and commissions paid by the Insurer.

## VI. VESTING

A. As long as this agreement remains in effect, all first year and renewal commissions shall be paid as they accrue; however, any such payments are subject to theschedule of commissions in effect at the date the first full premium is received by the Insurer, the provisions and rules of the Insurer regarding minimum first year and renewal commissions required to issue a check.

B. During any consecutive 12-month period following the termination of this agreement, total renewal commissions are less than the minimum required by the Insurer, vesting automatically terminates and no additional commission payments will be due from the Insurer.

C. In the event this agreement is terminated by the death of the REPRESENTATIVE, all first year and renewal commissions shall be paid as they accrue, subject only to the terms and conditions of paragraphs A and B immediately above. In the absence of a properly executed beneficiary designation on file with the Insurer, all such payments, if any, shall be made to the surviving spouse and at the death of the surviving spouse to the estate of said spouse. If the REPRESENTATIVE dies leaving no surviving spouse, such monies will be paid to the estate of the REPRESENTATIVE; provided however, that if the REPRESENTATIVE is a corporation or a partnership, all such payments will be paid to said corporation or partnership.

## VII. GENERAL PROVISIONS

A. The Insurer may make such changes and decisions as it deems advisable in the conduct of its business, including the discontinuance of any policy form or the withdrawal from any territory, and the Insurer shall incur no liability to the REPRESENTATIVE by reason of its doing so.

B. The Insurer shall have the right to test market any of its products on a select basis and at the discretion of the Insurer.

C. The REPRESENTATIVE shall, indemnify and hold the Insurer harmless against or from any and all expense, costs, causes of action, and damages including without limitation, reasonable attorney fees, resulting from or growing out of any unauthorized or negligent act of commission or omission by the REPRESENTATIVE or its employees, directors, officers, or Representatives under its jurisdiction. This provision shall survive termination of this agreement.

3/12/0 16:01P
506017 02678

D. The Insurer shall have a prior right and offset to all commissions and fees payable hereunder toward any indebtedness and/or other obligations due from the REPRESENTATIVE or anyone under the Jurisdiction of the REPRESENTATIVE to any Primary Company and/or Affiliated Company/ies with interest at the legal rate. This prior right and offset shall not be extinguished by the termination of this agreement. Following the termination of any Representative under the Jurisdiction of any REPRESENTATIVE, should the amount in any commission account of that Representative be insufficient to repay any amount due the Insurer, the debit will become the responsibility of the REPRESENTATIVE, in accordance with the Insurer's then current debit collection procedure.

E. Neither the agreement, any duties or delegation under this agreement, nor the commissions or fees accruing hereunder, nor any interest herein, nor any right or claim created hereby or arising by reason of the REPRESENTATIVE acting hereunder, shall be assignable, except upon the written consent of the Insurer.

F. Forbearance or failure of the Insurer to insist upon performance of this agreement or to enforce its rights hereunder, shall not constitute a waiver of its rights or privileges hereunder or of its subsequent right to insist upon such performance.

G. This agreement, including the Appointment Application and any Commission Schedule(s) incorporated as part of the Agreement, contains all promises, inducements and representations between the parties. This agreement supersedes any and all previous agreements between the parties herein pertaining to the solicitation of the Insurer's products and the payment of monies to the REPRESENTATIVE provided, however, that rights or obligations which have already accrued (and would survive termination) under any previous contract between the Insurer and the REPRESENTATIVE shall not be hereby impaired.

H. The Insurer reserves the right to decline or modify any application for insurance.

I. This agreement shall not be effective until executed by the Primary Company. Once this agreement is effective with the Primary Company, it may become effective with Affiliated Company/ies as described herein.

J. Should the REPRESENTATIVE, at any time, violate any provision of Section III of this agreement, entitled Limitation of Authority, or commit any fraud upon insurer or its policyholders; have a license as agent or broker revoked for cause after notice and hearing by a state insurance department or otherwise act to prejudice materially the interests of Insurer, the REPRESENTATIVE shall, at the option of the Insurer, forfeit any and all rights to all commissions and monies that the REPRESENTATIVE might otherwise have under this agreement, vested or not. It is expressly agreed that termination of this agreement shall not terminate this provision.

K. The REPRESENTATIVE agrees to maintain complete and accurate records of the marketing and sale of the Insurer's products. The Insurer reserves the right to inspect such records and other documents in each REPRESENTATIVE's files that relate to the marketing, attempted sale or sale of the Insurer's products. If the Insurer chooses to inspect such records, it will endeavor to do so during normal business hours and after giving reasonable notice, unless, in the judgment of the Insurer, unusual circumstances require inspection at other times or inspection without prior notice. This provision shall survive termination of this agreement for a period of two (2) years.

L. For as long as this agreement is in force, the REPRESENTATIVE will maintain Errors and Omissions (E&O) coverage and will provide the Insurer annually proof of such E&O coverage in a manner acceptable to the Insurer.

M. If the REPRESENTATIVE is served with a regulatory inquiry or legal papers involving Insurer business, the REPRESENTATIVE shall immediately notify the Insurer by sending to that Insurer's Compliance Officer, a copy of those papers, served by overnight delivery, by the end of the business day next following the day of receipt by the REPRESENTATIVE.

N. The REPRESENTATIVE is responsible for assuring that any Representative under the Jurisdiction of the REPRESENTATIVE: (1) become fully informed as to the provisions and benefits of each product offered by the Insurer for which the Representative conducts Insurer business; (2) represent such products adequately and fairly to prospective purchasers; and (3) act in compliance with the Insurer's policies and procedures as set out in the Customer Service and Compliance Manual, Operations Manual, or otherwise communicated to the REPRESENTATIVE, including, without limitation, those regarding suitability of sales inquiries and compliance with the Insurer's principles and code of ethical market conduct.

O. When the Insurer assigns to the REPRESENTATIVE any agency not recruited by the REPRESENTATIVE, then the Insurer may reassign that agency to another upline of the Insurer's choice at any time and without the necessity of a release from the REPRESENTATIVE. If the Insurer wishes to remove any agency recruited by the REPRESENTATIVE from the Jurisdiction of the REPRESENTATIVE, the Insurer will negotiate a release; however, such release will not be unreasonably withheld by the REPRESENTATIVE.

P. REPRESENTATIVE is not entitled to participate in any REPRESENTATIVE benefit programs except those which are provided by the Primary Company. REPRESENTATIVE is not eligible to participate in, or to receive any benefits from, any programs provided by the Affiliate Company/ies.

Q. Disputes arising under this Agreement shall be subject to the laws of the state where the Insurer engaged in the dispute is located.

R. The area within which the REPRESENTATIVE shall have the right to represent the Insurer is not assigned exclusively to the REPRESENTATIVE.

S. REPRESENTATIVE agrees to conform to all regulations of the Insurance Department and the insurance laws in the state(s) in which the REPRESENTATIVE is conducting Insurer's business.

AGL / BECHTEL  000005

3/12/0 16:01P

506017 102679

## VIII. TERMINATION

A. This agreement shall automatically terminate upon the death of REPRESENTATIVE if REPRESENTATIVE is an individual or upon dissolution of REPRESENTATIVE if REPRESENTATIVE is a corporation or a partnership.

B. This agreement shall terminate upon the revocation or non-renewal of the REPRESENTATIVE's license.

C. This agreement may be terminated with or without cause by any Insurer (subject to provisions D and E below) or the REPRESENTATIVE by sending written notice of such termination to the last known address of the other party.

D. Upon termination, the REPRESENTATIVE shall immediately pay in cash to the Insurer all sums that are due or become due hereunder and shall immediately deliver to the Insurer all materials connected with the business of the Insurer and belonging to the Insurer. Such materials include, but are not limited to, rate cards, letters, records, computer software, general supplies or any and all other indications of agency provided by the Insurer. It is expressly agreed that termination of this agreement does not release the REPRESENTATIVE from continuing liability to the Insurer for immediate repayment of any and all unearned first year commissions or bonuses.

E. Termination of this agreement by the Primary Company terminates all contracts with Affiliated Company/ies without specific notice to the Insurer. However, any Affiliated Company may terminate its agency relationship with the REPRESENTATIVE, which will not, of itself, terminate the Primary Company agency relationship. Upon termination, the Insurer may assign a servicing agency; however, such assignment will not of itself affect the vesting of existing business.

F. Termination of this agreement automatically terminates any previous agreement to represent the Insurer that terminated the Agreement.

## IX. AMENDMENT

This contract cannot be changed by any oral promise or statement and no written modification will bind the Insurer unless approved by the President of the Insurer making the modification.

## X. PERSONAL GUARANTEE

Each and every individual who signs this agreement warrants that they have authority to bind the entity on whose behalf they are signing.

## XI. EFFECTIVE DATE

The agreed effective date will be the date that this agreement to represent is signed and acknowledged by the Primary Company as hereinafter specified.

## XII. INVESTIGATION NOTICE

The undersigned hereby authorizes the Primary and Affiliated Company/ies to conduct an investigation concerning character, credit reputation and personal traits and releases those contacted and the Insurer from any liability with respect to the content of the information provided and any resulting action by the Insurer including the sharing of such information or the termination of this agreement to represent.

## XIII. FEDERAL CRIME CONTROL ACT

A. Undersigned warrants it:

1. has not been convicted of any criminal felony involving dishonesty or breach of trust or

2. has obtained written authorization to engage in the business of insurance from the Insurance Department in the state where REPRESENTATIVE resides which REPRESENTATIVE agrees to produce upon Insurer request.

B. The REPRESENTATIVE agrees to update the representations in the Confidential History/Background Information Section of Part 4 of the Appointment Application by notifying the Primary Company in writing within thirty (30) days, if there should be a change in the response to any question in the Information Section of Part 4 of the Appointment Application.

AGL81056-0100

3/12/20 15:03P  ----39AM ----Life Brokerage Equity Group----  No.6874  P. 002

**AIG** AMERICAN GENERAL

**Assignment of Agent Contract**

☑ American General Life Insurance Company (AGL)
☑ The Old Line Life Insurance Company (OLL)
Members of American International Group, Inc.

For value received, _Kevin Bechtel_ an agent under the AGFG Agency Agreement (or its successor as defined by the company) with the primary company named in the CONSENT TO ASSIGNMENT below ("American General Life" / "Old Line Life") and hereinafter called Assignor, assigns Assignor's Agent Contract ("Contract") for INSURER AIG Annuity Insurance Company, formerly known as American General Annuity Insurance Company, in its entirety to _Life Brokerage Equity Group_ Hereinafter called Assignee. This Assignment removes from Assignor any and all rights, privileges, duties, and obligations under the Contract and places them with Assignee as if the Contract had been originally executed by Assignee. It is expressly understood among the parties to this Assignment that American General Life / Old Line Life reserves the right to offset any indebtedness now or in the future owed to it by Assignee against amounts payable to Assignee under the Primary Contract.

Assignee, under the terms of this Assignment, has received full power and authority, for Assignee's own benefit and conduct of business, all rights, privileges, duties and obligations as full as if Assignee were the original party to the Contract; provided, however, that no transfer of Assignee's rights hereunder, whether voluntary, involuntary, or by operation of law, shall be binding upon American General Life/Old Line Life until actual written notice of such transfer has been received by it.

Executed this _24th_ day of _February_

_____  Witness _____
Assignor

**ASSIGNEE AGREEMENT**

Assignee has received the assignment of the Agent Contract ("Contract") executed between Assignor and the Primary Company in the CONSENT TO ASSIGNMENT below ("American General Life" / "Old Line Life") in exchange for the AGL's / OLL's consent to the assignment.

Assignee is the holder of all rights, privileges, duties, and obligations under the Contract. All commissions payable under the Agreement after the effective date of this Assignment shall be paid to Assignee and will be reported under Tax Identification Number REDACTED 2014_____ pursuant to Assignee's instructions.

Executed this _24th_ day of _February_

_____  _Life Brokerage Equity Group_  _President_
Assignee Signature     Name _Gary A. Richardson_     Title

**CONSENT TO ASSIGNMENT**

American General Life/Old Line Life hereby consents to the foregoing assignment, subject to the terms, provisions, and conditions above stated or referred to.

Executed this _24th_ day of _FEBRUARY_ , _2003_

☐ AMERICAN GENERAL LIFE INSURANCE COMPANY    ☑ OLD LINE LIFE INSURANCE COMPANY

_R A Holler_
Signature _____  Name _____  Title _____
AGL 7002.03

Received Time Feb 24  3:13PM

AGL / BECHTEL  000007



3/12/0 16:01P
5060.17 302681

Effective December 2002
# SCHEDULE OF COMMISSIONS



AIG Life Brokerage

*Distributing products issued by:*
The Old Line Life Insurance Company of America,
American General Life Insurance Company and
AIG Annuity Insurance Company.

*Old Line Life*
*First-Year Base Commissions[1] (Schedule A)*

| Brokerage Old Line Life | | Base |
|---|---|---|
| LTG Ultra/30 (2) | Level Term | 100.00 |
| LTG Ultra/20 (2) | Level Term | 100.00 |
| LTG Ultra/15 (2) | Level Term | 90.00 |
| LTG Ultra/10 (2) | Level Term | 70.00 |
| LTG Ultra-C/30 | Level Term | 100.00 |
| LTG Ultra-C/20 | Level Term | 100.00 |
| LTG Ultra-C/15 | Level Term | 90.00 |
| LTG Ultra-C/10 | Level Term | 70.00 |
| ROP Term 30 | Level Term | 90.00 |
| ROP Term 20 | Level Term | 90.00 |
| ROP Term 15 | Level Term | 90.00 |
| AG Classic + | UL | 90.00 |
| Universal Elite Plus | UL | 90.00 |
| AG Prime Survivor + | 2nd/Die UL | 75.00 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice.

(1) Table ratings are fully commissionable. Flat extra charges of less than 10 years are non-commissionable.
(2) No first-year, renewal or bonus paid on policy fee.

©2002 American International Group, Inc.

AGL80100A-1202

AGL / BECHTEL 000008



3/12/0 16:01P
506017 02682

Effective December 2002

# SCHEDULE OF COMMISSIONS

*American General Life (Schedule A)*
*First-Year Base Commissions*(1)



AIG Life Brokerage

*Distributing products issued by:*
*The Old Line Life Insurance Company of America,*
*American General Life Insurance Company and AIG*
*Annuity Insurance Company.*

| Brokerage AGL | | Base |
|---|---|---|
| Elite Universal Life | UL | 85 |
| Elite G Universal Life | UL | 85 |
| Elite Survivor G | 2nd/Die UL | 75 |
| Elite Survivor (coming 1/03) | 2nd/Die UL | 75 |
| Platinum Income Annuity | SPIA | 3.00 |
| **Supplemental Products** | | **Base** |
| Platinum Provider Ultra | UL | 70 |
| Platinum Provider Ultra G | UL | 70 |
| Platinum Accumulator (2) | UL | 60 |
| Platinum Survivor Ultra (3) | 2nd/Die UL | 65 |
| Platinum Survivor Ultra G (3) | 2nd/Die UL | 65 |
| Platinum Provider Ultra 500 | EIUL | 70 |
| Platinum Accumulator 500 (2) | EIUL | 60 |
| Platinum Survivor Ultra 500 (3) | 2nd/Die EIUL | 65 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice.

(1) AGL pays no commission on aviation extra, premiums or any temporary extra premiums of seven years duration or less. For table ratings above Table 6, first year commissions are paid on the basis of Table 6 premiums.
(2) Platinum Accumulator and Accumulator 500 UL commissions reduced by 1% for each year of issue age above 65.
(3) With one uninsurable life commissions for Platinum Survivor and Platinum Survivor 500 will reduce.

©2002 American International Group, Inc.

AGSAGL085-1202

AGL / BECHTEL  000009

3/12/0 16:01P
506017 02683

**Effective December 2002**

# SCHEDULE OF COMMISSIONS

 **AIG** AMERICAN GENERAL

AIG Life Brokerage

*Distributing products issued by:*
The Old Line Life Insurance Company of America,
American General Life Insurance Company and
AIG Annuity Insurance Company.

*Old Line Life*
*Renewals and Excess Over Target*
*(Schedule D)*

| Old Line Life | | Renewal | Excess |
|---|---|---|---|
| All LTG Ultra   (1) (2) | Level Term | 0.00 | - |
| All LTG Ultra-C (2) | Level Term | 0.00 | - |
| ROP Term 30 | Level Term | 1.00 | - |
| ROP Term 20 | Level Term | 1.00 | - |
| ROP Term 15 | Level Term | 1.00 | - |
| AG Classic + | UL | 1.50 | 1.50 |
| Universal Elite Plus | UL | 1.50 | 3.00 |
| AG Prime Survivor + | 2nd/Die UL | 1.50 | 1.50 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice.

(1) No first-year base, renewal or bonus paid on policy fee.
(2) Renewals only; Excess does not apply.

©2002 American International Group, Inc.

AGLB02000-1202

AGL / BECHTEL  000010



3/12/0 16:01P
506017 102684

**Effective December 2002**

# SCHEDULE OF COMMISSIONS

*American General Life (Schedule D)*
*Excess over Target*
*and Renewals*[1]



AIG Life Brokerage

*Distributing products issued by:*
The Old Line Life Insurance Company of America,
American General Life Insurance Company and
AIG Annuity Insurance Company.

| American General Life | | Excess | Renewals |
|---|---|---|---|
| Elite | UL | 1.00 | 1.00 |
| Elite G | UL | 1.00 | 1.00 |
| Elite Survivor G | 2nd/Die UL | 1.00 | 1.00 |
| Elite Survivor (coming 1/03) | 2nd/Die UL | 1.00 | 1.00 |
| Platinum Provider Ultra | UL | 1.00 | 1.00 |
| Platinum Provider Ultra G | UL | 1.00 | 1.00 |
| Platinum Accumulator | UL | 1.00 | 1.00 |
| Platinum Survivor Ultra | 2nd/Die UL | 1.00 | 1.00 |
| Platinum Survivor Ultra G | 2nd/Die UI | 1.00 | 1.00 |
| Platinum Provider Ultra 500 | EIUL | 1.00 | 1.00 |
| Platinum Accumulator 500 | EIUL | 1.00 | 1.00 |
| Platinum Survivor Ultra 500 | 2nd/Die EIUL | 1.00 | 1.00 |

This schedule of commissions is a supplement to the Agency Agreement and its terms and conditions.
This schedule is subject to change at any time by written notice. Unless otherwise noted, renewals are years 2-10 with
service fees beginning in year 11.

(1) AGL pays no commission on aviation extra premiums or any temporary extra premiums of seven years duration or less.
For table ratings above Table 6, first year commissions are paid on the basis of Table 6 premiums.

©2002 American International Group, Inc.

AIGLB2000-1202

# EXHIBIT B

**(to Exhibit 1: Lohman Affidavit)**

04/24/2007 16:17 0695138 7913

## AGENCY AGREEMENT

Each life insurance company's products are separately underwritten and independently supported by the representative company. The below listed companies are members of the American International Group, Inc.

Life Brokerage Partners LLC

FOR

Last Name _Bechtel_        First Name _Kevin_        Middle Initial _H_

If Representative is a Corporation, the full Corporate name must appear above, and an authorized officer must sign and indicate the officer's title.

Individual
Social Security Number **REDACTED**

Corporation
Tax Identification Number _REDACTED4089_

Representative

Signature _____        Title _Owner_

American General Life Companies

Contract Date _____
To be completed by Home Office        ____Home Office Authorized Signator____

American General Life Insurance Company, Houston, TX
AGL81056-1105        A division of the American International Companies.®

**WE KNOW LIFE.®**



AIG | **AMERICAN GENERAL**

AIG Life Brokerage

AGL / BECHTEL  000057

**TABLE OF CONTENTS**

**Paragraph**
Recitals
Definitions

I.      Authorized Acts
II.     Limitation of Authority
III.    Advertising
IV.     Relationship
V.      Compensation
VI.     Vesting
VII.    General Provisions
VIII.   Termination
IX.     Amendment
X.      Personal Guarantee
XI.     Effective Date
XII.    Investigation Notice
XIII.   Federal Crime Control Act
XIV.    Confidentiality

**Schedules**

A. Commission Schedule – Primary Company

B. Appointment Application

AGL / BECHTEL 000058

## RECITALS

Representative ("REPRESENTATIVE") has executed an Appointment Application requesting appointments with one or more life insurance subsidiaries of American International Group, Inc.

The Appointment Application designates one of the life insurers as a Primary Appointing Company (the "Primary Company").

This Agreement together with the Appointment Application and Commission Schedules for each separate life insurer that appoints REPRESENTATIVE comprise the REPRESENTATIVE's contract with each of the Insurers that appoints REPRESENTATIVE.

Execution of this Agreement by the Primary Company and the REPRESENTATIVE evidences their Agreement to transact business in accordance with the terms and conditions set forth in this Agreement.

If REPRESENTATIVE requested appointment with one or more affiliates of the Primary Company in the Appointment Application, or a subsequent amendment to that form, REPRESENTATIVE's execution of this Agreement evidences REPRESENTATIVE's Agreement to transact business with each affiliated Insurer in accordance with the terms and conditions set forth in this Agreement. Each affiliated Insurer that appoints REPRESENTATIVE and sends a company commission schedule to REPRESENTATIVE has agreed to transact business with REPRESENTATIVE according to the terms and conditions of this Agreement.

## DEFINITIONS

A. **Primary Company** – the Primary Company is designated in the Appointment Application as the Primary Company. The Primary Company's responsibilities include executing the REPRESENTATIVE Agreement, performing background checks and providing convention credits and other sales incentives, if any, to REPRESENTATIVE.

B. **Affiliated Company** – the Affiliated Company(ies) is any other life insurance subsidiary of American International Group, Inc. that is identified in the Appointment Application, appoints REPRESENTATIVE and provides a company commission schedule as evidence of its Agreement to transact business with REPRESENTATIVE according to the terms of this Agreement.

C. **Insurer** – the term Insurer as used in this Agreement refers to each of the life insurance companies that appoints REPRESENTATIVE, including the Primary Company.

D. **Jurisdiction** – Eligibility for, or receipt of, override compensation on another Representative's business.

E. **Nonpublic Personal Information:** "Nonpublic Personal Information" of customers or consumers ("NPI") includes, but is not limited to, names, addresses, account balances, account numbers, account activity, social security numbers, taxpayer identification numbers, and sensitive financial and health information. NPI includes information on each party's forms or in a database of any kind, information created by each party, information collected by or on behalf of a party, and personally identifiable information derived from NPI. Reference to NPI of Company or REPRESENTATIVE shall include NPI collected by or on behalf of American International Group, Inc., its successors, subsidiaries, affiliates agents or contractors. There may be instances where each party will have the same NPI which may be subject to different privacy policies and procedures according to the notices provided to the customer or consumer by the respective parties to the Agreement.

F. **Protected Health Information:** The terms "Protected Health Information" and "PHI" shall have the meaning set forth in 45 C.F.R. Sec. 164.501 as may be amended. Other terms shall have the same meanings as set forth in the applicable definition of the Health Insurance Portability and Accessibility Act (HIPAA), as amended, Privacy Rule or other regulations.

## I. AUTHORIZED ACTS

A. The REPRESENTATIVE is authorized to conduct Insurer's business for the Insurer's products covering such classes of risks as the Insurer may authorize and in those states where the product is approved and REPRESENTATIVE is licensed and appointed as required by state law. If REPRESENTATIVE is a corporation, then the principal(s) of such corporation must also be licensed individually, if required pursuant to appropriate state law.

B. The REPRESENTATIVE is authorized to collect and promptly remit to the Insurer the first premium on business produced by the REPRESENTATIVE in accordance with the Insurer's rules and regulations.

C. The REPRESENTATIVE will promptly deliver issued policies in accordance with Insurer's policies and procedures.

D. All monies, settlements, or documents received by the REPRESENTATIVE for, or on behalf of, the Insurer shall be received by the REPRESENTATIVE in a fiduciary capacity and immediately paid over or delivered to the Insurer, except as may be otherwise directed in writing by the Insurer.

AGL / BECHTEL  000059

## II. LIMITATION OF AUTHORITY

The REPRESENTATIVE is without authority to perform any act or thing other than that expressly granted in this Agreement and expressly agrees not to perform any of the following acts:

1. Make, modify, alter or discharge any policy.
2. Extend the time payment of any premium.
3. Waive any forfeiture.
4. Guarantee dividends or interest rates.
5. Incur any debt or liability in the name of the Insurer.
6. Withhold, commingle or convert to the use of the REPRESENTATIVE or the benefit of others, any monies, securities, policies or receipts belonging to the Insurer, the applicant, or the insured, or fail to promptly submit to the Insurer any applications for policies.
7. Accept or deposit any check or draft for premiums made payable to other than the Insurer.
8. Unless in the best interest of the policyowner, directly or indirectly induce or attempt to induce any policyowners of Insurer to relinquish, surrender, replace or lapse their policies.

## III. ADVERTISING / USE OF LOGO

REPRESENTATIVE may, at REPRESENTATIVE's expense, advertise Insurer's products, provided the text of all advertising, including any form of sales/promotional material such as, but not limited to business cards, stationery or other indications of agency under this Agreement and including the use of the names "American International Group, Inc.," "AIG," "American General," their logos or the name of any insurer is approved in writing by the company before use.

## IV. RELATIONSHIP

The relationship between the Insurer and the REPRESENTATIVE shall be that of principal and independent contractor, and nothing contained herein shall be construed as creating the relationship of employer and employee for any purpose, including tax purposes. REPRESENTATIVE agrees to be responsible for all taxes as a self-employed independent contractor. The REPRESENTATIVE shall be free to exercise independent judgment as to the time and manner in which the REPRESENTATIVE shall perform the services authorized under this Agreement. Any material supplied by the Insurer is for the purpose of supporting the activities of the REPRESENTATIVE.

## V. COMPENSATION

A. Subject to the provisions hereof and the rules of the Insurer, the full compensation of the REPRESENTATIVE shall be payable at the applicable rate set forth in the Schedule of Commission in effect at the date the first full premium is received by the Insurer, which Schedule of Commission and all amendments, supplements and replacements thereof and thereto are hereby made a part of this Agreement.

B. Commission is subject to change at any time by written notice by the Insurer to the REPRESENTATIVE, but no such change shall affect commissions on any policy issued prior to the effective date of such change.

C. If commission rates are not now shown in the Schedule of Commission, including conversions, replacements or, the exercise of re-entry provisions or, if special premium rate quotations are made, commission rates shall be such as may be fixed by the Insurer as of the time when issue is effective in accordance with rates and practices of the Insurer then in effect.

D. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall lapse because of nonpayment of premium and shall be replaced or reinstated, any commissions on the new or reinstated policy shall be payable only at the sole discretion of the Insurer.

E. To be entitled to commissions, if any, the REPRESENTATIVE's name or the name of another Representative under your jurisdiction must appear as soliciting agent on the application for insurance. Disputes respecting commissions shall be subject to decision and settlement by the Insurer and the Insurer's decision shall be final and binding upon the parties involved.

F. Whenever, in the judgment of the Insurer, it shall become advisable to recall any policy issued before delivery thereof is made, the REPRESENTATIVE shall promptly refund to the Insurer any commissions received on account of such policy. Whenever, after delivery, the Insurer shall effect or procure the surrender, rescission or cancellation of any policy and refund premiums paid thereon, the Insurer shall have the right to charge back commissions and demand that the REPRESENTATIVE repay such commissions to the Insurer. If the Insurer shall refund or waive the premium or premiums under the provisions of any disability waiver of premium rider, the REPRESENTATIVE shall lose all rights to commission and persistency fees as applied to such refunded or waived premiums, and shall repay any amounts advanced. An Insurer may include in its Commission Schedule, which is incorporated as a part of this Agreement, guidelines describing more specifically the circumstances under which it will charge back commissions on certain products. In the absence of such guidelines, the Insurer's rights shall be as described in this Section V. Compensation.

G. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall be converted or replaced, any commissions on the new policy shall be subject to adjustment and payable only at the sole discretion of the Insurer.

AGL / BECHTEL  000060

H. Except where prohibited by any State, the REPRESENTATIVE is responsible for all license fees, including those of its Representatives. The Insurer's discretion shall govern with respect to whether the Insurer shall charge to the REPRESENTATIVE's commission or other compensation account the cost of obtaining and renewing the REPRESENTATIVE's and its Representatives' license or licenses and/or appointment fees. This practice is subject to change at the discretion of the Insurer.

I. Policy applications for any Insurer will be issued and commissions paid by the Insurer.

## VI. VESTING

A. As long as this Agreement remains in effect, all first year and renewal commissions shall be paid as they accrue; however, any such payments are subject to the schedule of commissions in effect at the date the first full premium is received by the Insurer; the provisions and rules of the Insurer regarding minimum first year and renewal commissions required to issue a check.

B. During any consecutive 12-month period following the termination of this Agreement, total renewal commissions are less than the minimum required by the Insurer, vesting automatically terminates and no additional commission payments will be due from the Insurer.

C. In the event this Agreement is terminated by the death of the REPRESENTATIVE, all first year and renewal commissions shall be paid as they accrue, subject only to the terms and conditions of paragraphs A and B immediately above. In the absence of a properly executed beneficiary designation on file with the Insurer, all such payments, if any, shall be made to the surviving spouse and at the death of the surviving spouse to the estate of said spouse. If the REPRESENTATIVE dies leaving no surviving spouse, such monies will be paid to the estate of the REPRESENTATIVE; provided however, that if the REPRESENTATIVE is a corporation or a partnership, all such payments will be paid to said corporation or partnership.

## VII. GENERAL PROVISIONS

A. The Insurer may make such changes and decisions as it deems advisable in the conduct of its business, including the discontinuance of any policy form or the withdrawal from any territory, and the Insurer shall incur no liability to the REPRESENTATIVE by reason of its doing so.

B. The Insurer shall have the right to test market any of its products on a select basis and at the discretion of the Insurer.

C. The REPRESENTATIVE shall indemnify and hold the Insurer harmless against or from any and all expense, costs, causes of action, and damages including without limitation, reasonable attorney fees, resulting from or growing out of any unauthorized or negligent act of commission or omission by the REPRESENTATIVE or its employees, directors, officers, or Representatives under its jurisdiction. This provision shall survive termination of this Agreement.

D. The Insurer shall have a prior right and offset to all commissions and fees payable hereunder toward any indebtedness and/or other obligations due from the REPRESENTATIVE or anyone under the jurisdiction of the REPRESENTATIVE to any Primary Company and/or Affiliated Company/ies with interest at the legal rate. This prior right and offset shall not be extinguished by the termination of this Agreement. Following the termination of any Representative under the jurisdiction of the REPRESENTATIVE, should the amount in any commission account of that Representative be insufficient to repay any amount due the Insurer, the debit will become the responsibility of the REPRESENTATIVE, in accordance with the Insurer's then current debit collection procedure.

E. Neither the Agreement, any duties or delegation under this Agreement, nor the commissions or fees accruing hereunder, nor any interest herein, nor any right or claim created hereby or arising by reason of the REPRESENTATIVE acting hereunder, shall be assignable, except upon the written consent of the Insurer.

F. Forbearance or failure of the Insurer to insist upon performance of this Agreement or to enforce its rights hereunder, shall not constitute a waiver of its rights or privileges hereunder or of its subsequent right to insist upon such performance.

G. This Agreement, including the Appointment Application and any Commission Schedule(s) incorporated as part of the Agreement, contains all promises, inducements and representations between the parties. This Agreement supersedes any and all previous Agreements between the parties herein pertaining to the solicitation of the Insurer's products and the payment of monies to the REPRESENTATIVE provided, however, that rights or obligations which have already accrued (and would survive termination) under any previous contract between the Insurer and the REPRESENTATIVE shall not be hereby impaired.

H. The Insurer reserves the right to decline or modify any application for insurance.

I. This Agreement shall not be effective until executed by the Primary Company. Once this Agreement is effective with the Primary Company, it may become effective with Affiliated Company(ies) as described herein.

AGL / BECHTEL  000061

J. Should the REPRESENTATIVE, at any time, violate any provision of Section II of this Agreement, entitled Limitation of Authority, or commit any fraud upon Insurer or its policyholders; have a license as agent or broker revoked for cause after notice and hearing by a state Insurance department or otherwise act to prejudice materially the interests of Insurer, the REPRESENTATIVE shall, at the option of the Insurer, forfeit any and all rights to all commissions and monies that the REPRESENTATIVE might otherwise have under this Agreement, vested or not. It is expressly agreed that termination of this Agreement shall not terminate this provision.

K. The REPRESENTATIVE agrees to maintain complete and accurate records of the marketing and sale of the Insurer's products. The Insurer reserves the right to inspect such records and other documents in each REPRESENTATIVE's files that relate to the marketing, attempted sale or sale of the Insurer's products. If the Insurer chooses to inspect such records, it will endeavor to do so during normal business hours and after giving reasonable notice, unless, in the judgment of the Insurer, unusual circumstances require inspection at other times or inspection without prior notice. This provision shall survive termination of this Agreement for a period of two (2) years.

L. For as long as this Agreement is in force, the REPRESENTATIVE will maintain Errors and Omissions (E&O) coverage and will provide the Insurer annually proof of such E&O coverage in a manner acceptable to the Insurer.

M. If the REPRESENTATIVE is served with a regulatory inquiry or legal papers involving Insurer business, the REPRE-SENTATIVE shall immediately notify the Insurer by sending to that Insurer's Compliance Officer, a copy of the papers, served by overnight delivery, by the end of the business day next following the day of receipt by the REPRESENTATIVE.

N. The REPRESENTATIVE is responsible for assuring that any Representative under the Jurisdiction of the REPRESEN-TATIVE: (1) become fully informed as to the provisions and benefits of each product offered by the Insurer for which the Representative conducts Insurer business; (2) represent such products adequately and fairly to prospective purchasers; and (3) act in compliance with the Insurer's policies and procedures as set out in the Customer Service and Compliance Manual, Operations Manual, or otherwise communicated to the REPRESENTATIVE, including, without limitation, those regarding suitability of sales inquiries and compliance with the Insurer's principles and code of ethical market conduct.

O. When the Insurer assigns to the REPRESENTATIVE any agency not recruited by the REPRESENTATIVE, then the Insurer may reassign that agency to another upline of the Insurer's choice at any time and without the necessity of a release from the REPRESENTATIVE. If the Insurer wishes to remove any agency recruited by the REPRESENTATIVE from the Jurisdiction of the REPRESENTATIVE, the Insurer will negotiate a release; however, such release will not be unreasonably withheld by the REPRESENTATIVE.

P. REPRESENTATIVE is not entitled to participate in any REPRESENTATIVE benefit programs except those which are provided by the Primary Company. REPRESENTATIVE is not eligible to participate in, or to receive any benefits from, any programs provided by the Affiliate Company/ies.

Q. Disputes arising under this Agreement shall be subject to the laws of the state where the Insurer engaged in the dispute is located.

R. The area within which the REPRESENTATIVE shall have the right to represent the Insurer is not assigned exclusively to the REPRESENTATIVE.

S. REPRESENTATIVE agrees to conform to all regulations of the Insurance Department and the Insurance laws in the state(s) in which the REPRESENTATIVE is conducting Insurer's business.

T. REPRESENTATIVE understands and agrees that (i) the Primary Company may amend the Agreement or the Company's policies, rules and procedures, in order to comply with changes in laws or regulations, or, as the Company deems appropriate related to changes in laws or regulations, through communication of any such amendment to REREPRESENTATIVE, and (ii) For purposes of any such amendment, communication may include, but not be limited to, posting of amendment information on the Primary Company's websites or other means of making such information known or available to the agent.

## VIII. TERMINATION

A. This Agreement shall automatically terminate upon the death of REPRESENTATIVE if REPRESENTATIVE is an individual or upon dissolution of REPRESENTATIVE if REPRESENTATIVE is a corporation or a partnership.

B. This Agreement shall terminate upon the revocation or non-renewal of the REPRESENTATIVE's license.

C. This Agreement may be terminated with or without cause by any Insurer (subject to provisions D and E below) or the REPRESENTATIVE by sending written notice of such termination to the last known address of the other party.

AGL / BECHTEL 000062

D. Upon termination, the REPRESENTATIVE shall immediately pay in cash to the Insurer all sums that are due or become due hereunder and shall immediately deliver to the Insurer all materials connected with the business of the Insurer and belonging to the Insurer. Such materials include, but are not limited to, rate cards, letters, records, computer software, general supplies or any and all other indications of agency provided by the Insurer. It is expressly agreed that termination of this Agreement does not release the REPRESENTATIVE from continuing liability to the Insurer for immediate repayment of any and all unearned first year commissions or bonuses.

E. Termination of this Agreement by the Primary Company terminates all contracts with Affiliated Company/ies without specific notice to the REPRESENTATIVE required by the Insurer. However, any Affiliated Company may terminate its agency relationship with the REPRESENTATIVE, which will not, of itself, terminate the Primary Company agency relationship. Upon termination, the Insurer may assign a servicing agency; however, such assignment will not of itself affect the vesting of existing business.

F. Termination of this Agreement automatically terminates any previous Agreement to represent the Insurer that terminated the Agreement.

## IX. AMENDMENT

This contract cannot be changed by any oral promise or statement and no written modification will bind the Insurer unless approved by the President of the Insurer making the modification.

## X. PERSONAL GUARANTEE

Each and every individual who signs this Agreement warrants that they have authority to bind the entity on whose behalf they are signing.

## XI. EFFECTIVE DATE

The agreed effective date will be the date that this Agreement to represent is signed and acknowledged by the Primary Company as hereinafter specified.

## XII. INVESTIGATION NOTICE

The undersigned hereby authorizes the Primary and Affiliated Company/ies to conduct an investigation concerning character, credit reputation and personal traits and releases those contacted and the Insurer from any liability with respect to the content of the information provided and any resulting action by the Insurer including the sharing of such information or the termination of this Agreement to represent.

## XIII. FEDERAL CRIME CONTROL ACT

A. Undersigned warrants it:

1. has not been convicted of any criminal felony involving dishonesty or breach of trust or

2. has obtained written authorization to engage in the business of insurance from the Insurance Department in the state where REPRESENTATIVE resides which REPRESENTATIVE agrees to produce upon Insurer request.

B. The REPRESENTATIVE agrees to update the representations in the Confidential History/Background Information Section of Part 4 of the Appointment Application by notifying the Primary Company in writing within thirty (30) days, if there should be a change in the response to any question in the Information Section of Part 4 of the Appointment Application.

## XVI. PRIVACY CONTROL & SECURITY

A. "Protected Health Information" and "Nonpublic Personal Information" shall be collectively called the "Information" in this Section, XVI, Privacy Control and Security.

B. All information which any party obtains as a result of this relationship shall not be collected, or used, disclosed, reused or redisclosed to any third party, except to carry out the purposes for which the information was disclosed. The REPRESENTATIVE shall maintain the confidentiality of Information consistent with the Company's notices of privacy practices, policies and procedures, provided that such use or disclosure would not violate any applicable laws, rules or regulations if done by the Company.

C. The REPRESENTATIVE shall use commercially reasonable efforts and appropriate safeguards to maintain the integrity, confidentiality, and security of PHI and to prevent the unauthorized use or disclosure of PHI and to

AGL / BECHTEL  000063

comply with the security standards or the HIPAA security regulations. Upon Company request Agent will provide to the Company access to and documentation regarding any safeguards.

D. Each party shall be permitted to disclose relevant aspects of the other parties' Information to its officers, agents, subcontractors and employees only to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under the Agreement; provided that such party shall take all reasonable measures to ensure that the Information of another party is not disclosed or reproduced in contravention of each of the obligations of this Agreement by each party's officers, agents, subcontractors and employees. The obligations of this Agreement are personal to each party.

E. The REPRESENTATIVE shall report promptly within seven (7) days to the Company's Privacy Officer in writing any use or disclosure of Information that is not permitted by the Agreement or any addendum, of which the REPRESENTATIVE becomes aware. REPRESENTATIVE'S report shall identify: (i) the nature of the unauthorized use or disclosure, (ii) the Information used or disclosed, (iii) who made the unauthorized use or received the unauthorized disclosure, (iv) what REPRESENTATIVE has done or shall do to mitigate any deleterious effect of the unauthorized use or disclosure, (v) what corrective action REPRESENTATIVE has taken or shall take to prevent future similar unauthorized use or disclosure, and (vi) any other information as reasonably requested by the Company's Privacy Officer.

F. The REPRESENTATIVE shall require all of its employees, representatives, subcontractors or agents that receive or have access to Information to agree to adhere to the same restrictions and conditions on the use and/or disclosure of Information that apply herein, including the obligation to return or destroy the Information as provided for below.

G. The obligations in this Agreement shall not restrict any disclosure by any party pursuant to any applicable state or federal laws, or by request or order of any court or government agency. The REPRESENTATIVE shall immediately notify Company upon receipt by the REPRESENTATIVE of any request from the Department of Health and Human Services for the REPRESENTATIVE'S internal practices, books, and records relating to the use and disclosure of Information.

H. Within ten (10) days of receiving a written request from Company, the REPRESENTATIVE shall provide to the Company such Information as is requested by the Company, if any, to permit the Company to respond to a request by an individual for access to, an amendment of, or an accounting of the disclosures of the individual's PHI in accordance with 45 C.F.R. Secs. 164.524, 164.526, and 164.528. If an individual contacts the REPRESENTATIVE directly about access to, amendment of, or an accounting of disclosures of his/her PHI, the REPRESENTATIVE will forward such request immediately to the Company and not provide such access, amendment, or disclosure. Notwithstanding anything herein to the contrary, REPRESENTATIVE shall make reasonable efforts to cooperate with the Company in responding to any such requests and enabling the Company to comply with federal laws and regulations regarding the timing of response to such requests.

I. This Section XVI, Privacy Protection and Security, will survive the termination or expiration of this Agreement. Upon termination of the Agreement, the REPRESENTATIVE shall return or destroy (with the Company's written permission) all Information that REPRESENTATIVE maintains in any form pursuant to the Agreement, and retain no copies of such Information. However, if the Company determines that such return or destruction is not feasible, REPRESENTATIVE will continue to extend the protections of this Addendum to such PHI and limit further use of the information to the purposes that make the return or destruction not feasible. The respective rights and obligations of each party pursuant to this subsection shall survive the termination of the Agreement.

AGLB1056-1105

AGL / BECHTEL  000064

# EXHIBIT C

**(to Exhibit 1: Lohman Affidavit)**

 **AMERICAN GENERAL**



Assignment of Commissions

**American General Life Insurance Company**
*A member company of American International Group, Inc.*
P.O. Box 401 • Milwaukee, WI 53201-0401

Agent Code No. _____

FOR VALUE RECEIVED, the undersigned hereby transfers, sets over and assigns unto _____

Life Brokerage Partners LLC _____ (TAX ID & SS# REDACTED4489 )

(an individual), (a corporation), (a partnership), (a sole proprietorship)

of 3982 Tampa Rd Oldsmar FL 34677 _____ (address)

an amount equal to 100 % percent of any and all commissions, renewal commissions, allowances and fees which may hereafter accrue in favor of the undersigned by virtue of the agency contract now in force between the undersigned and American General Life Insurance Company, it being understood and agreed that this assignment shall be subject to any present indebtedness or any which may hereafter accrue to be due and owing American General Life Insurance Company.

The undersigned hereby represents and warrants that said commissions and allowances are not now assigned, and the undersigned hereby will forever warrant and defend his right to receive the same, this instrument to remain in full force and effect until same is released by the assignee by an instrument in writing furnished said Insurance Company.

The undersigned hereby authorizes and directs said Insurance Company to pay over any such commissions and allowances to said assignee, subject to the conditions hereof, and it is agreed that any payment so made will be a full and complete discharge of said Insurance Company's obligation to the extent of any payment so made.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and seal at  Oldsmar, FL

_____ , this  1st _____ day of  March _____ , 20 07 .

By: _____
   Signature of Assignor

Received and replaced on file this _____ day of _____ , 20 _____

AMERICAN GENERAL LIFE INSURANCE COMPANY

By: _____
   President & CEO

1-2033
B1501000-1015-0701                                                        REV0104

AGL / BECHTEL   000046

# EXHIBIT D

**(to Exhibit 1: Lohman Affidavit)**



Laura Pizzo@USLIFE
04/27/2007 12:39 PM

To: Pat Russo/DALLAS/USLIFE@AGFG, Andrew
Skrobis/Milwaukee/USLIFE@USLIFE, Doug
Krimmer/Milwaukee/USLIFE@USLIFE, Milwaukee Producer Services
cc: fienergy@bellsouth.net, john_fienergy@bellsouth.net,
Patti_Newall@agfg.com, Theresa_Taylor@aigag.com, "Vanessa
Nally" <vnally@lifebrokeragepartners.com>
Subject: Bechtel & Richardson List of New agent codes under new Hierarchy

As of Today please ask your agents attached to use the agent code on this list for Business. Please let us know if you have business that needs to be processed and what the agent name is so we can process that request before all others.

   

Gary Richardson project.xls   Kevin bechtel project.xls

Andy/Doug on these listed there are a few policies that need to be reissued.

Research, can you please handle the policies that are already paid that need to be moved to the agent's new agent code.

Thank You :)

Laura Pizzo
AIG Life Brokerage - Producer Services
Contract Maintenance - Analyst
(888)653-5463,  ext. 1757
Email: Milwaukee_Contract_Maintenance@aigag.com

AGL / BECHTEL  000097

## AIG Kevin Bechtel List of Agents

| Agent Name | Agent New Code | Pending Policies that need to move to new code |
|---|---|---|
| Brad Friedman | 4W114 | UME115540L, UME115541L, UM0034129L |
| Michael Masarek | 4W115 | UM0030236L, UME115523L |
| Stephen Wechsler | 3SV36 | |
| Steven Brasner | 4W117 | |
| Bruce Burns | 3QL21 | |
| Timothy Bodner | 4W118 | |
| Bracknell Baker | 4P694 | |
| Brian Berkowitz | 3EG38 | |
| Lyle Mouton | 4W125 | |
| Matt Beck | 4W126 | |
| Hans Bechtel | 3UW73 | |
| Craig Birchler | 3KE93 | |
| William Constatine | 3SM26 | |
| Coury Financial Svcs | 3FX55 | |
| Walter Coury | 3FX56 | |
| Jack Driscoll | 3RG40 | |
| Financial Freedom Corp | 4AK23 | |
| Robert Eaton | 4AK24 | |
| Kenneth Fardie | 3QT62 | |
| Sherry Fardie-Spalding | 3QT58 | |
| Gary Gross | 3QK62 | |
| Lindsay Jagolinzer | 3QT71 | |
| Health Benefits of Arizona | 3SV25 | |
| Kenneth Parent | 3SV26 | |
| Victoria Peritz | 3QT60 | |
| Craig Stack | 3QT59 | |
| Brad Wasserman | 3SP36 | |
| Philip Roy Fncl Svcs LLC | 3NK79 | |
| Phillip Wasserman | 3NK80 | |
| Andrew Wolf | 3QT70 | |

04/30/2007 13:53 0695167 1366

AGL / BECHTEL  000098

Case 8:15-cv-00982-AEP   Document 48-1   Filed 02/09/16   Page 36 of 149 PageID 660

04/30/2007 15:53 0695167 1567

| Listed Pending Policy need to be effective as Today 4-24-07 | Commission Needs to have Policies moved to new agent code or new Profile |
|---|---|
| | |
| | |
| UM0041876L | UME115581L |
| | UME115537L, UME115566L, UME115532L, UME115564L, UME115559L, M70005050L, UME115535L |
| | |
| | M70004830L, UME100490L |
| | |
| UM0023898L | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

AGL / BECHTEL  000099

# EXHIBIT E

**(to Exhibit 1: Lohman Affidavit)**

**REDACTED**

## AGENCY AGREEMENT

*Each life insurance company's products are separately underwritten and independently supported by the representative company. The below listed companies are members of the American International Group, Inc.*

Last Name **Wechsler**    First Name **FOR Stephen**    Middle Initial **B**

If Representative is a Corporation, the full Corporate name must appear above, and an authorized officer must sign and indicate the officer's title.

**Individual**
Social Security Number _____

**Corporation**
Tax Identification Number _____

**Representative**

Signature _____    Title _____

**American General Life Companies**

Contract Date _____
To be completed by Home Office            Home Office Authorized Signator

American General Life Insurance Company, Houston, TX
4GL81056-1405    A division of the American International Companies.®

**WE KNOW LIFE.®**



## TABLE OF CONTENTS

**Paragraph**
Recitals
Definitions

| | |
|---|---|
| I. | Authorized Acts |
| II. | Limitation of Authority |
| III. | Advertising |
| IV. | Relationship |
| V. | Compensation |
| VI. | Vesting |
| VII. | General Provisions |
| VIII. | Termination |
| IX. | Amendment |
| X. | Personal Guarantee |
| XI. | Effective Date |
| XII. | Investigation Notice |
| XIII. | Federal Crime Control Act |
| XIV. | Confidentiality |

**Schedules**

A. Commission Schedule – Primary Company

B. Appointment Application

AGL / BECHTEL 000232

## RECITALS

Representative ("REPRESENTATIVE") has executed an Appointment Application requesting appointments with one or more life insurance subsidiaries of American International Group, Inc.

The Appointment Application designates one of the life insurers as a Primary Appointing Company (the "Primary Company").

This Agreement together with the Appointment Application and Commission Schedules for each separate life insurer that appoints REPRESENTATIVE comprise the REPRESENTATIVE's contract with each of the insurers that appoints REPRESENTATIVE.

Execution of this Agreement by the Primary Company and the REPRESENTATIVE evidences their Agreement to transact business in accordance with the terms and conditions set forth in this Agreement.

If REPRESENTATIVE requested appointment with one or more affiliates of the Primary Company in the Appointment Application, or a subsequent amendment to that form, REPRESENTATIVE's execution of this Agreement evidences REPRESENTATIVE's Agreement to transact business with each affiliated insurer in accordance with the terms and conditions set forth in this Agreement. Each affiliated insurer that appoints REPRESENTATIVE and sends a company commission schedule to REPRESENTATIVE has agreed to transact business with REPRESENTATIVE according to the terms and conditions of this Agreement.

## DEFINITIONS

A. Primary Company – the Primary Company is designated in the Appointment Application as the Primary Company. The Primary Company's responsibilities include executing the REPRESENTATIVE Agreement, performing background checks and providing convention credits and other sales incentives, if any, to REPRESENTATIVE.

B. Affiliated Company – the Affiliated Company(ies) is any other life insurance subsidiary of American International Group, Inc. that is identified in the Appointment Application, appoints REPRESENTATIVE and provides a company commission schedule as evidence of its Agreement to transact business with REPRESENTATIVE according to the terms of this Agreement.

C. Insurer – the term Insurer as used in this Agreement refers to each of the life insurance companies that appoints REPRESENTATIVE, including the Primary Company.

D. Jurisdiction – Eligibility for, or receipt of, override compensation on another Representative's business.

E. Nonpublic Personal Information: "Nonpublic Personal Information" of customers or consumers ("NPI") includes, but is not limited to, names, addresses, account balances, account numbers, account activity, social security numbers, taxpayer identification numbers, and sensitive financial and health information. NPI includes information on each party's forms or in a database of any kind, information created by each party, information collected by or on behalf of a party, and personally identifiable information derived from NPI. Reference to NPI of Company or REPRESENTATIVE shall include NPI collected by or on behalf of American International Group, Inc., its successors, subsidiaries, affiliates agents or contractors. There may be instances where each party will have the same NPI which may be subject to different privacy policies and procedures according to the notices provided to the customer or consumer by the respective parties to the Agreement.

F. Protected Health Information: The terms "Protected Health Information" and "PHI" shall have the meaning set forth in 45 C.F.R. Sec. 164.501 as may be amended. Other terms shall have the same meanings as set forth in the applicable definition of the Health Insurance Portability and Accessibility Act (HIPAA), as amended, Privacy Rule or other regulations.

## I. AUTHORIZED ACTS

A. The REPRESENTATIVE is authorized to conduct Insurer's business for the Insurer's products covering such classes of risks as the Insurer may authorize and in those states where the product is approved and REPRESENTATIVE is licensed and appointed as required by state law. If REPRESENTATIVE is a corporation, then the principal(s) of such corporation must also be licensed individually, if required pursuant to appropriate state law.

B. The REPRESENTATIVE is authorized to collect and promptly remit to the Insurer the first premium on business produced by the REPRESENTATIVE in accordance with the Insurer's rules and regulations.

C. The REPRESENTATIVE will promptly deliver issued policies in accordance with Insurer's policies and procedures.

D. All monies, settlements, or documents received by the REPRESENTATIVE for, or on behalf of, the Insurer shall be received by the REPRESENTATIVE in a fiduciary capacity and immediately paid over or delivered to the Insurer, except as may be otherwise directed in writing by the Insurer.

AGL / BECHTEL 000233

## II. LIMITATION OF AUTHORITY

The REPRESENTATIVE is without authority to perform any act or thing other than that expressly granted in this Agreement and expressly agrees not to perform any of the following acts:

    1. Make, modify, alter or discharge any policy.
    2. Extend the time payment of any premium.
    3. Waive any forfeiture.
    4. Guarantee dividends or interest rates.
    5. Incur any debt or liability in the name of the Insurer.
    6. Withhold, commingle or convert to the use of the REPRESENTATIVE or the benefit of others, any monies, securities, policies or receipts belonging to the Insurer, the applicant, or the insured, or fail to promptly submit to the Insurer any applications for policies.
    7. Accept or deposit any check or draft for premiums made payable to other than the Insurer.
    8. Unless in the best interest of the policyowner, directly or indirectly induce or attempt to induce any policyowners of Insurer to relinquish, surrender, replace or lapse their policies.

## III. ADVERTISING / USE OF LOGO

REPRESENTATIVE may, at REPRESENTATIVE's expense, advertise Insurer's products, provided the text of all advertising, including any form of sales/promotional material such as, but not limited to business cards, stationery or other indications of agency under this Agreement and including the use of the names "American International Group, Inc.," "AIG," "American General," their logos or the name of any insurer is approved in writing by the company before use.

## IV. RELATIONSHIP

The relationship between the Insurer and the REPRESENTATIVE shall be that of principal and independent contractor, and nothing contained herein shall be construed as creating the relationship of employer and employee for any purpose, including tax purposes, REPRESENTATIVE agrees to be responsible for all taxes as a self-employed independent contractor. The REPRESENTATIVE shall be free to exercise independent judgment as to the time and manner in which the REPRESENTATIVE shall perform the services authorized under this Agreement. Any material supplied by the Insurer is for the purpose of supporting the activities of the REPRESENTATIVE.

## V. COMPENSATION

A. Subject to the provisions hereof and the rules of the Insurer, the full compensation of the REPRESENTATIVE shall be payable at the applicable rate set forth in the Schedule of Commission in effect at the date the first full premium is received by the Insurer, which Schedule of Commission and all amendments, supplements and replacements thereof and thereto are hereby made a part of this Agreement.

B. Commission is subject to change at any time by written notice by the Insurer to the REPRESENTATIVE, but no such change shall affect commissions on any policy issued prior to the effective date of such change.

C. If commission rates are not now shown in the Schedule of Commission, including conversions, replacements or, the exercise of re-entry provisions or, if special premium rate quotations are made, commission rates shall be such as may be fixed by the Insurer as of the time when issue is effective in accordance with rates and practices of the Insurer then in effect.

D. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall lapse because of nonpayment of premium and shall be replaced or reinstated, any commissions on the new or reinstated policy shall be payable only at the sole discretion of the Insurer.

E. To be entitled to commissions, if any, the REPRESENTATIVE's name or the name of another Representative under your Jurisdiction must appear as soliciting agent on the application for insurance. Disputes respecting commissions shall be subject to decision and settlement by the Insurer and the Insurer's decision shall be final and binding upon the parties involved.

F. Whenever, in the judgment of the Insurer, it shall become advisable to recall any policy issued before delivery thereof is made, the REPRESENTATIVE shall promptly refund to the Insurer any commissions received on account of such policy. Whenever, after delivery, the Insurer shall effect or procure the surrender, rescission or cancellation of any policy and refund premiums paid thereon, the Insurer shall have the right to charge back commissions and demand that the REPRESENTATIVE repay such commissions to the Insurer. If the Insurer shall refund or waive the premium or premiums under the provisions of any disability waiver of premium rider, the REPRESENTATIVE shall lose all rights to commission and persistency fees as applied to such refunded or waived premiums, and shall repay any amounts advanced. An Insurer may include in its Commission Schedule, which is incorporated as a part of this Agreement, guidelines describing more specifically the circumstances under which it will charge back commissions on certain products. In the absence of such guidelines, the Insurer's rights shall be as described in this Section V. Compensation.

G. In the event any policy on which the REPRESENTATIVE is entitled to commissions shall be converted or replaced, any commissions on the new policy shall be subject to adjustment and payable only at the sole discretion of the Insurer.

AGL / BECHTEL 000234

H. Except where prohibited by any State, the REPRESENTATIVE is responsible for all license fees, including those of its Representatives. The Insurer's discretion shall govern with respect to whether the Insurer shall charge to the REPRESENTATIVE's commission or other compensation account the cost of obtaining and renewing the REPRESENTATIVE's and its Representatives' license or licenses and/or appointment fees. This practice is subject to change at the discretion of the Insurer.

I. Policy applications for any Insurer will be issued and commissions paid by the Insurer.

## VI. VESTING

A. As long as this Agreement remains in effect, all first year and renewal commissions shall be paid as they accrue; however, any such payments are subject to the schedule of commissions in effect at the date the first full premium is received by the Insurer, the provisions and rules of the Insurer regarding minimum first year and renewal commissions required to issue a check.

B. During any consecutive 12-month period following the termination of this Agreement, total renewal commissions are less than the minimum required by the Insurer, vesting automatically terminates and no additional commission payments will be due from the Insurer.

C. In the event this Agreement is terminated by the death of the REPRESENTATIVE, all first year and renewal commissions shall be paid as they accrue, subject only to the terms and conditions of paragraphs A and B immediately above. In the absence of a properly executed beneficiary designation on file with the Insurer, all such payments, if any, shall be made to the surviving spouse and at the death of the surviving spouse to the estate of said spouse. If the REPRESENTATIVE dies leaving no surviving spouse, such monies will be paid to the estate of the REPRESENTATIVE; provided however, that if the REPRESENTATIVE is a corporation or a partnership, all such payments will be paid to said corporation or partnership.

## VII. GENERAL PROVISIONS

A. The Insurer may make such changes and decisions as it deems advisable in the conduct of its business, including the discontinuance of any policy form or the withdrawal from any territory, and the Insurer shall incur no liability to the REPRESENTATIVE by reason of its doing so.

B. The Insurer shall have the right to test market any of its products on a select basis and at the discretion of the Insurer.

C. The REPRESENTATIVE shall indemnify and hold the Insurer harmless against or from any and all expense, costs, causes of action, and damages including without limitation, reasonable attorney fees, resulting from or growing out of any unauthorized or negligent act of commission or omission by the REPRESENTATIVE or its employees, directors, officers, or Representatives under its jurisdiction. This provision shall survive termination of this Agreement.

D. The Insurer shall have a prior right and offset to all commissions and fees payable hereunder toward any indebtedness and/or other obligations due from the REPRESENTATIVE or anyone under the jurisdiction of the REPRESENTATIVE to any Primary Company and/or Affiliated Company/ies with interest at the legal rate. This prior right and offset shall not be extinguished by the termination of this Agreement. Following the termination of any Representative under the jurisdiction of the REPRESENTATIVE, should the amount in any commission account of that Representative be insufficient to repay any amount due the Insurer, the debit will become the responsibility of the REPRESENTATIVE, in accordance with the Insurer's then current debit collection procedure.

E. Neither the Agreement, any duties or delegation under this Agreement, nor the commission or fees accruing hereunder, nor any interest herein, nor any right or claim created hereby or arising by reason of the REPRESENTATIVE acting hereunder, shall be assignable, except upon the written consent of the Insurer.

F. Forbearance or failure of the Insurer to insist upon performance of this Agreement or to enforce its rights hereunder, shall not constitute a waiver of its rights or privileges hereunder or of its subsequent right to insist upon such performance.

G. This Agreement, including the Appointment Application and any Commission Schedule(s) incorporated as part of the Agreement, contains all promises, inducements and representations between the parties. This Agreement supersedes any and all previous Agreements between the parties herein pertaining to the solicitation of the Insurer's products and the payment of monies to the REPRESENTATIVE provided, however, that rights or obligations which have already accrued (and would survive termination) under any previous contract between the Insurer and the REPRESENTATIVE shall not be hereby impaired.

H. The Insurer reserves the right to decline or modify any application for insurance.

I. This Agreement shall not be effective until executed by the Primary Company. Once this Agreement is effective with the Primary Company, it may become effective with Affiliated Company(ies) as described herein.

AGL / BECHTEL 000235

J. Should the REPRESENTATIVE, at any time, violate any provision of Section II of this Agreement, entitled Limitation of Authority, or commit any fraud upon Insurer or its policyholders; have a license as agent or broker revoked for cause after notice and hearing by a state insurance department or otherwise act to prejudice materially the interests of Insurer, the REPRESENTATIVE shall, at the option of the Insurer, forfeit any and all rights to all commissions and monies that the REPRESENTATIVE might otherwise have under this Agreement, vested or not. It is expressly agreed that termination of this Agreement shall not terminate this provision.

K. The REPRESENTATIVE agrees to maintain complete and accurate records of the marketing and sale of the Insurer's products. The Insurer reserves the right to inspect such records and other documents in each REPRESENTATIVE's files that relate to the marketing, attempted sale or sale of the Insurer's products. If the Insurer chooses to inspect such records, it will endeavor to do so during normal business hours and after giving reasonable notice, unless, in the judgment of the Insurer, unusual circumstances require inspection at other times or inspection without prior notice. This provision shall survive termination of this Agreement for a period of two (2) years.

L. For as long as this Agreement is in force, the REPRESENTATIVE will maintain Errors and Omissions (E&O) coverage and will provide the Insurer annually proof of such E&O coverage in a manner acceptable to the Insurer.

M. If the REPRESENTATIVE is served with a regulatory inquiry or legal papers involving Insurer business, the REPRE-SENTATIVE shall immediately notify the Insurer by sending to that Insurer's Compliance Officer, a copy of the papers, served by overnight delivery, by the end of the business day next following the day of receipt by the REPRESENTATIVE.

N. The REPRESENTATIVE is responsible for assuring that any Representative under the Jurisdiction of the REPRESEN-TATIVE: (1) become fully informed as to the provisions and benefits of each product offered by the Insurer for which the Representative conducts Insurer business; (2) represent such products adequately and fairly to prospective purchasers; and (3) act in compliance with the Insurer's policies and procedures as set out in the Customer Service and   Compliance Manual, Operations Manual, or otherwise communicated to the REPRESENTATIVE, including without limitation, those regarding suitability of sales inquiries and compliance with the Insurer's principles and code of ethical market conduct.

O. When the Insurer assigns to the REPRESENTATIVE any agency not recruited by the REPRESENTATIVE, then the Insurer may reassign that agency to another upline of the Insurer's choice at any time and without the necessity of a release from the REPRESENTATIVE. If the Insurer wishes to remove any agency recruited by the REPRESENTATIVE from the Jurisdiction of the REPRESENTATIVE, the Insurer will negotiate a release; however, such release will not be unreasonably withheld by the REPRESENTATIVE.

P. REPRESENTATIVE is not entitled to participate in any REPRESENTATIVE benefit programs except those which are provided by the Primary Company. REPRESENTATIVE is not eligible to participate in, or to receive any benefits from, any programs provided by the Affiliate Company/ies.

Q. Disputes arising under this Agreement shall be subject to the laws of the state where the Insurer  engaged in the dispute is located.

R. The area within which the REPRESENTATIVE shall have the right to represent the Insurer is not assigned exclusively to the REPRESENTATIVE.

S. REPRESENTATIVE agrees to conform to all regulations of the Insurance Department and the insurance laws in the state(s) in which the REPRESENTATIVE is conducting Insurer's business.

T. REPRESENTATIVE understands and agrees that (i) the Primary Company may amend the Agreement or the Company's policies, rules and procedures, in order to comply with changes in laws or regulations, or, as the Company deems appropriate related to changes in laws or regulations, through communication of any such amendment to REPRESENTATIVE, and (ii) For purposes of any such amendment, communication may include, but not be limited to, posting of amendment information on the Primary Company's websites or other means of making such information known or available to the agent.

## VIII. TERMINATION

A. This Agreement shall automatically terminate upon the death of REPRESENTATIVE if REPRESENTATIVE is an individual or upon dissolution of REPRESENTATIVE if REPRESENTATIVE is a corporation or a partnership.

B. This Agreement shall terminate upon the revocation or non-renewal of the REPRESENTATIVE's license.

C. This Agreement may be terminated with or without cause by any Insurer (subject to provisions D and E below) or the REPRESENTATIVE by sending written notice of such termination to the last known address of the other party.

AGL / BECHTEL 000236

D.  Upon termination, the REPRESENTATIVE shall immediately pay in cash to the Insurer all sums that are due or become due hereunder and shall immediately deliver to the Insurer all materials connected with the business of the Insurer and belonging to the Insurer. Such materials include, but are not limited to, rate cards, letters, records, computer software, general supplies or any and all other indications of agency provided by the Insurer. It is expressly agreed that termination of this Agreement does not release the REPRESENTATIVE from continuing liability to the Insurer for immediate repayment of any and all unearned first year commissions or bonuses.

E.  Termination of this Agreement by the Primary Company terminates all contracts with Affiliated Company/ies without specific notice to the REPRESENTATIVE required by the Insurer. However, any Affiliated Company may terminate its agency relationship with the REPRESENTATIVE, which will not, of itself, terminate the Primary Company agency relationship. Upon termination, the Insurer may assign a servicing agency; however, such assignment will not of itself affect the vesting of existing business.

F.  Termination of this Agreement automatically terminates any previous Agreement to represent the Insurer that terminated the Agreement.

## IX. AMENDMENT

This contract cannot be changed by any oral promise or statement and no written modification will bind the Insurer unless approved by the President of the Insurer making the modification.

## X. PERSONAL GUARANTEE

Each and every individual who signs this Agreement warrants that they have authority to bind the entity on whose behalf they are signing.

## XI. EFFECTIVE DATE

The agreed effective date will be the date that this Agreement to represent is signed and acknowledged by the Primary Company as hereinafter specified.

## XII. INVESTIGATION NOTICE

The undersigned hereby authorizes the Primary and Affiliated Company/ies to conduct an investigation concerning character, credit reputation and personal traits and releases those contacted and the Insurer from any liability with respect to the content of the information provided and any resulting action by the Insurer including the sharing of such information or the termination of this Agreement to represent.

## XIII. FEDERAL CRIME CONTROL ACT

A. Undersigned warrants it:

1. has not been convicted of any criminal felony involving dishonesty or breach of trust or

2. has obtained written authorization to engage in the business of insurance from the Insurance Department in the state where REPRESENTATIVE resides which REPRESENTATIVE agrees to produce upon Insurer request.

B. The REPRESENTATIVE agrees to update the representations in the Confidential History/Background Information Section of Part 4 of the Appointment Application by notifying the Primary Company in writing within thirty (30) days, if there should be a change in the response to any question in the Information Section of Part 4 of the Appointment Application.

## XVI. PRIVACY CONTROL & SECURITY

A.  "Protected Health Information" and "Nonpublic Personal Information" shall be collectively called the "Information" in this Section, XVI, Privacy Control and Security.

B.  All Information which any party obtains as a result of this relationship shall not be collected, or used, disclosed, reused or redisclosed to any third party, except to carry out the purposes for which the information was disclosed. The REPRESENTATIVE shall maintain the confidentiality of Information consistent with the Company's notices of privacy practices, policies and procedures, provided that such use or disclosure would not violate any applicable laws, rules or regulations if done by the Company.

C.  The REPRESENTATIVE shall use commercially reasonable efforts and appropriate safeguards to maintain the integrity, confidentiality, and security of PHI and to prevent the unauthorized use or disclosure of PHI and to

AGL / BECHTEL 000237

comply with the security standards or the HIPAA security regulations. Upon Company request Agent will provide to the Company access to and documentation regarding any safeguards.

D.   Each party shall be permitted to disclose relevant aspects of the other parties' Information to its officers, agents, subcontractors and employees only to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under the Agreement; provided that such party shall take all reasonable measures to ensure that the Information of another party is not disclosed or reproduced in contravention of each of the obligations of this Agreement by such party's officers, agents, subcontractors and employees. The obligations of this Agreement are personal to each party.

E.   The REPRESENTATIVE shall report promptly within seven (7) days to the Company's Privacy Officer in writing any use or disclosure of Information that is not permitted by the Agreement or any addendum, of which the REPRESENTATIVE becomes aware. REPRESENTATIVE'S report shall identify: (i) the nature of the unauthorized use or disclosure, (ii) the Information used or disclosed, (iii) who made the unauthorized use or received the unauthorized disclosure, (iv) what REPRESENTATIVE has done or shall do to mitigate any deleterious effect of the unauthorized use or disclosure, (v) what corrective action REPRESENTATIVE has taken or shall take to prevent future similar unauthorized use or disclosure, and (vi) any other Information as reasonably requested by the Company's Privacy Officer.

F.   The REPRESENTATIVE shall require all of its employees, representatives, subcontractors or agents that receive or have access to Information to agree to adhere to the same restrictions and conditions on the use and/or disclosure of Information that apply herein, including the obligation to return or destroy the Information as provided for below.

G.   The obligations in this Agreement shall not restrict any disclosure by any party pursuant to any applicable state or federal laws, or by request or order of any court or government agency. The REPRESENTATIVE shall immediately notify Company upon receipt by the REPRESENTATIVE of any request from the Department of Health and Human Services for the REPRESENTATIVE'S internal practices, books, and records relating to the use and disclosure of Information.

H.   Within ten (10) days of receiving a written request from Company, the REPRESENTATIVE shall provide to the Company such information as is requested by the Company, if any, to permit the Company to respond to a request by an individual for access to, an amendment of, or an accounting of the disclosures of the individual's PHI in accordance with 45 C.F.R. Secs. 164.524, 164.526, and 164.528. If an individual contacts the REPRESENTATIVE directly about access to, amendment of, or an accounting of disclosures of his/her PHI, the REPRESENTATIVE will forward such request immediately to the Company and not provide such access, amendment, or disclosure. Notwithstanding anything herein to the contrary, REPRESENTATIVE shall make reasonable efforts to cooperate with the Company in responding to any such requests and enabling the Company to comply with federal laws and regulations regarding the timing of response to such requests.

I.   This Section XVI, Privacy Protection and Security, will survive the termination or expiration of this Agreement. Upon termination of the Agreement, the REPRESENTATIVE shall return or destroy (with the Company's written permission) all Information that REPRESENTATIVE maintains in any form pursuant to the Agreement, and retain no copies of such information. However, if the Company determines that such return or destruction is not feasible, REPRESENTATIVE will continue to extend the protections of this Addendum to such PHI and limit further use of the Information to the purposes that make the return or destruction not feasible. The respective rights and obligations of each party pursuant to this subsection shall survive the termination of the Agreement.

AGL51056-1125

AGL / BECHTEL 000238

# EXHIBIT F

**(to Exhibit 1: Lohman Affidavit)**

Redacted

17

 **AIG** ® AMERICAN GENERAL

**Part A Life Insurance Application**

## UM0044158L

☐ American General Life Insurance Company, Houston, TX
☐ The United States Life Insurance Company in the City of New York, New York, NY

Member companies of American International Group, Inc.
In this application, "Company" refers to the insurance company whose name is checked above.
The insurance company checked above is solely responsible for the obligation and payment of benefits under any policy that it may issue. No other company shown is responsible for such obligations or payments.

| Personal Information |
|---|

**1. Primary Proposed Insured**

Name __Michael Sasai__   Social Security # ▇▇▇▇   Sex ☒ M ☐ F

Birthplace (state, country) __Israel__   Date of Birth ▇▇▇▇   Age __70__

Tobacco use Have you ever used any form of tobacco or nicotine products? ☐ yes ☒ no If yes, date of last use _____

If yes, type and quantity of tobacco or nicotine products used _____

Driver's License No. ▇▇▇▇  State ___ U.S.Citizen ☒ yes ☐ no If no, Date of Entry _____ Visa Type ___

Address __3201 NE 183rd St Suite 306__  City, State __Aventura  FL__   ZIP __33160__

Home Phone __(954)554 2838__  Work Phone ( )   E-mail Address _____

Employer __Self__   Occupation __Real Estate developer__ Length of Employment __45+__

Employer Address __Same As above__   City, State _____   ZIP _____

Duties _____

Personal Income $ __3,200,000__  Household Income $ __3,200,000__  Net Worth $ __65,500,000__

**2. Other Proposed Insured**

Name _____   Social Security # _____   Sex ☐ M ☐ F

Birthplace (state, country) _____   Date of Birth _____   Age ___

Relationship to Primary Proposed Insured _____

Tobacco use Have you ever used any form of tobacco or nicotine products? ☐ yes ☐ no If yes, date of last use _____

If yes, type and quantity of tobacco or nicotine products used _____

Driver's License No. _____   State___ U.S.Citizen ☐ yes ☐ no If no, Date of Entry _____ Visa Type ___

Address _____   City, State _____   ZIP _____

Home Phone ( )  Work Phone ( )   E-mail Address _____

Employer _____   Occupation _____ Length of Employment _____

Employer Address _____   City, State _____   ZIP _____

Duties _____

Personal Income $ _____   Household Income $ _____   Net Worth $ _____

**3. Child Rider** (Complete if a proposed insured requests child riders. If more than three children, list information in the Remarks section. Remember to complete Part B, sections 3–7, for all proposed insured children.)

| Child Name | Sex | Birthplace (state, country) | Date of Birth |
|---|---|---|---|
| _____ | ☐ M ☐ F | _____ | _____ |
| _____ | ☐ M ☐ F | _____ | _____ |
| _____ | ☐ M ☐ F | _____ | _____ |

AGL C102305-2003   Page 1 of 7

AGL / BECHTEL 000203

## Ownership

4. Owner  ☐ Primary Proposed Insured  ☐ Other Proposed Insured  ☒ Trust  ☐ Other than a Proposed Insured or Trust
   A. Complete if the proposed insured is not the owner (if contingent owner is required, use Remarks section.)
   Name Michael Sabri 2007-1 Insurance Trust  Social Security or Tax ID # 51-6592630  Date of Birth 7/31/2007
   c/o Christiana Bank & Trust Company
   Address 381 Kennett Pike  City, State Greenville, DE  ZIP 19807
   Home Phone ( )  Relationship to Primary Proposed Insured Trust

   B. Complete if owner is a trust (if trustee is premium payor, also complete section 14 D.)
   Exact Name of Trust Michael Sabri 2007-1 Insurance Trust  Trust Tax ID # 51-6592630
   Current Trustee(s) Christiana Bank & Trust Company  Date of Trust 7/31/2007

## Product Information

5. Product Name (if variable, complete appropriate supplement) Elite Universal Life 2003
   Amount Applied For: Base Coverage $ 10,000,00 ●  Supplemental Coverage (if applicable) $
   Death Benefit Compliance Test Used (if applicable): ☒ Guideline Premium  ☐ Cash Value Accumulation
   Automatic Premium Loan (if applicable): ☐ Yes ☒ No
   Premium Class Quoted Std. non Tobacco
   Reason for Insurance Financial Planning

6. Dividend Options (For participating policy only.)
   ☐ Cash  ☐ Premium Reduction  ☐ Paid-up Additions  ☐ Deposit Earning Interest  ☐ Other (Explain)

7. Death Benefit Options (For UL & VUL only.)  ☒ Option 1 - Level  ☐ Option 2 - Increasing  ☐ Option 3 - Level Plus Return of Premium

8. Riders  ☐ Waiver of Premium  ☐ Waiver of Monthly Deduction  ☐ Waiver of Monthly Guarantee Premium
   ☐ Maturity Extension Rider – Accumulation Value  ☒ Maturity Extension Rider – Death Benefit  ☒ Terminal Illness Rider
   ☐ Accidental Death Benefit $  ☐ Other Insured $  ☐ Child $
   ☐ Spouse $  Plan  ☐ Other Rider(s)

## Beneficiary

9. Primary  Name Same as above  Relationship Trust  % Share 100
   Name  Relationship  % Share

10. Contingent  Name  Relationship  % Share
    Name  Relationship  % Share

11. Trust Information  Exact Name of Trust Michael Sabri 2007-1 Insurance Trust  Trust Tax ID # 51-6592630
    Current Trustee(s) Christiana Bank & Trust Company  Date of Trust 7/31/2007

12. Rider Beneficiaries  Spouse Rider  Child Rider

## Business Coverage

13. Business Details  (Complete only if applying for business coverage.)
    Does any proposed insured have an ownership interest in the business?  ☐ yes ☐ no
    If yes, what is the percentage of ownership for the:  Primary Proposed Insured  Other Proposed Insured
    If buy-sell, stock redemption, or key person insurance, will all partners or key people be covered?  ☐ yes ☐ no
    Describe any special circumstances.

## Premium

14. Premium Payment  ☒ Modal $ 97,865,70  ☐ Single $  ☐ Additional Initial $
    A. Frequency of modal premium:  ☐ Annual  ☐ Semi-annual  ☒ Quarterly  ☐ Monthly (Bank draft)
    B. Method:  ☐ Direct Billing  ☐ Bank Draft (Complete Bank Draft Authorization.)  ☐ List Bill:  Number
    ☐ Other (Please explain)
    C. Amount submitted with application $  0
    D. Premium Payor (Complete if other than proposed insured.)
    Name Michael Sabri 2007-1 Insurance Trust  Social Security or Tax ID # 51-6592630  Home Phone ( )
    c/o Christiana Bank & Trust Company  Address 381 Kennett Pike  City, State Greenville, DE  ZIP 19807

AGLC102040-2003  Page 2 of 7

AGL / BECHTEL 000204

| Existing Coverage |
|---|

**15. Other Life Insurance or Annuities** *(Indicate life insurance policies or annuities in force or pending for the proposed insured(s).)*
Does any proposed insured have any existing or pending annuity or life insurance contracts?   ☒ yes ☐ no
*(If yes, indicate life insurance policies or annuities in force or pending for the proposed insured(s).)*
Type:  i = individual, b = business, g = group, p = pending life insurance or annuity

| Name of Proposed Insured | Policy Number | Insurance Company | Type(s) *(see above)* | Year of Issue | Face Amount | Replace* | 1035 Ex |
|---|---|---|---|---|---|---|---|
| Michael Sasoni | | American Genral | pending | | 10,000,000 | ☐ yes | ☐ yes |
| | | | | | | ☐ yes | ☐ yes |
| | | | | | | ☐ yes | ☐ yes |
| | | | | | | ☐ yes | ☐ yes |

* **Replace** means that the insurance being applied for may replace, change or use any monetary value of any existing or pending life insurance policy or annuity. If replacement may be involved, complete and submit replacement-related forms. Please note: certain states require completion of replacement related forms even when other life insurance or annuities are not being replaced by the policy being applied for.

| Limited Temporary Life Insurance Eligibility |
|---|

**16. Health and Age Questions**   *(If any proposed insured answers yes to either question, temporary insurance is not available, the agreement will be void and any payment submitted will be refunded.)*

A. Has any proposed insured ever had a heart attack, stroke, cancer, diabetes or disorder of the immune system, or during the last two years been confined in a hospital or other health care facility or been advised to have any diagnostic test or surgery not yet performed?   ☐ yes ☐ no

B. Is any proposed insured age 71 or above?   ☐ yes ☐ no

| Nonmedical Questions |
|---|

**17. Background Information**   *(Complete questions A through F for all proposed insureds who are applying. If you answer applies to any proposed insured, provide details specified after each question.)*

A. Do any proposed insureds intend to travel or reside outside of the United States or Canada within the next two years?   ☐ yes ☒ no
*(If yes, list proposed insured's name, country, date, length of stay and purpose.)* _____

B. In the past five years, have any proposed insureds participated in, or do they intend to participate in: any flights as a trainee, pilot or crew member, scuba diving, skydiving or parachuting, ultralight aviation, auto racing, cave exploration, hang gliding, boat racing, mountaineering, extreme sports or other hazardous activities?   ☐ yes ☒ no
*(If yes, circle the applicable activities and complete the Aviation and/or Avocation Questionnaire.)*

C. Have any proposed insureds:

   1) During the past 90 days submitted an application for life insurance to any other company or begun the process of filling out an application?   ☐ yes ☒ no
   *(If yes, list proposed insured's name, company name, amount applied for, purpose of insurance and if app will be placed.)*

   2) Ever had a life or disability insurance application modified, rated, declined, postponed, withdrawn, canceled or refused for renewal?   ☐ yes ☒ no
   *(If yes, list proposed insured's name, date and reason.)*

D. Have any proposed insureds ever filed for bankruptcy?  *(If yes, list proposed insured's name, chapter filed, date, reason and if discharged.)*   ☐ yes ☒ no

E. In the past five years, have any proposed insureds been charged with or convicted of driving under the influence of alcohol or drugs or had any driving violations?  *(If yes, list proposed insured's name, date, state, license no. and specific violation.)*   ☐ yes ☒ no

F. Have any proposed insureds ever been convicted of, or pled guilty or no contest to a felony, or do they have any such charge pending against them?  *(If yes, list proposed insured name, date, state and felony.)*   ☐ yes ☒ no

| Remarks |
|---|

**18. Details and Explanations** _____

AGL / BECHTEL 000205

**Authorization and Signatures**

American General Life Insurance Company, Houston, TX | The United States Life Insurance Company in the City of New York, New York, NY

The above listed life insurance company as selected on page one of this application is solely responsible for the obligation and payment of benefits under any policy that it may issue. No other company is responsible for such obligations or payments. In this application, "Company" refers to the insurance company which was selected on page one.

**Authorization to Obtain and Disclose Information and Declaration**

I give my consent to all of the entities listed below to give to the Company, its legal representative, American General Life Companies (AGLC) (an affiliated service company), and affiliated insurers all information they have pertaining to: medical consultations, treatments, or surgeries; hospital confinements for physical and mental conditions; use of drugs or alcohol; or any other information for me, my spouse or my minor children. Other information could include items such as: personal finances; habits; hazardous avocations; motor vehicle records from the Department of Motor Vehicles; court records; or foreign travel, etc. I give my consent for the information outlined above to be provided by: any physician or medical practitioner; any hospital, clinic or other health care facility; any insurance or reinsurance company; any consumer reporting agency or insurance support organization; my employer; or the Medical Information Bureau (MIB).

I understand the information obtained will be used by the Company to determine: (1) eligibility for insurance; and (2) eligibility for benefits under an existing policy. Any information gathered during the evaluation of my application may be disclosed to: reinsurers; the MIB; other persons or organizations performing business or legal services in connection with my application or claim; me; any physician designated by me; or any person or entity required to receive such information by law or as I may further consent.

I, as well as any person authorized to act on my behalf, may, upon written request, obtain a copy of this consent. I understand this consent may be revoked at any time by sending a written request to the Company, Attn: Underwriting Department at P.O. Box 1931, Houston, TX 77251-1931.

This consent will be valid for 24 months from the date of this application. I agree that a copy of this consent will be as valid as the original. I authorize AGLC or affiliated insurers to obtain an investigative consumer report on me. I understand that I may: request to be interviewed for the report; and receive, upon written request, a copy of such report. ☐ Check if you wish to be interviewed.

I have read the above statements or they have been read to me. They are true and correct to the best of my knowledge and belief. I understand that this application: (1) will consist of Part A, Part B, and if applicable, related forms; and (2) shall be the basis for any policy issued. I understand that any misrepresentation contained in this application and relied on by the Company may be used to reduce or deny a claim or void the policy if: (1) it is within its contestable period; and (2) such misrepresentation materially affects the acceptance of the risk. Except as may be provided in a Limited Temporary Life Insurance Agreement (LTLIA), I understand and agree that no insurance will be in effect under this application, or under any new policy issued by the Company, unless or until the policy has been delivered and accepted, the full first modal premium for the issued policy has been paid, and there has been no change in the health of any proposed insured that would change the answers to any questions in the application. I understand and agree that no agent is authorized to accept risks or pass upon insurability; make or modify contracts; or waive any of the insurer's rights or requirements.

I have received a copy of the Notices to the Proposed Insured.

Limited Temporary Life Insurance Agreement – If eligible, I have received and accepted the LTLIA. Such insurance is available only if: (1) the full first modal premium is submitted with this application; and (2) only "no" answers have been given by any proposed insured to the Health and Age Questions.

Under penalties of perjury, I certify: (1) that the number shown on this application is my correct Social Security or Tax ID number; and (2) that I am not subject to backup withholding under Section 3406(a)(1)(C) of the Internal Revenue Code; and (3) that I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require my consent to any provisions of this document other than the certifications required to avoid backup withholding. You must cross out item (2) if you are subject to backup withholding and cross out item (3) if you are not a U.S. person (including a U.S. resident alien).

**Proposed Insured(s)/Owner Signature(s)**

Signed at (city, state) _Greenville, DE_   On (date) _AUG 1 2007_

X _(signature)_   X _(signature)_
Primary Proposed Insured (If under age 15, signature of parent or guardian) | Other Proposed Insured (If under age 15, signature of parent or guardian)

X _Marilia S. Wright – TRUST OFFICER_
Owner (if other than proposed insured)

**Agent(s) Signature(s)**

I certify that the information supplied by the proposed insured(s)/owner has been truthfully and accurately recorded on the Part A application.

_Steven B. Webber_   _35V36_
Writing Agent Name (please print) | Writing Agent #

X _(signature)_   X _____
Writing Agent Signature | Countersigned (Licensed resident agent if state required)

| If the Company needs to contact the proposed insured(s), when would be the best time to call? | | | |
|---|---|---|---|
| Time | Day of the Week | Date | Phone # (   ) |

AGLC00565-2000   Page 4 of 7

AGL / BECHTEL 000206

08/07/2007 14:36 0724304 2995

| Agent's Report |
|---|

**1. Statements**

A. Number of years you have known: Primary Proposed Insured _Just Act_ Other Proposed Insured _____

B. I have ordered/obtained the following requirements: ☒ APS ☐ Blood Profile/Urinalysis ☐ EKG ☒ Inspection Report
☒ MD Exam ☐ Oral Fluids (as state permits) ☐ Paramedical Exam ☒ Treadmill ☐ Urinalysis Only

C. If requirements are scheduled, please provide name of examiner, clinic and date ordered. _6/13/07_ _____

D. Did you personally see the proposed insured(s) on the date of this application, ask each question, and accurately record
the answers yourself? (If no, please provide details in the Remarks section below.)   ☒ yes ☐ no

E. Does any proposed insured have any existing or pending annuity or life insurance contracts?   ☐ yes ☒ no
If yes, do you have any information that indicates that any proposed insured may replace, change, or use any monetary value
of any existing or pending life insurance policy or annuity with any company in connection with the purchase of insurance?   ☐ yes ☐ no
(If yes, please provide details in the Remarks section below and attach all replacement-related forms. Certain states require
completion of replacement-related forms even when other life insurance or annuities are not being replaced by the policy
being applied for.)

F. Are you aware of any information that would adversely affect any proposed insured's eligibility, acceptability, or insurability?   ☐ yes ☒ no
(If yes, please provide details in the Remarks section below, and do not provide limited temporary life insurance.)

G. Did you provide the client with a Limited Temporary Life Insurance Agreement?   ☐ yes ☒ no

H. Have any of the proposed insureds or the owner submitted an application for coverage with any insurance member of the
American International Group, Inc. within the last 30 days?   ☐ yes ☒ no

I. If primary proposed insured is a child or age 18 and over and not self-supporting, what
amount of insurance is in force on the father? $ _____ and/or mother? $ _____ and/or siblings? $ _____

J. Are you related by blood or marriage to any proposed insured?   ☐ yes ☒ no
(If yes, relationship) _____

| Remarks |
|---|

**2. Details and Explanations** (Please include information on any split dollar, collateral assignment, etc.) _____

_____
_____
_____
_____
_____
_____

| Commission |
|---|

**3. Agent/Agency Information** (Please list servicing agent first.)

| Agent(s) to Receive Commission | Agency Number | Agent Number | Percent of Split | Broker-Dealer (if variable) |
|---|---|---|---|---|
| Stephen B. Wechsler | 3P263 | 39V36 | 65% | ☐ AGSI ☐ Other: |
| Kevin Bechtel | 3P263 | 3P2164 | 35% | ☐ AGSI ☐ Other: |
| | | | | ☐ AGSI ☐ Other: |
| | | | | ☐ AGSI ☐ Other: |

Writing Agent X _(signature)_    Date _8/1/07_
Social Security or Tax ID # _____   Phone # _813.792.6182_
E-mail Address _ROKEEFE@LBPUSA.COM_   Fax # _____

For Broker-Dealer use

Processing Center _____   Contact Person _____   Phone # ( ) _____
Servicing Agent (if other than writing agent) send policy/delivery requirements to _Life Brokerage Partners_
_ROKEEFE@LBPUSA.COM_

AGL C100505 2003

Page 6 of 7

AGL / BECHTEL 000207

# EXHIBIT H

**(to Exhibit 1: Lohman Affidavit)**

## Premium History

Contract Number:  UM0044158L
Insured:   MICHAEL SASONI

| Accounting Date | Transaction Type | Amount |
|---|---|---|
| 10/20/2009 | Total Payment | $68,400.00 |
| 07/21/2009 | Total Payment | $68,400.00 |
| 05/29/2009 | Total Payment | $20,534.00 |
| 05/12/2008 | Total Payment | $97,866.00 |
| 11/23/2007 | Total Payment | $330,934.00 |
| 08/03/2007 | Total Payment | $97,866.00 |

Case 8:15-cv-00982-AEP  Document 48-1  Filed 02/09/16  Page 54 of 149 PageID 678

## Premium History

Contract Number:  UM0044159L
Insured:   MICHAEL SASONI

| Accounting Date | Transaction | Type Amount |
|---|---|---|
| 10/20/2009 | Total Payment | $68,400.00 |
| 07/21/2009 | Total Payment | $68,400.00 |
| 05/29/2009 | Total Payment | $20,534.00 |
| 05/12/2008 | Total Payment | $97,866.00 |
| 11/23/2007 | Total Payment | $330,934.00 |
| 08/03/2007 | Total Payment | $97,866.00 |

# EXHIBIT I

**(to Exhibit 1: Lohman Affidavit)**

## DEBT SUMMARY

|  | Life Brkg Partners LLC (Bechtel) | Stephen Wechsler |
|---|---|---|
| Previous Debt | ($63,853.43) |  |
| Actual debt as of 10/3/14 | ($587,954.40) | ($505,013.60) |
| Actual debt as of 11/7/14 | ($505,013.60) | $505,013.60 |
| Total | ($1,156,821.43) | $0.00 |

Commissions held to reduce debt:

| Date | Amount | Wechsler |
|---|---|---|
| 10/3/2014 | $5,062.75 | $487.64 |
| 10/24/2014 | $118.00 |  |
| 10/31/2014 | $1,804.55 |  |
| 11/21/2014 | $176.91 |  |
| 12/5/2014 | $1,864.56 |  |
| 12/19/2014 | $176.96 |  |
| 1/2/2015 | $3,811.85 |  |
| 1/9/2015 | $1,530.00 |  |
| 1/30/2015 | $541.47 |  |
| 2/6/2015 | $1,530.00 |  |
| 2/27/2015 | $23,551.99 |  |
| 3/6/2015 | $2,187.82 |  |
| 3/27/2015 | $218.10 |  |
| 4/3/2015 | $232.10 |  |
| 4/10/2015 | $5,842.05 |  |
| 4/24/2015 | $176.91 |  |
| 5/1/2015 | $404.33 |  |
| 5/8/2015 | $1,620.00 |  |
| 5/29/2015 | $497.96 |  |
| 6/5/2015 | $1,440.00 |  |
| 6/26/2015 | $176.91 |  |
| 7/3/2015 | $3,794.60 |  |
| 7/10/2015 | $7,093.61 | Previous Debt paid off. |
| 7/10/2015 | $1,933.97 |  |
| 7/31/2015 | $321.00 |  |
| 8/7/2015 | $67.46 |  |
| 8/21/2015 | $176.91 |  |
| 9/4/2015 | $1,546.49 |  |
| 9/25/2015 | $212.22 |  |
| 10/2/2015 | $5,666.63 |  |
| 10/16/2015 | $3,499.69 |  |
| 10/30/2015 | $401.53 |  |
| 11/6/2015 | $1,680.00 |  |
| 11/27/2015 | $321.00 |  |
| 12/4/2015 | $1,760.67 |  |

CONFIDENTIAL

AGL / BECHTEL 000355

| | | |
|---|---|---|
| 12/25/2015 | $3,052.73 | |
| 1/8/2016 | $1,680.00 | |
| **Total commissions held:** | $86,173.73 | $487.64 |
| **Total debt owed:** | ($1,070,647.70) | $487.64 |

*Transaction History per policy*

| UM0044158L-SASONI STMT DATE | Life Brkg Partners LLC Comm 3P263 | Life Brkg Partners LLC Bonus 3P263 | Stephen B Wechsler 3SV36 |
|---|---|---|---|
| 10/19/2007 | $30,827.79 | $138,968.58 | |
| 10/26/2007 | | | $57,251.61 |
| 11/30/2007 | $104,244.21 | $13,255.42 | |
| 12/7/2007 | | | $193,596.39 |
| 12/28/2007 | | | |
| 5/16/2008 | $2,299.85 | | |
| 5/23/2008 | | | $636.13 |
| 6/5/2009 | $482.55 | | $133.47 |
| 7/24/2009 | $1,607.40 | | |
| 7/31/2009 | | | $444.60 |
| 10/23/2009 | $2,291.40 | | $444.60 |
| 10/3/2014 | ($141,753.20) | ($152,224.00) | ($252,506.80) |
| Comp paid and not reverse | $0.00 | $0.00 | $0.00 |

| UM0044159L-SASONI STMT DATE | Life Brkg Partners LLC Comm 3P263 | Life Brkg Partners LLC Bonus 3P263 | Stephen B Wechsler 3SV36 |
|---|---|---|---|
| 10/19/2007 | $30,827.79 | $138,968.58 | |
| 10/26/2007 | | | $57,251.61 |
| 11/30/2007 | $104,244.21 | $13,255.42 | |
| 12/7/2007 | | | $193,596.39 |
| 12/28/2007 | | | |
| 5/16/2008 | $2,299.85 | | |
| 5/23/2008 | | | $636.13 |
| 6/5/2009 | $482.55 | | $133.47 |
| 7/24/2009 | $1,607.40 | | |
| 7/31/2009 | | | $444.60 |
| 10/23/2009 | $2,291.40 | | $444.60 |

| | | | |
|---|---|---|---|
| 10/3/2014 | ($141,753.20) | ($152,224.00) | ($252,506.80) |
| Comp paid and not reverse | $0.00 | $0.00 | $0.00 |

CONFIDENTIAL

AGL / BECHTEL 000357

# EXHIBIT J

### (to Exhibit 1: Lohman Affidavit)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MICHAEL SASONI 2007-1 INSURANCE )
TRUST, a Delaware statutory trust; MICHAEL )
SASONI 2007-2 INSURANCE TRUST, a )
Delaware statutory trust; MICHAEL SASONI, )  C.A. No. _____
STEPHEN B. WECHSLER; THE WECHSLER )
FINANCIAL GROUP, INC.; KEVIN BECHTEL; )
and LIFE BROKERAGE PARTNERS, LLC, )
                                   )
    Plaintiffs, )
                                   )
  v. )
                                   )
AMERICAN GENERAL LIFE INSURANCE )
COMPANY, )
                                   )
    Defendant. )

## COMPLAINT

Plaintiffs, Michael Sasoni 2007-1 Insurance Trust and Michael Sasoni 2007-2 Insurance

Trust (collectively the "Trusts" or the "Sasoni Trusts"); Stephen Wechsler; Wechsler Financial

Group, Inc.; Kevin Bechtel; and Life Brokerage Partners, LLC ("Plaintiffs"), complain of

Defendant American General Life Insurance Company ("American General") as follows:

## NATURE OF THE ACTION

1.  This action arises out of the attempts by American General to rescind valid life

insurance policies issued to Delaware policy owners on Delaware policy forms by alleging

erroneously that such policies constitute purportedly improper stranger owned life insurance

when, in fact, American General is attempting to rescind the policies – and to keep the

substantial premiums it already has collected – to obtain an undeserved financial windfall.

2.     American General extensively marketed large face value policies to elderly investors in order to collect as much premium income as possible as fast as possible. Then, if the policies proved to be unprofitable, or if financial circumstances changed, American General would renege on its contractual promises by refusing to pay death benefits under the policies or canceling them without refunding the hundreds of thousands of dollars of premiums that it received. Now, American General finds itself in financial trouble due to its substantial and reckless investments in "credit-default swaps," "collateralized debt obligations" and other exotic derivatives. It has also determined that the policies it issued to the Trusts, and for which it accepted hundreds of thousands of dollars in premiums, have become unprofitable. As a result, American General is attempting to avoid its clear contractual obligations by filing "rescission" lawsuits throughout the country challenging the validity of the Delaware insurance transactions it actively solicited less than two years ago. This is a deliberate and calculated attempt to undermine Delaware law and public policy. Not only is American General attempting to evade its contractual obligations, it is attempting to keep all of the premiums paid on the policies in clear violation of law. American General's effort to avoid its contractual obligations is simply a further extension of its issuance of life insurance policies that it would honor only so long as it viewed doing so to be in *its* interest.

3.     In its efforts to maximize the receipt of premium income by issuing as many of these high-dollar policies as possible, American General, on information and belief, relaxed or disregarded its own underwriting guidelines, disregarded any issues or "red flags" raised in the underwriting process, did not seek information that it now contends, after the fact, to be material, and otherwise knowingly engaged in "cash flow underwriting."

4. It has become apparent that American General planned to honor the life insurance policies it issued only so long as the policies were profitable, and to engage in an improper practice, sometimes called "post-issuance underwriting" with respect to policies it no longer viewed as profitable. In other words, upon information and belief, if it were actually called upon to pay a death benefit, or if other economic conditions caused the policies to cease to be profitable, American General would purport to "rescind" the policies unilaterally based on facts of which the Defendant was aware or did not care about at the time the policies were sold. That is precisely what has occurred in this instance. Such *post hoc* underwriting is universally recognized as constituting insurance "bad faith."

5. American General's parent company, American International Group, Inc. ("AIG"), has encountered a series of crippling crises over the past eighteen months, including a nearly catastrophic financial meltdown resulting from its substantial and reckless investment in unregulated credit default swaps. And because AIG's recklessness threatened to drag down the entire U.S. (and world) financial systems, AIG received a bailout of well over $170 billion from American taxpayers. As a consequence of these problems of its own creation, American General has been under intense pressure to expunge unprofitable, large face amount life insurance policies (and the reserves required to be maintained with respect to such policies) from its books, particularly where such investment policies are unlikely to lapse or be surrendered for little or no value and thereby provide the Defendant a profit or windfall.

6. As part of this wrongful *post hoc* underwriting strategy, American General has filed a number of lawsuits around the country in which it has asked courts to disregard applicable law and public policy and to rescind valid life insurance policies, including the policies at issue here. Upon information and belief, the Defendant deliberately avoided filing this lawsuit in

- 3 -

Delaware, where the owners of the policies are based and whose law the Defendant represented would apply to the policies. Instead, the Defendant has blatantly "forum shopped" by preemptively filing its rescission lawsuits only in other states whose insurable interest laws it believes (incorrectly) do not permit such life insurance transactions. American General employed a litigation strategy to avoid its contractual obligations while avoiding Delaware courts in an attempt to avoid Delaware law, which plainly authorizes the Delaware insurance transactions at issue.

7.     American General's position that it is entitled to rescind policies that it believes have been or will be sold to investors is not only incorrect, but incredibly disingenuous, as AIG and its subsidiaries have themselves purchased *billions* of dollars of life insurance policies on the secondary market.

8.     The actions by American General in repudiating its contractual obligations to pay death benefits under the policies have caused harm and threaten to cause further harm to the Trusts. American General's actions not only threaten to deprive the Trusts of the bargains they made with American General, but have also forced and are continuing to force the Trusts to incur the unnecessary expense of litigation to enforce their legal rights, and have significantly reduced and will continue to reduce the value of the policies and the beneficial interests in the Trusts.

9.     In this action, Plaintiffs seek declaratory relief with respect to an actual controversy concerning the rights, duties, and obligations of the Trusts and American General under the life insurance policies issued by American General to the Trusts in Delaware (the "Policies" or "Sasoni Policies") that, by American General's own admission, conform with and are governed by Delaware law. American General has attempted to rescind and cancel the Delaware insurance Policies at issue here by filing suit in Florida on July 31, 2009 in the Circuit

Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, although service was not made on the Sasoni Trusts until October 26, 2009. These Delaware Trusts seek declarations from this Delaware Court that, under Delaware law, the Defendant may not rescind or cancel the Delaware Policies; that the applications for the Policies were truthful and correct; that any objections to the issuance of the Policies that American General purports to now have, are based upon facts previously known to it, or events caused by its own agents; and that the Policies remain in full force and effect.

10.     In the Florida action brought by American General to rescind the Policies, American General unjustifiably and without basis accuses the Plaintiffs, including some of American General's own agents, of fraud. Having used the agents to solicit purchasers for the Policies, American General now accuses its own agents of having fraudulently misrepresented facts about the Trusts, in order to create an excuse for attempting rescission of the Policies that American General was only too happy to issue when it thought the Policies would be profitable, and has sought the return of commissions paid to the agents and refused to pay future commissions. Plaintiffs Stephen Wechsler, the Wechsler Financial Group, Inc., Kevin Bechtel and Life Brokerage Partners, LLC (the "Plaintiff Agents") therefore also seek a declaration that the Policies owned by the Sasoni Trusts are valid and enforceable, and that they are entitled to retain all commissions paid to them by American General with respect to those Policies, as well as receiving all future commissions due for the Policies. The Plaintiff Agents also seek damages for the Defendant's wrongful repudiation of their obligation to pay commissions to these Plaintiff Agents pursuant to their agreements with these Plaintiff Agents. Additionally, the Plaintiff Agents each seek a declaration that any representations they made to American General

- 5 -

with respect to the Policies were truthful and/or not material to American General, and to be awarded their costs and fees.

11.     In the Florida action brought by American General to rescind the Policies, the Defendant also unjustifiably and without basis accuses Michael Sasoni of fraud, seeks damages from him, and contends that alleged misrepresentations by him entitle American General to rescind the Policies.  Michael Sasoni seeks a declaration that any representations he made to American General with respect to the Policies were truthful and/or not material to American General, and to be awarded his costs and fees.  He seeks such a declaration both to protect himself against the claims asserted against him by American General and to protect himself from potential liability in the event that the Policies are rescinded.

12.     Plaintiffs also seek injunctive relief that: (1) enjoins American General from rescinding, declaring void, invalid, unenforceable or null, either of the Policies; (2) enjoins American General from proceeding with the action they have filed to rescind the Sasoni Policies, or pursuing other claims against Plaintiffs in such action; and (3) enjoins American General from seeking return of commissions from Plaintiff Agents.

**THE PARTIES**

13.     The Sasoni Trusts are statutory trusts created and organized pursuant to the laws of the State of Delaware and formed pursuant to the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, *et seq.,* with their principal place of business located at 3801 Kennett Pike, Greenville, Delaware 19807.  As Delaware statutory trusts, the Sasoni Trusts are separate legal entities under 12 Del. C. § 3801(g) and are empowered under 12 Del. C. § 3804 to sue in their own names.  The Sasoni Trusts were each created for the purpose of owning life insurance policies on the life of Michael Sasoni.  Christiana Bank & Trust Company is the trustee of the Sasoni Trusts.

14.     Plaintiff Michael Sasoni, the insured under the two Delaware life insurance policies issued to the Sasoni Trusts, is a citizen of Florida.

15.     Plaintiff Stephen Wechsler is a citizen of New York with his principal place of business in New York, New York and is the principal of Plaintiff Wechsler Financial Group, Inc. Plaintiff Wechsler Financial Group, Inc. is a New York corporation with its principal place of business in New York, New York. Mr. Wechsler is a licensed non-resident life insurance agent in the State of Delaware. During the relevant timeframe, Mr. Wechsler was appointed by American General with the Delaware Department of Insurance as its authorized Delaware agent and representative of American General.

16.     Plaintiff Kevin Bechtel is a citizen of Florida and has his principal place of business in Florida. Plaintiff Life Brokerage Partners, LLC is a citizen of Florida and has its principal place of business in Oldsmar, Florida. Mr. Bechtel is a principal of Plaintiff Life Brokerage Partners, LLC. Mr. Bechtel is a licensed non-resident life insurance agent in the State of Delaware. During the relevant timeframe, Mr. Bechtel was appointed by American General with the Delaware Department of Insurance as its authorized Delaware agent and representative of American General.

17.     Defendant American General Life Insurance Company, a subsidiary of AIG, is a corporation organized under the laws of the State of Texas, with its principal office in Harris County, Texas.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1),

insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs,

and there is complete diversity between Plaintiffs and Defendant.

19.     This Court has personal jurisdiction over the Defendant, as among other reasons, it

issued insurance coverage in Delaware to Delaware policy owners and beneficiaries.  It also has

made continuous and systematic contacts with Delaware, and is licensed as an insurer in the

State of Delaware.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a

substantial part of the events giving rise to the claims occurred in this District and the life

insurance policies that are the subject of this action were issued in this District, such that the property

that is the subject of this action is situated in this District.

## FACTUAL BACKGROUND

### A.     Life Insurance Sold to Investors and the Participation of American General in that Market

21.     Upon information and belief, for decades, the life insurance industry has had to

pay out relatively few death claims because the vast majority of life insurance policies lapse (*i.e.*,

the policy owner ceases paying premiums) before the insured's death.  This occurs because, after

owning a policy for some amount of time, most insureds find themselves in a position in which

they are no longer able – or no longer desire – to continue to pay premiums.  Before the

development of the "secondary market" for life insurance policies, such insureds were faced with

little option and generally chose to surrender their insurance policy, thus relinquishing a

potentially valuable asset for little or no payment from the insurer.  This state of affairs resulted

in a tremendous windfall to insurers like American General, as they were able to retain premiums paid by all policy owners while paying out fewer death benefits under the policies originally issued to insureds.

22.     The secondary market for life insurance policies developed as a direct response to this imbalance of power between insurers and their insureds that resulted in many insureds surrendering their policies, and thereby abandoning months – or years – of premiums previously paid to the insurer.  Investors who purchase insurance policies from insureds in the secondary market provide the insureds with the option of selling their insurance policies to the investor rather than simply surrendering the policy to the insurer.  Although some insurers, as a scare tactic, have characterized this secondary market for life insurance policies as "wagering on human life," the secondary market provides an important service to insureds who are now able to sell a valuable asset (their paid-for insurance policy) rather than simply allowing the policy to lapse to the insurer's great benefit.

23.     The secondary market for life insurance has not only benefited existing insureds, but also benefits potential insurance consumers.  Knowing that there are investors willing to purchase life insurance policies allows insureds to purchase insurance policies as a potential investment, which they can either keep for long-term estate planning or elect to sell the policy to an investor.  The increased options provided by the secondary market encourage more people to utilize their insurability whether it be for long-term estate planning or to capitalize on it for more immediate financial planning purposes.

24.     Although the secondary market for life insurance policies plainly benefits insureds and potential insureds by allowing them to efficiently utilize their insurability, some life insurers have taken a negative view of the secondary market because of its perceived impact on

historical life insurance policy lapse rates. An investor who buys a policy on the secondary market or who purchases a policy directly from the insurer on an insured's life is unlikely to allow the policy to lapse. Thus, when a policy is sold to an investor, the insurer is likely to have to pay the death benefit. Insurers who dislike the secondary market dislike it because it ensures that they will have to do precisely what they promise in the insurance policies they issue – ultimately pay out insurance benefits for which they have received a substantial premium.

25.     Upon information and belief, in or around 2004-2005, the life insurance industry began to experience significant growth in the marketing and sale of high face amount policies for high net worth elderly individuals. Upon information and belief, this growth was largely attributable to the expansion in the secondary market for life insurance. Investors have a greater interest in purchasing high face amount policies. That the increased demand for high face amount policies was driven by the secondary market was commented upon frequently within the insurance industry and was well known to all major life insurers.

26.     The increased demand for large face amount policies on the lives of seniors provided an opportunity for significant revenue for insurers wishing to sell such policies. Because such policies were unlikely to lapse, however, certain insurers determined that they did not believe such policies would ultimately be profitable and developed underwriting criteria to avoid the sale of such policies. For instance, such insurers would not issue a policy to a trust unless a copy of the trust agreement was provided to the insurer for review. Other insurers however, eager to obtain a share of the premium revenue from the increased demand for high face amount polices, actively embraced the secondary market and the transactions that led to this increased demand. American General was just such a company.

**B.** **American General's Sale of (and Purchase of) Life Insurance Policies as an Investment**

27.    Upon information and belief, American General was not concerned with whether or not the policies it would issue were owned by third parties or whether the policies were likely to be sold into the secondary market after issuance.  To the contrary, upon information and belief, because American General wanted to increase its premium revenue, American General actively solicited insurance agents and other producers to offer life insurance products that would be sold directly to third party owners or that were likely to be sold into the secondary market. American General was concerned only with generating as much premium revenue as possible through the sale of expensive life insurance policies on the lives of elderly, high net worth individuals.

28.    The policy form used by American General for policies to be owned by Delaware residents (whether individuals, trusts, or otherwise) specifically stated: "You may change the Owner or the Beneficiary at any time during the lifetime of the Insured unless the previous designation provides otherwise."  American General's standard form application for use with Delaware residents did not inquire as to whether the policy owner intended to exercise this contractual right to transfer ownership or beneficial interest in the policy.  Upon information and belief, American General did not inquire as to whether the policy owner intended to transfer the policy because it did not want to discourage applications from insureds and/or policy owners who intended to purchase insurance policies for sale on the secondary market.  American General, rather, was anxious to obtain as much premium revenue as possible from such parties.

29.    As American General knew, Delaware law explicitly provides that "The trustee of a trust established by an individual has an insurable interest in the life of that individual…" 18 *Del. C.* § 2704(c)(5).  The policy form used by American General for policies to be owned by

Delaware residents (whether individuals, trusts, or otherwise), regardless of the state in which the insured resided, specifically stated: "This Is A Delaware Policy." Upon information and belief, American General sold policies to Delaware trusts on the lives of citizens of other states because it wanted to obtain premium revenue from such sales. Upon information and belief, when underwriting policies to be owned by trusts (including trusts located in Delaware), American General did not ask to review copies of the trust agreements for such trusts because it did not want to discourage applications from trusts, but rather wished to obtain premium revenue from such applicants.

30. American General's, and its parent AIG's, participation in the secondary-market for life insurance extends far beyond actively promoting and soliciting life insurance policies for investment purposes. Rather, AIG and its subsidiaries, including American General, have invested in numerous insurance policies on the secondary market and have financed the premiums for numerous insurance policies which were sold on the secondary market.

31. Upon information and belief, AIG and its subsidiaries have been purchasing life insurance policies on the secondary market since as early as 2001. Upon information and belief, because AIG was concerned about the public relations risk of purchasing life insurance policies on the secondary market, AIG initially conducted such purchases through a third party trust. AIG was sued in 2005 by the New York State Attorney General for, among other things, attempting to conceal that it was purchasing life insurance policies on the secondary market so as to avoid accounting rules with respect to the purchase of such policies.

32. Upon information and belief, AIG and its subsidiaries purchased more than 4,000 life insurance policies on the secondary market and have valued this portfolio as being worth several billion dollars. In April of 2009, Risk Finance, a unit of AIG, completed a $2 billion

securitization of such policies (the policies had a combined face amount of over $8 billion) – the largest successful securitization of such policies to date, which AIG used to repay some of the bailout funds it received.

33.     American General's assertion that by virtue of owning life insurance policies, the Trusts are "gambling on human life" conflicts with its own practices and standards.  AIG and its subsidiaries have one of, if not the, largest portfolios of life insurance policies purchased on the secondary market in the world.

**C.     American General Issues Delaware Life Insurance Policies to the Sasoni Trusts**

34.     In accordance with the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801, *et seq.,* on or about July 31, 2007, Michael Sasoni established the Michael Sasoni 2007-1 Insurance Trust and the Michael Sasoni 2007-2 Insurance Trust to own life insurance policies on his life. Christiana Bank serves as the Trustee of the Sasoni Trusts.

35.     On or about September 12, 2007, an application for the life insurance policy to be issued to the Michael Sasoni 2007-1 Insurance Trust was executed, and an application for the life insurance policy to be issued to the Michael Sasoni 2007-2 Insurance Trust was executed (collectively, "the Applications").  The Sasoni Trusts signed the Applications in Greenville, Delaware.

36.     In the Applications for the policies to be issued to the Sasoni Trusts, Michael Sasoni was listed as the "Proposed Insured."  The Michael Sasoni 2007-1 Insurance Trust and Michael Sasoni 2007-2 Insurance Trust were listed as the Policy Owners in the respective Applications.  The Sasoni Trusts were also explicitly listed as the only beneficiary of the Sasoni Policies in the respective Applications.

37.     In exchange for the agreement to pay premiums and other consideration, American General subsequently issued and delivered, in Greenville, Delaware, Flexible Premium Adjustable Life Insurance Policy No. UM0044158L dated August 3, 2007 to the Michael Sasoni 2007-1 Insurance Trust.  The initial face amount of the Policy is $10,000,000.  The Michael Sasoni 2007-1 Insurance Trust remains both the Policy owner and beneficiary.

38.     In exchange for the agreement to pay premiums and other consideration, American General subsequently issued and delivered, in Greenville, Delaware, Flexible Premium Adjustable Life Insurance Policy No. and UM0044159L dated August 3, 2007 to the Michael Sasoni 2007-2 Insurance Trust.  The initial face amount of the Policy is $10,000,000.  The Michael Sasoni 2007-2 Insurance Trust remains both the Policy owner and beneficiary.

39.     The Sasoni Policies both explicitly state on page 3 that **"This Is A Delaware Policy"** (emphasis added).

40.     Both Sasoni Policies state: "You may change the Owner or the Beneficiary at any time during the lifetime of the Insured unless the previous designation provides otherwise."

41.     All correspondence from American General to the Sasoni Trusts has been sent to Greenville, Delaware, along with all premium notices and annual statements.

42.     All premiums due under the Sasoni Policies as of this date have been paid or tendered in accordance with the terms of the Sasoni Policies and the Sasoni Trusts have duly performed all other conditions of the Sasoni Policies on their part.  All premium notices were sent by American General to the Sasoni Trusts in Greenville, Delaware, and all premiums have been paid from or procured in Delaware.

43.     The Sasoni Policies were delivered to the Trusts in Greenville, Delaware.

**D.** **American General Wrongfully and Unjustifiably Attempts to Rescind the Delaware Insurance Policies**

44.     Since issuing the Sasoni Policies, American General and its parent, AIG, find themselves in substantially changed economic conditions.  These changed conditions, and not an actual concern over the Sasoni Policies' legitimacy, are the impetus for American General's purported rescission of the Sasoni Policies.

45.     During September of 2008, AIG's credit rating was downgraded and the company nearly collapsed as a result of a liquidity crisis.  Only intervention by the Federal Reserve Bank was able to save the company, as AIG received the largest government bailout of a private company in United States history.

46.     Because of AIG's financial difficulties, AIG and its subsidiaries have been under intense pressure to reduce their costs and liabilities.  This pressure intensified when AIG came under scrutiny for perceived financial waste on multiple occasions;  first when it came to light that AIG spent corporate funds on a lavish business retreat shortly after the bailout was announced, and again when AIG announced that it planned to spend hundreds of millions of the bailout dollars it received on bonuses for its executives.

47.     Upon information and belief, the financial difficulties of AIG have threatened American General's ability to maintain statutorily required reserves while continuing to operate as the company was previously accustomed.

48.     Upon information and belief, in an effort to reduce its reserve requirements and other liabilities, American General and other AIG companies have made a concerted effort to remove high face amount policies from their books.  Upon information and belief, American General's attempt to rescind the Sasoni Policies is part of that effort.

- 15 -

49.     American General filed suit in Florida on July 31, 2009 in the Circuit Court of the

11th Judicial Circuit in and for Miami-Dade County, Florida, attempting to rescind the Sasoni

Policies.  In that action, American General also sued Plaintiff Michael Sasoni and the Plaintiff

Agents alleging, among other things, fraud in connection with the applications for the Sasoni

Policies, and asserting that, if the Sasoni Policies are rescinded, the Plaintiff Agents must return

to American General all commissions they were paid in connection with the Sasoni Policies.

50.     American General's attempt to rescind the Sasoni Policies – through a litigation

American General filed in Florida – is a brazen attempt to evade and undermine Delaware law.

Indeed, in that lawsuit American General entirely ignores Delaware law and the fact that the

Sasoni Policies explicitly state that they are Delaware policies.

51.     Because the Sasoni Policies at issue here explicitly state that they are Delaware

policies and because they are payable to the Sasoni Trusts, which are organized and administered

under Delaware law, the Sasoni Policies are clearly governed by Delaware law.  Additionally,

Delaware law provides that the existence of an insurable interest in a trust-owned life insurance

policy, such as the Sasoni Policies, is governed by Delaware law without regard to the insured's

state of residency or location. 18 *Del. C.* § 2704(g).

52.     American General's claim for rescission based on a lack of insurable interest fails

under Delaware law.  American General has taken the position that the Sasoni Policies were part

of an impermissible Stranger Originated Life Insurance ("STOLI") scheme.  Under Delaware

law, however, an insurable interest existed at policy inception, and therefore, American General

cannot rescind, void, or cancel the Policies on this basis.  Delaware law provides that "every

individual has an insurable interest in the life, body and health of himself or herself...." 18 *Del. C.* §

2704(c).  Delaware law further provides: "[t]he trustee of a trust established by an individual has

an insurable interest in the life of that individual….." 18 *Del. C.* § 2704(c)(5). Michael Sasoni

established the Michael Sasoni 2007-1 Insurance Trust and the Michael Sasoni 2007-2 Insurance

Trust. Under Delaware law, therefore, the trustee of the Sasoni Trusts has the same insurable

interest in Mr. Sasoni's life that Mr. Sasoni has.

53.     American General's claim for rescission based on alleged misrepresentations also

fails. The Sasoni Trusts answered all questions on the Applications truthfully.

54.     Upon information and belief, some of the Application questions were answered

solely by American General's agent(s) and not by the Sasoni Trusts. Accordingly, the agent's

acts and knowledge are imputed to American General and cannot serve as a basis for rescission

of the Sasoni Policies.

55.     American General did not seek information about the ownership or beneficiaries

of the Sasoni Trusts in the Applications or during the underwriting process for the Sasoni

Policies. American General did not ask what entities, if any, owned the Sasoni Trusts or held

beneficial interests in the Sasoni Trusts. Upon information and belief, American General did not

even request copies of the trust agreements of the Sasoni Trusts. If American General chose not

to ask additional questions about the ownership or beneficiaries of the Sasoni Trusts, then such

information is not material, and therefore cannot serve as a basis for rescission. Nor did the

Sasoni Trusts have any independent legal obligation to disclose information about their

ownership and beneficiaries to American General. The Sasoni Trusts did not misrepresent or

omit material information with respect to the Sasoni Policies, fraudulently, intentionally or

otherwise, and did not act with the intent to deceive American General. American General's

attempt to rescind the Sasoni Policies based on the ownership and beneficiaries of the Sasoni

Trusts and a purported lack of insurable interest in the Sasoni Policies is, thus, plainly

- 17 -

impermissible post-issuance underwriting. American General cannot, therefore, rescind or cancel the Sasoni Policies on this basis.

56. American General's attempt to rescind the Sasoni Policies is not motivated by any interest in protecting the insured from investors having an interest in the early death of the insured. To the contrary, the AIG family owns billions of dollars of life insurance policies on the lives of unrelated (or "stranger") insureds. Upon information and belief, American General's motivation in seeking to rescind policies issued to other alleged "STOLI investors" is to purge its inventory of policies held by owners who will not default on the premium payments or allow coverage to lapse and to eliminate the burden of having to maintain statutorily required reserves for the high face value policies. Its attempt to rescind valid contracts was motivated solely by pecuniary gain.

57. American General's attempt to rescind or cancel the Sasoni Policies is unjustified, unlawful and violates the duty of good faith. The Sasoni Policies issued to the Sasoni Trusts remain in full force and effect.

58. The Sasoni Policies require the parties to the agreements deal with each other fairly and in good faith.

59. American General has failed to deal with the Sasoni Trusts in good faith by attempting to rescind or cancel the Sasoni Policies, and/or "contesting" the Sasoni Policies, without a reasonable basis, without conducting a thorough and impartial investigation of the facts, and based on facts and allegations that American General knew or should have known to be untrue. Moreover, American General's attempt to rescind the Sasoni Policies was not only done without a reasonable basis, and without conducting a thorough investigation, but was done

a mere days before the Sasoni Policies became "incontestable" and without providing notice of such contest to the Sasoni Trusts until months later.

60.     American General has further failed to deal with the Sasoni Trusts in good faith by contesting the Sasoni Policies based on statements that were not in the Applications for the Sasoni Policies. Such contest violates both the letter and spirit of the "Incontestability" provision of the Sasoni Policies, which states that only statements made in the Application can be used in such contest.

61.     American General seeks rescission of the Sasoni Policies based on its allegation that the income and net worth of Michael Sasoni were misrepresented on the Applications. However, the income and net worth of Michael Sasoni listed on the Applications was accurate. Had American General conducted a thorough investigation of the facts before attempting to rescind the Sasoni Policies, it would have learned that it did not have a proper basis for rescission. Further, information regarding Michael Sasoni's net worth was not material to the risk insured, and therefore, even if it were inaccurate, could not provide a proper basis for rescission.

62.     American General seeks rescission by claiming that there was no insurable interest in connection with the Policies. Upon information and belief, in so doing, it neither considered nor analyzed the Delaware statutes concerning insurable interest, which establish conclusively an insurable interest in connection with the Policies. American General never requested or reviewed a copy of the trust agreements governing the Trusts. Even a cursory review of these facts would have revealed to American General that they had no basis to rescind the Policies.

63.     American General's attempt to rescind the Sasoni Policies is unjustified, unlawful, and done in bad faith, particularly in that American General seeks to invalidate the Policies as being stranger owned life insurance when, in fact, AIG is one of the world's largest and most prominent owners, promoters and facilitators of investor owned life insurance and secondary market transactions.

64.     American General has acted in bad faith and has engaged in malicious, intentional, and/or grossly negligent conduct that American General knew would result in extraordinary harm and that American General purported to rescind the Sasoni Policies without any reasonable basis in fact or law.

### COUNT I
### DECLARATORY JUDGMENT

65.     Plaintiffs reallege and incorporate by reference each of the allegations made at paragraphs 1 through 64, inclusive.

66.     This is a claim for declaratory relief pursuant to 28 *U.S.C.* §§ 2201-2202. Plaintiffs seek a judicial determination of the rights, duties and obligations of the parties with respect to an actual controversy arising in connection with the Policies.

67.     The Sasoni Trusts and American General have entered into insurance contracts that are valid and enforceable under Delaware law to cover the life of Michael Sasoni.

68.     The Trusts have complied with all applicable conditions of the Policies including timely payment of all premiums due under the Policies to date.

69.     American General has accepted all premiums paid for the Sasoni Policies by the Sasoni Trusts.

70.    The Sasoni Trusts seek a judicial determination that under the Delaware statute, 18 *Del. C.* § 2704, an insurable interest existed at the inception of the Sasoni Policies.

71.    The Sasoni Trusts further desire a judicial determination that American General's purported rescission or cancellation of the Sasoni Policies is legally incorrect and invalid, that the transactions were proper and enforceable under Delaware law, and that American General must honor the Sasoni Policies.

72.    Plaintiff Michael Sasoni seeks a judicial determination that any and all representations he made to American General in connection with the Sasoni Policies were either accurate or not material to American General's decision to issue the Sasoni Policies.

73.    American General had agreements with the Plaintiff Agents to pay such Plaintiff Agents commissions in connection with the sale of life insurance policies for which the Plaintiff Agents acted as agents. Pursuant to such agreements, American General was obligated to pay such Plaintiff Agents commissions in connection with the sale of the Sasoni Policies.

74.    American General has repudiated these obligations and sought the return of commissions paid to the Plaintiff Agents and/or refused to pay future commissions to the Plaintiff Agents.

75.    The Plaintiff Agents seek a judicial determination that the Sasoni Policies are enforceable and valid, and that they are entitled to retain all commissions paid by American General in connection with those Policies, and to receive all future commissions due in connection with such Policies. These Plaintiffs further seek a judicial determination that any representations they made to American General in connection with the Sasoni Policies were either accurate or not material to American General's decision to issue the Sasoni Policies.

76.     An actual controversy exists between and among the Plaintiffs and American General concerning their respective rights, duties, and obligations under the Policies and with respect to the Policies.

77.     American General has sought to rescind or cancel the Sasoni Policies, which it alleges are void *ab initio*. There is thus an actual case or controversy between Sasoni Trusts and American General.

78.     American General has accused the Plaintiffs of fraud (and alleged that their alleged misrepresentations justify rescission of the Sasoni Policies) and brought other causes of action against them in its action to rescind the Sasoni Policies. American General has also asserted that the Sasoni Policies may be rescinded and that American General is entitled to recover commissions paid to the Plaintiff Agents in connection with the Sasoni Policies. There is thus an actual case or controversy between these Plaintiffs and American General.

79.     Plaintiffs desire a judicial determination of the respective rights, duties, and obligations of the parties and a declaration that their contentions as set forth herein are correct. Such a declaration is necessary and proper at this time in order that all parties may determine their rights and obligations among themselves, so as to avoid a multiplicity of legal actions that would otherwise be necessary. Plaintiffs further allege that it would be equitable and just to award them their costs and reasonable and necessary attorneys' fees.

## COUNT II
### INJUNCTIVE RELIEF

80.     Plaintiffs reallege and incorporate by reference each of the allegations made at paragraphs 1 through 79 inclusive.

81.     American General has committed wrongful acts against Plaintiffs. American General has wrongfully and unjustifiably sought to rescind valid insurance policies, wrongfully accused Plaintiffs of fraud, and sought to intimidate Plaintiffs, and circumvent Delaware law and public policy, by filing a lawsuit against Plaintiffs.

82.     The wrongful actions of American General threaten Plaintiffs with irreparable injury that does not have an adequate remedy at law.

83.     Plaintiffs seek a preliminary and permanent injunction against American General that: (1) enjoins American General from rescinding, declaring void, invalid, unenforceable or null, either of the Policies; (2) enjoins American General from proceeding with the action it filed to rescind or cancel the Sasoni Policies or pursuing other claims against Plaintiffs in such action, including claims against the Plaintiff Agents and against Michael Sasoni; and (3) enjoins American General from seeking return of commissions from Plaintiff Agents.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enters judgment ordering as follows:

1.     Adjudicating and declaring that the purported rescission or cancellation of the Policies by American General is unlawful and improper and that the Policies remain in full force and effect;

2.     Adjudicating and declaring that any and all representations made by Plaintiffs to American General with respect to the Sasoni Policies were either accurate or not material to American General's decision to issue the Sasoni Policies;

3.      Adjudicating and declaring that the Plaintiff Agents are entitled to keep the commissions they earned on the sale of the Sasoni Policies and to future commissions related to the Sasoni Policies.

4.      Granting Plaintiffs their costs of suit, expenses, and reasonable attorneys' fees;

5.      Granting Plaintiffs pre and post-judgment interest on the foregoing sums;

6.      Granting Plaintiffs injunctive relief requested herein;

7.      Granting Plaintiffs such other and further relief as the Court deems just and appropriate.

POTTER ANDERSON & CORROON LLP

By: _____
      John E. James (No. 996)
      David E. Moore (No. 3983)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19801
      Tel: (302) 984-6000
      jjames@potteranderson.com
      dmoore@potteranderson.com

*Attorneys for Plaintiffs*

Dated: December 21, 2009
947175

# EXHIBIT K

**(to Exhibit 1: Lohman Affidavit)**

IN THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

AMERICAN GENERAL LIFE
INSURANCE COMPANY,

        Plaintiff,              CASE NO.: 2009-57024-CA-01

v.

THE MICHAEL SASONI 2007-1 INSURANCE
TRUST, AND MICHAEL SASONI 2007-2
INSURANCE TRUST, by and through their
Trustees; MARSHA S. BRIGHT and
CHRISTIANA BANK & TRUST CO., as
Trustees of the MICHAEL SASONI 2007-1
INSURANCE TRUST and MICHAEL SASONI
2007-2 INSURANCE TRUST; MICHAEL
SASONI, individually; STEPHEN B.
WECHSLER, individually and as principal of
the The Wechsler Financial Group, Inc.; THE
WECHSLER FINANCIAL GROUP, INC.;
KEVIN BECHTEL, individually and as
principal of Life Brokerage Partners, LLC; and
LIFE BROKERAGE PARTNERS, LLC

        Defendants.
_____/

## COMPLAINT & DEMAND
## FOR JURY TRIAL

Plaintiff, AMERICAN GENERAL LIFE INSURANCE COMPANY ("American

General"), sues Defendants, THE MICHAEL SASONI 2007-1 INSURANCE TRUST and THE

MICHAEL SASONI 2007-2 INSURANCE TRUST, by and through their Trustees; MARSHA

S. BRIGHT and CHRISTIANA BANK & TRUST CO., as Trustees of the MICHAEL SASONI-

2007-1 INSURANCE TRUST and the MICHAEL SASONI 2007-2 INSURANCE TRUST;

MICHAEL SASONI, individually; STEPHEN B. WECHSLER, individually and as principal of

The Wechsler Financial Group, Inc.; THE WECHSLER FINANCIAL GROUP, INC.; KEVIN BECHTEL, individually and as principal of Life Brokerage Partners, LLC; and LIFE BROKERAGE PARTNERS, LLC, separately and severally, and alleges:

## INTRODUCTION

1.      This is an action for declaratory relief and rescission of two life insurance policies procured by improper and fraudulent means, and procured for improper and undisclosed purposes. American General issued policy numbers UM0044158L and UN0044159L (the Policies) in August 2007 insuring the life of defendant MICHAEL SASONI (the "Insured") for a total combined face amount of $20,000,000, unknowingly relying upon documents submitted by Defendants in a fraudulent scheme designed to procure life insurance on an individual for which there is no insurable interest and sell the Policies to investors who are unrelated to the Insured and who are speculating on the life of the Insured. American General issued the Policies based upon a facially appropriate application. American General has now discovered that the transaction was part of a scheme perpetrated by (a) the Insured, along with (b) defendants Stephen Wechsler, The Wechsler Financial Group, Inc., Kevin Bechtel, and Life Brokerage Partners, LLC (collectively, the "Brokers"), and by (c) defendants Marsha S. Bright and Christiana Bank and Trust Co. (collectively, the "Trustees"), as trustees of the insurance trusts named above (the "Trusts"), which was designated as the ostensible owner of the Policies.

2.      This scheme consisted of a plan to recruit older persons to pose as applicants for and proposed owners of large-face-amount life insurance policies that were never meant to be retained by the ostensible owners after issuance. Instead, the Policies procured in this case were actually procured by the true owners of the Policies -- the Brokers, the Trusts, the Trustees and/or their unnamed investors (some of whom later may be added as parties as American

2

General discovers their identities) -- in an effort to avoid the insurable interest requirements of state law so that they could hold and/or ultimately sell the Policies to third-party investors seeking to wager on the life of the Insured. Defendants' procurement of the Policies was without a legitimate insurable interest and based upon fraudulent misrepresentations that void the Policies under state laws of (1) misrepresentation and rescission and (2) insurable interest.

## JURISDICTION AND VENUE

3. This action is an action in part for declaratory and other equitable relief based on Fla. Stat. §§ 86.011, 627.404, and 627.409(1) and for damages in excess of the jurisdictional limits of this Court under Fla. Stat. § 26.012.

4. Venue in this judicial district is proper pursuant to Fla. Stat. §§ 47.011 and 47.051 because the cause of action accrued, and at least one Defendant resides or conducts business in Miami-Dade County Florida.

5. This Court has personal jurisdiction over all Defendants because each of the Defendants participated in a conspiracy to commit a tortious act within the State of Florida and caused injury to Plaintiff in the State of Florida.

## PARTIES

6. Plaintiff American General is an insurance company organized under the laws of Texas with its principal place of business in Houston, Texas. American General is licensed and authorized to engage in the business of, among other things, selling life insurance in the State of Florida and has at all times complied with Florida law governing the insurance business in the State.

7. Upon information and belief, Defendant MICHAEL SASONI is a citizen of the State of Florida, residing in Miami-Dade County.

3

8. The MICHAEL SASONI 2007-1 Insurance Trust and the MICHAEL SASONI 2007-2 Insurance Trust are trusts subject to the ownership and control of their Trustees set forth in the following paragraph who, on information and belief, are citizens of the State of Delaware.

9. Upon information and belief, Defendants Marsha S. Bright ("Bright") in her capacity as trustee, and Christiana Bank and Trust Co. ("Christiana Bank"), are citizens of the State of Delaware, with their principal place of business in Delaware. Bright and Christiana Bank are the trustees of the Trusts set forth in the preceding paragraph, which currently own and hold the Policies.

10. Upon information and belief, Defendant Stephen Wechsler ("Wechsler") is a citizen of the State of New York, with his principal place of business in New York, New York, and is the principal of The Wechsler Financial Group, Inc. Wechsler was appointed with American General under an independent brokerage contract at all times relevant to the transactions and events set forth in this action.

11. Upon information and belief, Defendant The Wechsler Financial Group, Inc. is a New York Corporation with its principal place of business in New York, New York.

12. Upon information and belief, Defendant Kevin Bechtel ("Bechtel") is a citizen of the State of Florida, with his principle place of business in Oldsmar, Florida, and is the principal of Life Brokerage Partners, LLC. Bechtel was appointed with American General under an independent brokerage contract at all times relevant to the transactions and events set forth in this action.

13. Upon information and belief, Defendant Life Brokerage Partners, LLC, ("Life Brokerage") is a Florida Limited Liability Company with its principal place of business in Oldsmar, Florida.

4

## BACKGROUND
### Stranger-Originated Life Insurance

14.     Over the last decade, a secondary market has emerged in which speculative investors have sought to obtain, and in many cases have succeeded in obtaining, a pecuniary interest in life insurance policies insuring the lives of strangers.   Although there are other varieties of secondary market transactions, the most problematic speculative scenario is where the insured and/or policy owner intends at inception for the policy or a beneficial interest in the entity that owns the policy to be sold to speculators.

15.     These speculators do not acquire an interest in a life insurance policy insuring the lives of persons with whom they have a familial relationship, or in whose longevity they possess a legally recognized interest; instead, these speculators purchase policies that insure the lives of strangers -- or, in many cases, purchase beneficial interests in insurance trusts or ownership in shell corporations that own those policies -- in the expectation that they will profit by the death of the insured.

16.     Such arrangements are commonly referred to as IOLI, which stands for "investor-originated life insurance," or STOLI or SOLI, which stands for "stranger-originated life insurance," sometimes known as "stranger-owned life insurance."   (These transactions are referred to as "STOLI" herein.)

17.     STOLI transactions often run afoul of state insurable interest laws and universal public policy, which protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued.

18.     Speculators, who are the true intended owners of STOLI policies, attempt to circumvent the law and public policy by carefully constructing their transactions in order to hide these impermissible investments.

19.    The speculators must first find a relatively older and high-net worth individual (or persons willing to fraudulently inflate their financial status) willing to participate in the investment transactions. Logically, the STOLI investors seek out the highest anticipated rates of return when choosing the life insurance policy on which they will speculate. This means the typical life insurance policy to which speculators gravitate insures the life of an individual approaching age seventy or older, with a net worth -- or a fraudulently misrepresented net worth -- of over one million dollars. Often purposefully manipulating their reported net worth, individuals in such an age range can obtain large-face-amount policies and, actuarially speaking, are expected to have a relatively limited lifespan.

20.    The speculators must also determine the resale value of the policy in the secondary market; this value is based largely upon the life expectancy of the prospective insured. The shorter the expected lifetime of the prospective insured, the more valuable the policy is to those who would gamble on his or her life. Prior to the resale of a policy, the prospective insured often submits to a life expectancy analysis, the results of which are provided to putative investors.

21.    Once the speculators locate an individual who meets their investment profile, and more importantly, agree to collaborate in the STOLI arrangement, an application is submitted for one or more insurance policies. The speculators typically pay most or all of the prospective insured's costs, including premium payments. Some speculators even agree to pay the prospective insured a fee upon the issuance of the policy.

22.    In many cases, the policy application indicates that a third-party entity, such as a trust, a shell corporation, or a limited partnership, will be the owner and beneficiary of the life insurance proceeds. This permits the speculators to acquire an interest in this holding entity –

6

and, most importantly, in the death benefit that later will be disbursed – while hiding the facts of their ownership from the insurer.

23. Another way the investors obtain ownership of the policy is to loan the insured the funds to pay the premium for a finite period of time, usually for the two-year contestability period. Once this contestability period has expired, the insured can either repay the loan or assign the policy to the investors in satisfaction of the loan, thus completing the transaction. The loan is structured in a way to encourage the insured to assign the policy to the investors by, among other things, loaning the funds with exorbitant fees and interest rates.

24. While there are many other variations, all STOLI programs have one thing in common: their objective is to give investors who have no insurable interest in the life of the insured a stake in the life insurance policy of a complete stranger that is intended to produce a windfall to the investor that becomes more valuable the earlier the insured dies.

## FACTS

25. During the time of the transactions described herein, Wechsler and Bechtel were appointed as independent brokers authorized to procure and submit applications from prospective insureds for the issuance of a life insurance policy by American General, subject to underwriting and approval by American General.

26. In or around August 2007, the Brokers procured and submitted an application for life insurance seeking coverage on behalf of the Insured, which resulted in American General's issuing the Policies on the life of the Insured for a total combined face amount of $20,000,000.

27. Set out in more detail below, as part of the application process for the Policies, the Insured, the Brokers, and the Trustees, answered detailed questions on the life insurance application necessary for the underwriting of the Policies.

7

28.   As part of the completion of the life insurance application, the Insured and the

Trustees swore to the truthfulness of their representations contained in that application by their

signature with the following agreement:

> I have read the above statements or they have been read to me.
> They are true and complete to the best of my knowledge and
> belief. I understand that this application: (1) will consist of Part A,
> Part B, and if applicable, related forms; and (2) shall be the basis
> for any policy issued. I understand that any misrepresentation
> contained in this application and relied on by the Company may be
> used to reduce or deny a claim or void the policy if: (1) it is within
> its contestable period; and (2) such misrepresentation materially
> affects the acceptance of the risk.
> . . . .
> I understand and agree that no agent is authorized to: accept risks
> or pass upon insurability; make or modify contracts; or waive any
> of the Insurer's rights or requirements.

29.   Likewise, the Financial Questionnaire completed and signed by the Insured and the

Trustees contained the following agreement:

> All of the above answers are full, complete and true to the best of
> my knowledge and belief, and are a confirmation of, and form a
> part of, the application for insurance.

30.   Likewise, Part A of the Policy application contains a certification for the broker to

complete. Defendant Wechsler signed the certifications on the Policy application:

> I certify that the information supplied by the proposed
> Insured(s)/owner has been truthfully and accurately recorded on
> the Part A application.

31.   The Insured and Trustees obtained the Policies, on the basis of the application and

other required and related documents, naming the Trusts as the ostensible owners and

beneficiaries.

32.   American General issued the Policies in August 2007, which bear a policy date of

August 3, 2007, for a total combined face amount of $20 million, as a result of an application

8

dated on or about August 1, 2007 submitted to American General by the Brokers, naming the MICHAEL SASONI 2007-1 Insurance Trust as the ostensible owner and beneficiary of Policy Number UM0044158L and the MICHAEL SASONI 2007-2 Insurance Trust as the ostensible owner and beneficiary of Policy Number UM0044159L. The application also indicated that the purpose of the insurance was "financial planning." American General relied upon this information in determining whether to issue the Policies. This representation was false.

33.     The Insured was 70 years old as of the policy date.

34.     On or about August 1, 2007, in Part A of the application for the Policies, the Insured, Brokers, and Trustees represented the Insured's household income to be $3,270,000, and his net worth to be $65,500,000. Upon information and belief, these representations were false. American General relied upon this information in determining whether to issue the Policies.

35.     On or about August 1, 2007, in the Financial Questionnaire portion of the application for the Policies, the Insured and Trustees represented the Insured's household income to be $3,270,000, and his net worth to be $65,500,000. Upon information and belief, these representations were false. American General relied upon this information in determining whether to issue the Policies.

36.     Wechsler expressly represented as part of the underwriting process, on or about August 1, 2007, that: (1) the Insured was not "receiving any cash payment, borrowing funds in excess of those required to pay the scheduled premiums and interest or receiving any other consideration as an inducement to participate in this transaction," and (2) "there is no prearranged agreement to transfer the policy nor will the policyholder have a prearranged option

9

or right of first refusal to transfer the policy to a third party." Upon information and belief, these representations were false.

37. Upon information and belief, the Insured did not make, and has not made, any premium payments on the Policies. The funds advanced to pay for the Policies were loaned and/or procured by the Brokers, Trustees, and/or unnamed investors.

38. In connection with the Policies, both Wechsler and Bechtel received substantial monetary commissions.

39. The Brokers and Trustees solicited the Insured to take part in a fraudulent STOLI scheme whereby the Insured would apply to American General for life insurance for which he would not pay and would not keep but, instead, would sell -- through the aid of the Brokers, Trust, and Trustees -- to investors who have no insurable interest in the life of the Insured.

40. The Trusts, though the ostensible original owners of the Policies, are not the true owner of the Policies but, instead, are pass-through owners designed to deliver ownership and interest in the Policies to the true owners of the Policies who are named and or unnamed investors with no insurable interest in the life of the Insured. As a result, Defendants and/or other unnamed investors have invested in and are wagering on the lives of other persons. These STOLI transactions clearly violate state law and public policy.

41. Defendants' intent for the Policies, from the beginning of the transaction, was to transfer and/or sell the Policies to companies, investors, investor groups, or other third parties who are strangers with no insurable interest in the lives of the Insured.

42. Defendants represented to American General that the Insured's designated beneficiaries, through the Trust, were the Policies' true beneficiaries. These representations were

false. Instead, the true applicants for, and owners and beneficiaries of the Policies were, and are, other named and/or unnamed investors who have no insurable interest in the life of the Insured.

43. As part of the STOLI scheme, the Brokers and the Trustees conspired in or around August 2007, with an individual known as Frank Pellicone, purporting to be a provider of underwriting inspection reports, to submit false and/or fraudulent information on and/or verification of the Insured's financial and professional status, representing among other things, that the Insured's net worth was $65,500,000, that his annual income was $3,270,000, and that he had lived in his Aventura residence for twenty years. Upon information and belief, this information was false.

44. Actual controversies exist between the parties as to whether (a) the Policies are void *ab initio* because (1) Defendants materially misrepresented the true facts in the Policies' applications and/or the Policies were procured by fraudulent means and (2) the Policies lacked a lawful insurable interest; and as to whether (b) American General is entitled to (1) retain the premiums paid on the Policies and to (2) receive commission chargebacks from the Brokers in connection with the Policies. A declaratory judgment on these issues will completely resolve the controversies among the parties.

## COUNT ONE
### Declaratory Judgment for Rescission of the Policies Based on Misrepresentation
### (Against the Insured, the Trust and the Trustees)

45. American General realleges and incorporates by reference herein all preceding paragraphs in this Complaint.

46. American General is entitled to rescind the Policies based on the material misrepresentations set out herein.

11

47.     American General is entitled to rescind the Policies pursuant to Fla. Stat. §

627.409(1), which provides in pertinent part:

> (1)     Any statement or description made by or on behalf of an
> insured or annuitant in an application for an insurance policy or
> annuity contract, or in negotiations for a policy or contract, is a
> representation and is not a warranty.     A misrepresentation,
> omission, concealment of fact, or incorrect statement may prevent
> recovery under the contract or policy only if any of the following
> apply:
>
> (a)     The misrepresentation, omission, concealment, or statement
> is fraudulent **or** is material either to the acceptance of the risk or to
> the hazard assumed by the insurer.
>
> (b)     If the true facts had been known to the insurer pursuant to a
> policy requirement or other requirement, the insurer in good faith
> would not have issued the policy or contract, would not have
> issued it at the same premium rate, would not have issued a policy
> or contract in as large an amount, or would not have provided
> coverage with respect to the hazard resulting in the loss.
>
> (Emphasis added).

48.     The Insured, the Trust and the Trustees made misrepresentations, omissions, and

concealments of fact and/or incorrect statements in the Policy application and as part of the

negotiations for the Policies' issue.   American General was entitled to, and did, rely on the

truthfulness and accuracy of the representations made in the Policy application, and during the

application process, in issuing the Policies.

49.     The Insured's, the Trusts', and the Trustees' misrepresentations, omissions,

concealments of fact and/or incorrect statements were fraudulent, and/or material, and/or

American General would not have issued the Policies had it known the true facts surrounding the

Policy transactions, facts that the Insured, the Trusts, and the Trustees were required to disclose

pursuant to the Policies' requirements and/or other requirements.

12

50.     An actual controversy exists between the parties as to whether the Policies are void *ab initio* because the Insured, the Trusts, and the Trustees materially misrepresented the true facts in the Policy application and/or the Policies were procured by fraudulent means. Such misrepresentations and/or omissions constitute a failure of condition precedent for coverage under the Policies. Moreover, pursuant to state law, including Fla. Stat. § 627.409(1), the misrepresentations are grounds for rescission of the Policies. A declaratory judgment on this issue will completely resolve the controversy among the parties.

51.     American General is entitled to a judicial declaration stating (a) that the Policies did not take effect because the Insured, the Trusts, and the Trustees failed to perform a condition precedent for coverage under the Policies; (b) that the Policies were void *ab initio* as a result of the material misrepresentations made by the Insured, the Trusts, and the Trustees in the Policy applications; or (c) that application of Fla. Stat. § 627.409(1) requires rescission.

52.     As a result of the misrepresentations and concealment by the Insured, the Trusts, and the Trustees, American General has been forced to expend money and resources, among other ways, in its underwriting and issuance of the Policies, in its administration and servicing of the Policies, in its investigation of the misrepresentations, suppressions and concealments set forth herein, and in bringing this action for relief. Thus, American General is entitled to retain the premiums paid on the Policies by way of disgorgement and/or offset of damages incurred by American General as a result of the Insured's, the Trusts', and the Trustees' fraud.

53.     Although in this and other Counts herein American General has demonstrated its entitlement to retain the premiums paid on the Policies at issue in this action and has sought a declaration from this Court accordingly, American General hereby constructively tenders the premiums on the Policies to this Court and stands ready to pay the premiums into the Court

13

registry should the Court so require. American General respectfully states that it is seeking a declaratory judgment that it is entitled to retain the premiums is in no way intended to waive American General's entitlement to rescind and/or void the Policies.

**WHEREFORE**, premises considered, American General respectfully requests an Order including or directing the following relief:

a.     For a declaratory judgment stating that the Policies did not take effect for failure of the performance of a condition precedent because the Insured, the Trusts, and the Trustees materially misrepresented the true facts in the Policy applications;

b.     In the alternative, for a declaratory judgment stating that the Policies were void *ab initio* as a result of the Insured's, the Trusts', and the Trustees' material misrepresentations upon which American General relied;

c.     In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.409(1) requires rescission of the Policies;

d.     For an award of American General's costs incurred in this action;

e.     For a declaration that American General is entitled to retain premiums paid on the Policies; and

f.     For other such relief the Court deems proper, just and equitable.

## COUNT TWO
### Declaratory Judgment for Rescission and/or
### Voiding of the Policies Based on Lack of Insurable Interest
### (Against the Insured, the Trust, and the Trustees)

54.     American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

55.     The Policies lack a lawful insurable interest.  The Policies are illegal wagering contracts under state laws and public policy.

56.     The Policies violate Fla. Stat. § 627.404.

57.     The Defendants made statements, declarations, and representations that were untrue relative to the insurable interest in the Insured's life.  American General relied in good faith on those untrue misrepresentations, omissions, and concealments of fact and/or incorrect statements in the Policy applications.  As a result, American General has been damaged by, among other things, issuing Policies that is void under state laws and public policy.

58.     The STOLI scheme described herein perpetrated by all Defendants violates the letter and spirit of state law on insurable interest and is inconsistent with the public policy of prohibiting the wagering on the lives of others.

59.     An actual controversy exists between the parties as to whether the Policies are void *ab initio* because of the Insured's, the Trusts', and the Trustees' misrepresentations of the true facts relevant to insurable interest and because the procurement of the Policies violate state law and public policy.  Such misrepresentations and/or omissions and/or violation of state law and public policy constitute a failure of condition precedent for coverage under the Policies.  A declaratory judgment on this issue will completely resolve the controversy among the parties.

15

60.     American General is entitled to a judicial declaration stating (a) that the Policies did not take effect because the Insured, the Trusts, and the Trustees failed to perform a condition precedent for coverage under the Policies; or in the alternative (b) that the Policies are void *ab initio* as a result of the material misrepresentations made by the Insured, the Trusts, and the Trustees in the Policy applications on which American General relied and/or as a result of the Policies' violation of state law and public policy.

61.     As a result of the misrepresentations and concealment by the Insured, the Trusts, and the Trustees in furtherance of this STOLI scheme, American General has been forced to expend money and resources, among other ways, in its underwriting and issuance of the Policies, in its administration and servicing of the Policies, in its investigation of the misrepresentations, suppressions and concealments set forth herein, and in bringing this action for relief.  Thus, American General is entitled to retain the premiums paid on the Policies by way of disgorgement and/or offset of damages incurred by American General as a result of the Insured's, the Trusts', and the Trustees' fraud.

62.     Although in this and other Counts herein American General has demonstrated its entitlement to retain the premiums paid on the Policies at issue in this action and has sought a declaration from this Court accordingly, American General hereby constructively tenders the premiums on the Policies to this Court and stands ready to pay the premiums into the Court registry should the Court so require.  American General respectfully states that its actions in seeking a declaratory judgment that it is entitled to retain the premiums is in no way intended to waive American General's entitlement to rescind and/or void the Policies.

**WHEREFORE**, premises considered, American General respectfully requests an Order including or directing the following relief:

16

a.  For a declaratory judgment stating that the Policies did not take effect for failure of the performance of a condition precedent because the Insured, the Trusts, and the Trustees materially misrepresented the true facts in the Policy applications and/or the Policies violate state law and public policy;

b.  In the alternative, for a declaratory judgment stating that the Policies were void *ab initio* as a result of the Insured's, the Trusts', and the Trustees' material misrepresentations upon which American General relied in good faith and/or as a result of the Policies' violation of state law and public policy;

c.  In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.409(1) requires rescission of the Policies;

d.  In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.404 renders the Policies void;

e.  For an award of American General's costs incurred in this action;

f.  For a declaration that American General is entitled to retain premiums paid on the Policies; and

g.  For other such relief the Court deems proper, just and equitable.

## COUNT THREE
### Rescission and/or Voidance of Policies and Disgorgement
### Based on Fraud and Misrepresentation
### (Against all Defendants)

63.  American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

64.     To induce American General to issue the Policies, Defendants represented to American General that the proposed Insured had a certain financial net worth and insurance needs, as alleged specifically herein, justifying the sizable insurance coverage sought.

65.     Said representations were false. The true facts were that the Insured's net worth and insurance needs were substantially less than that represented.

66.     Further, to induce American General to issue the Policies, Defendants caused false and/or fraudulent information to be submitted to American General from third parties regarding the Insured's income, net worth, and insurance needs.

67.     Defendants' representations were in fact false. The true facts were that the Policies were purchased with the intent that it would benefit the Brokers, Trustees, and/or unnamed investors. Further, the Trust's purported ownership of the Policies were not intended ultimately to benefit the Insured or his designated beneficiaries, but instead benefited the remaining Defendants and unnamed investors.

68.     Prior to issuing the Policies, American General did not know that these representations were false, but believed them to be true and, reasonably and in good faith, relied upon them. Had American General (1) known the truth regarding the Insured's actual net worth and insurance needs, and/or (2) known the truth of Defendants' purpose in procuring the Policy - - to engage in an unlawful STOLI scheme in violation of state insurable interest and misrepresentation laws and in violation of public policy -- American General would not have issued the Policies.

69.     Defendants took actions, did things, and engaged in the unauthorized and unlawful activities alleged above and incorporated herein as part of Defendants' STOLI scheme, knowing

the representations made to American General were false, in furtherance of their scheme and with the intent to deceive American General and to induce it to issue the Policies.

70.    In performing the acts herein alleged in furtherance of their scheme, Defendants intentionally misrepresented and/or concealed from American General material facts known to the Defendants with the intention of inducing American General to issue the Policies in violation of state law thereby making American General liable for unlawful insurance coverage and depriving American General of its money.

71.    As a result of the misrepresentations and concealment by Defendants, American General has been forced to expend money and resources, among other ways, in its underwriting and issuance of the Policies, in its administration and servicing of the Policies, in its investigation of the misrepresentations, suppressions and concealments set forth herein, and in bringing this action for relief.  Thus, American General is entitled to retain the premiums paid on the Policies by way of disgorgement and/or offset of damages incurred by American General as a result of Defendants' fraud.

72.    Although in this and other Counts herein American General has demonstrated its entitlement to retain the premiums paid on the Policies at issue in this action and has sought a declaration from this Court accordingly, American General hereby constructively tenders the premiums on the Policies to this Court and stands ready to pay the premiums into the Court registry should the Court so require.  American General respectfully states that its seeking a declaratory judgment that it is entitled to retain the premiums is in no way intended to waive American General's entitlement to rescind and/or void the Policies.

**WHEREFORE**, premises considered, American General respectfully requests an Order including or directing the following relief:

19

a.    For a declaratory judgment stating that the Policies did not take effect for failure of the performance of a condition precedent because the Defendants materially misrepresented the true facts in the Policy applications;

b.    In the alternative, for a declaratory judgment stating that the Policies were void *ab initio* as a result of the Defendants' material misrepresentations upon which American General relied in good faith;

c.    In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.409(1) requires rescission of the Policies;

d.    In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.404 renders the Policies void;

e.    For an award of American General's costs incurred in this action;

f.    For disgorgement of any and all proceeds and profits obtained by Defendants as a result of their fraudulent scheme;

g.    For a declaration that American General is entitled to retain premiums paid on the Policies; and

h.    For other such relief the Court deems proper, just and equitable.

## COUNT FOUR
### Civil Conspiracy
### (Against all Defendants)

73.    American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

74.    Defendants consist of multiple parties, not all of whom necessarily had knowledge of the entire scheme or plan herein, but all of whom committed acts in furtherance of an overall scheme known by the Brokers, the Trustees, and certain others.

20

75. In or around May – August 2007, some or all of Defendants agreed together to devise and execute a scheme to solicit elderly insureds, including the Defendant Insured, and procure life insurance policies well in excess of said insureds' net worth with an intent to avoid state insurable interest laws.

76. The Insured engaged in multiple overt acts set out herein in furtherance of this conspiracy, including, but not limited to, meeting with the Brokers, misrepresenting information on insurance applications, causing third parties to submit false and/or fraudulent information to American General with the intent to induce American General to issue the Policies, establishing two Trusts to obtain ownership of the Policies, and working with unnamed financers to secure and pay premium payments to American General through third-party sources.

77. The Trusts and Trustees engaged in multiple overt acts set out herein in furtherance of this conspiracy, including, but not limited to, meeting with the Brokers and/or Insured, misrepresenting information on insurance applications, causing third parties to submit false and/or fraudulent information to American General with the intent to induce American General to issue the Policies, establishing Trusts to obtain ownership of the Policies, and working with unnamed financers to secure and pay premium payments to American General through third-party sources.

78. The Brokers engaged in multiple overt acts set out herein in furtherance of this conspiracy, including, but not limited to, meeting with the Insured, Trustees and financers, misrepresenting information on insurance applications, causing third parties to submit false and/or fraudulent information to American General with the intent to induce American General to issue the Policies, aiding in the establishment of the Trusts to obtain ownership of the Policies,

and working with unnamed financers to secure and pay premium payments to American General through third-party sources.

79.    In addition to directly violating state law, said scheme consisted of numerous fraudulent acts and misrepresentations on the part of Defendants set out herein.

80.    American General was damaged by said conspiracy, as it paid substantial monetary commissions and is now responsible for issuing Policies that it has since learned violate state insurable interest laws.

81.    As a result of the misrepresentations and concealment by Defendants, American General has been forced to expend money and resources, among other ways, in its underwriting and issuance of the Policies, in its administration and servicing of the Policies, in its investigation of the misrepresentations, suppressions and concealment set forth herein, and in bringing this action for relief. Thus, American General is entitled to retain the premiums paid on the Policies by way of disgorgement and/or offset of damages incurred by American General as a result of Defendants' fraud.

82.    Although in this and other Counts herein American General has demonstrated its entitlement to retain the premiums paid on the Policies at issue in this action and has sought a declaration from this Court accordingly, American General hereby constructively tenders the premiums on the Policies to this Court and stands ready to pay the premiums into the Court registry should the Court so require.  American General respectfully states that its seeking a declaratory judgment that it is entitled to retain the premiums is in no way intended to waive American General's entitlement to rescind and/or void the Policies.

**WHEREFORE,** premises considered, American General respectfully requests an Order including or directing the following relief:

22

a.      For a declaratory judgment stating that the Policies did not take effect for failure of the performance of a condition precedent because the Defendants materially misrepresented the true facts in the Policy applications;

b.      In the alternative, for a declaratory judgment stating that the Policies were void *ab initio* as a result of Defendants' material misrepresentations upon which American General relied in good faith;

c.      In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.409(1) requires rescission of the Policies;

d.      In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.404 renders the Policies void;

e.      For an award of money damages to be determined at trial;

f.      For an award of American General's costs incurred in this action;

g.      For a declaration that American General is entitled to retain premiums paid on the Policies; and

h.      For other such relief the Court deems proper, just and equitable.

## COUNT FIVE
### Aiding and Abetting Fraud
### (Against the Brokers and the Trustees)

83.     American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

84.     As alleged herein, the Insured (1) made fraudulent misrepresentations to American General and (2) engaged in fraudulent acts and/or fraudulently concealed from American General facts material to the risk on the Policies.

85.     Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on American General, the Brokers substantially aided and assisted the Insured in carrying out this fraudulent STOLI scheme in or around May – August 2007 by assisting the Insured in his fraudulent communications and representations to American General, including causing third parties to submit false and/or fraudulent information to American General with the intent to induce American General to issue the Policies, and by marketing and providing an organized method of engaging in and furthering said STOLI scheme.   At all times relevant hereto, the Brokers knew that the above-mentioned actions were in furtherance of the fraudulent STOLI scheme.

86.     Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on American General, the Trustees substantially aided and assisted the Insured in carrying out this fraudulent STOLI scheme in or around May – August 2007 by establishing and serving as trustees for the Trust to conceal the absence of an insurable interest in connection with the Policies and by facilitating the premium payments on the Policies made to American General.  At all times relevant hereto, the Trustees knew that the above-mentioned actions were in furtherance of the fraudulent STOLI scheme.

87.     American General was damaged by said aiding and abetting fraud, as it paid substantial monetary commissions and is now responsible for issuing Policies that it has since learned violate state insurable interest laws.

88.     As a result of said aiding and abetting fraud, American General has been forced to expend money and resources, among other ways, in its underwriting and issuance of the Policies, in its administration and servicing of the Policies, in its investigation of the misrepresentations, suppressions and concealment set forth herein, and in bringing this action for relief.   Thus,

American General is entitled to retain the premiums paid on the Policies by way of disgorgement and/or offset of damages incurred by American General as a result of the Brokers' and the Trustees' aiding and abetting fraud.

89.    Although in this and other Counts herein American General has demonstrated its entitlement to retain the premiums paid on the Policies at issue in this action and has sought a declaration from this Court accordingly, American General hereby constructively tenders the premiums on the Policies to this Court and stands ready to pay the premiums into the Court registry should the Court so require.  American General respectfully states that its seeking a declaratory judgment that it is entitled to retain the premiums is in no way intended to waive American General's entitlement to rescind and/or void the Policies.

**WHEREFORE,** premises considered, American General respectfully requests an Order including or directing the following relief:

a.     For a declaratory judgment stating that the Policies did not take effect for failure of the performance of a condition precedent because the Defendants materially misrepresented the true facts in the Policy applications;

b.     In the alternative, for a declaratory judgment stating that the Policies were void *ab initio* as a result of Defendants' material misrepresentations upon which American General relied in good faith;

c.     In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.409(1) requires rescission of the Policies;

d.     In the alternative, for a declaratory judgment stating that the application of Fla. Stat. § 627.404 renders the Policies void;

e.     For an award of money damages to be determined at trial;

f.   For an award of American General's costs incurred in this action;

g.   For a declaration that American General is entitled to retain premiums paid on the Policies; and

h.   For other such relief the Court deems proper, just and equitable.

## COUNT SIX
## Declaratory Judgment for Determination and Payment of Commission Chargebacks Owed on the Policies by Brokers to American General
## (Against the Brokers)

90.   American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

91.   Commissions paid to Wechsler and/or his corporate entities named herein in connection with the Policies: Amount to be determined at Trial.

92.   Commissions paid to Bechtel and/or his corporate entities named herein in connection with the Policies: Amount to be determined at Trial.

93.   As a result of American General's decision to rescind and/or void the Policies and constructively tender the premiums as set out herein, the Brokers are not entitled to the commissions they have received in connection with the Policies.

94.   The commission sums paid to the Brokers in connection with the Policies were sums that neither the Brokers nor any broker general agent was entitled to receive by reason of American General's decision to rescind the Policies and the fact that the Policies are void.

95.   American General has been forced to expend money and resources, among other ways, in its underwriting and issuance of the Policies, in its administration and servicing of the Policies, in its investigation of the misrepresentations, suppressions and concealment set forth herein, and in bringing this action for relief. Thus, American General is entitled to retain the

premiums paid on the Policies by way of disgorgement and/or offset of damages incurred by American General.

96.    Although in this and other Counts herein American General has demonstrated its entitlement to retain the premiums paid on the Policies at issue in this action and has sought a declaration from this Court accordingly, American General hereby constructively tenders the premiums on the Policies to this Court and stands ready to pay the premiums into the Court registry should the Court so require.  American General respectfully states that its seeking a declaratory judgment that it is entitled to retain the premiums is in no way intended to waive American General's entitlement to rescind and/or void the Policies

**WHEREFORE,** premises considered, American General respectfully requests an Order including or directing the following relief:

a.    For a declaratory judgment stating that American General is entitled to commission chargebacks against the Brokers, plus interest thereon, according to proof as presented at trial;

b.    For an award of American General's attorneys' fees and costs incurred in this action;

c.    For a declaration that American General is entitled to retain premiums paid on the Policies;

d.    For a declaration that American General is entitled to apply sums otherwise payable to the Brokers against the wrongfully credited commission amounts set out herein; and

e.    For other such relief the Court deems proper, just and equitable.

## COUNT SEVEN
### Breach of Contract
### (Against Brokers)

97.    American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

98.    American General entered into valid and enforceable written agreements with each Broker named herein that pertain to the conduct and facts alleged herein.

99.    Brokers each have breached said contracts with American General.

100.   As a direct, actual and proximate result of Brokers' breaches of their contracts, American General has been damaged as set out herein.

101.   American General has retained the undersigned counsel to bring this action and is obligated to pay a reasonable fee for their services. American General seeks recovery of costs, disbursements and reasonable attorneys' fees incurred in bringing this action pursuant to the governing agreements.

**WHEREFORE,** premises considered, and without waiver of any rights to compensatory and exemplary damages, American General respectfully requests an Order including or directing the following relief:

a.    For an award of money damages to be determined at trial;

b.    For disgorgement of any and all proceeds and profits obtained by Brokers as a result of their breaches of contracts or other improper conduct in connection with the Policies;

c.    For an award of interest, costs, and attorneys' fees, and other, general and further relief at law or in equity to which American General is entitled under the circumstances.

28

## COUNT EIGHT
### Negligence
### (Against Brokers)

102. American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

103. Brokers were under a duty of care to American General to procure the Policies in a manner consistent with Brokers' contracts with American General and in a manner consistent with state law and public policy.

104. Brokers breached that duty of care as set out herein.

105. As a direct, actual and proximate result of Brokers' breach of the duty of care, American General has been damaged as set out herein.

106. American General has retained the undersigned counsel to bring this action and is obligated to pay a reasonable fee for their services. American General seeks recovery of costs, disbursements and reasonable attorneys' fees incurred in bringing this action pursuant to the governing agreements.

**WHEREFORE,** premises considered, and without waiver of any rights to compensatory and exemplary damages, American General respectfully requests an Order including or directing the following relief:

a. For an award of money damages to be determined at trial;

b. For disgorgement of any and all proceeds and profits obtained by Brokers as a result of their negligence in connection with the Policies;

c. For an award of interest, costs, and attorneys' fees, and other, general and further relief at law or in equity to which American General is entitled under the circumstances.

## COUNT NINE
### Fraud
### (Against All Defendants)

107.  American General realleges and incorporates by reference herein paragraphs 1-44 of the Complaint as if set forth fully herein.

108.  Defendants made false statements or omissions of material fact to American General, as set out with particularity throughout this Complaint, in connection with the procurement of the Policies.

109.  Defendants made these false statements and/or omissions of material fact either willfully with intent to deceive or in reckless disregard of their falsity or materiality, and with the intent that American General act in reliance upon their false statements and/or omissions of material fact.

110.  American General in fact relied to its detriment on Defendants' false statements and/or omissions of material fact.

111.  American General has been damaged, as set out herein, as a direct, actual and proximate result of the Defendants' fraud.

**WHEREFORE,** premises considered, American General respectfully requests an Order including or directing the following relief:

a.  For an award of money damages, including punitive damages, to be determined at trial;

b.  For disgorgement of any and all proceeds and profits obtained by the Brokers, Trusts, and Trustees as a result of their fraud in connection with the Policies;

c.  For an award of interest and costs and other, general and further relief at law or in equity to which it is entitled under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable.

DATED: July 31, 2009.

**ACKERMAN, LINK & SARTORY, P.A.**
222 Lakeview Avenue
Suite 1250 - Esperante
West Palm Beach, Florida 33401
Telephone: (561) 838-4100
Facsimile: (561) 838-5305
E-mail: gross@alslaw.com

By: _____

**SCOTT J. LINK**
Florida Bar No. 602991
**DAVID P. ACKERMAN**
Florida Bar No. 374350
**GLORY P. ROSS**
Florida Bar No. 0582506

**AND**

**Of Counsel**

**MAYNARD COOPER & GALE, PC**
Michael D. Mulvaney, Esq.
Christopher C. Frost, Esq.
1901 Sixth Avenue North, Suite 2400
Birmingham, AL 35203
Telephone: (205) 254-1000
Facsimile: (205) 254-1999

*Attorneys for Plaintiff*

# EXHIBIT L

**(to Exhibit 1: Lohman Affidavit)**

3.
VoíD
1-5
7-9

IN THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

AMERICAN GENERAL LIFE
INSURANCE COMPANY,

CASE NO.: 2009-57024-CA-01

      Plaintiff,

v.

THE   MICHAEL   SASONI   2007-1
INSURANCE   TRUST,   AND   MICHAEL
SASONI 2007-2 INSURANCE TRUST, by and
through their Trustee; CHRISTIANA BANK &
TRUST CO., as Trustee of The MICHAEL
SASONI 2007-1 INSURANCE TRUST and
MICHAEL   SASONI   2007-2   INSURANCE
TRUST; MICHAEL SASONI, individually;
STEPHEN B. WECHSLER, individually and as
principal of the Wechsler Financial Group, Inc.;
WECHSLER   FINANCIAL   GROUP,   INC.;
KEVIN   BECHTEL,   individually   and   as
principal of Life Brokerage Partners, LLC; and
LIFE BROKERAGE PARTNERS, LLC



      Defendants.

_____/

## PLAINTIFF'S NOTICE OF VOLUNTARY DISMISSAL
## WITHOUT PREJUDICE

    Plaintiff American General Life Insurance Company, pursuant to Florida Rule of

Civil Procedure 1.420(a)(1)(A), hereby voluntarily dismisses the above-captioned action

without prejudice.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by E-mail this 1st day of October, 2012 to:

David H. Charlip, Esq.
Charlip Law Group, LC
Aventura Bayview
17501 Biscayne Blvd., Suite 510
Aventura, FL 33169
Primary: dcharlip@charliplawgroup.com
Secondary: arivero@charliplawgroup.com
Secondary: rfarkas@charliplaw.com
*Counsel for Defendant Michael Sasoni,
Individually*

Jonathan Galler
Proskauer Rose LLP
One Boca Place, Suite 340 W
2255 Glades Road
Boca Raton, FL 33431
Primary: jgaller@proskauer.com
*Counsel for Defendants The Michael Sasoni 2007-1
Trust, Michael Sasoni 2007-2 Insurance Trust and
Christiana Bank & Trust Co., as Trustee*

Charles G. Geitner
Hinshaw & Culbertson LLP
100 South Ashley Drive, Suite 500
Tampa, FL 33602
Primary: cgeitner@hinshawlaw.com
Secondary:zharrington@hinshawlaw.com
Secondary: psantivasci@hinshawlaw.com
*Counsel for Defendants Kevin Bechtel and Life
Brokerage Partners*

Ackerman, Link & Sartory, P.A.
*Attorneys for Plaintiff*
777 S. Flagler Drive, Suite 800 East
West Palm Beach, Florida 33401
Telephone: (561) 838-4100
Facsimile: (561) 838-5305

BY: _____
David P. Ackerman (FBN: 374350)
Primary: dackerman@alslaw.com
Secondary: klee@alslaw.com
Scott J. Link (FBN: 602991)
Primary: slink@alslaw.com
Lanelle K. Meidan (FBN: 94280)
Primary: lmeidan@alslaw.com
Secondary: Stephen@alslaw.com

And

2

**Of Counsel**
MAYNARD COOPER & GALE, PC
Michael D. Mulvaney,
MMulvaney@maynardcooper.com
David P. Donahue,
DDonahue@maynardcooper.com
1901 Sixth Avenue North, Suite 2400
Birmingham, AL 35203
Telephone:  (205) 254-1000
Facsimile:  (205) 254-1999

*Attorneys for Plaintiff*

BJ1725.DOC

Bk 28308 Pg 2273 CFN 20120723481 10/11/2012 09:31:47 Pg 3 of 3 Mia-Dade Cty, FL

# EXHIBIT M

**(to Exhibit 1: Lohman Affidavit)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MICHAEL SASONI 2007-1 INSURANCE TRUST, a )
Delaware statutory trust; MICHAEL SASONI-2007-2 )
INSURANCE TRUST, a Delaware statutory trust; )
                        )
        Plaintiffs, )
    v. )
                        )
                        )       C.A. No. 09-979-GMS
AMERICAN GENERAL LIFE INSURANCE )
COMPANY, )
                        )       Jury Trial Demanded
        Defendant. )
                        )
                        )
                        )
                        )

## AMERICAN GENERAL LIFE INSURANCE COMPANY'S ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS

Defendant, American General Life Insurance Company ("American General"), by and through its undersigned counsel, by way of Answer to Plaintiffs' Amended Complaint, alleges and says:

## NATURE OF THE ACTION

1. American General admits that it seeks a judicial finding that the insurance policies it issued to Michael Sasoni 2007-1 Insurance Trust and Michael Sasoni 2007-2 Insurance Trust (hereinafter collectively "Plaintiffs" or the "Sasoni Trusts") on the life of Michael Sasoni are void. American General otherwise denies the remaining allegations in paragraph 1 of the Amended Complaint.

2.      Insofar as the allegations contained in paragraph 2 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 2 of the Amended Complaint.

3.      American General denies the allegations in paragraph 3 of the Amended Complaint.

4.      American General denies the allegations in paragraph 4 of the Amended Complaint.

5.      American General denies the allegations in paragraph 5 of the Amended Complaint.

6.      American General denies the allegations in paragraph 6 of the Amended Complaint.

7.      American General denies the allegations in paragraph 7 of the Amended Complaint.

8.      American General admits that it filed a lawsuit against Plaintiffs and others on July 31, 2009 in the Circuit Court of Miami-Dade County, Florida and that the Parties have mutually agreed to move forward with the claims asserted against Plaintiff in this lawsuit. American General otherwise denies the remaining allegations in paragraph 8 of the Amended Complaint.

9.      American General denies the allegations in paragraph 9 of the Amended Complaint.

10.     American General denies that Plaintiffs are entitled to any of the relief they seek in this action.

## THE PARTIES

11.     American General denies that Michael Sasoni established the Trusts for the purpose of purchasing and maintaining life insurance policies on his life. Otherwise, American General admits the remaining allegations in paragraph 11 of the Amended Complaint.

12.     American General admits that it is a Texas corporation with its principal place of business in Harris County, Texas.

## JURISDICTION AND VENUE

13.     American General admits that this Court has jurisdiction over this matter.

14.     American General admits the allegations in paragraph 14 of the Amended Complaint.

15.     American General admits the allegations in paragraph 15 of the Amended Complaint.

## FACTUAL BACKGROUND

16.     Paragraph 16 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is required. To the extent paragraph 16 contains allegations directed to American General, those allegations are denied.

17.     Paragraph 17 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is required. To the extent paragraph 17 contains allegations directed to American General, those allegations are denied.

18.     Paragraph 18 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is

required.  To the extent paragraph 18 contains allegations directed to American General, those allegations are denied.

19.    Paragraph 19 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is required.  To the extent paragraph 19 contains allegations directed to American General, those allegations are denied.  American General specifically denies that Michael Sasoni formed the Trusts for the purpose of providing insurance on his life for the benefit of his family.

20.    Paragraph 20 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is required.  To the extent paragraph 20 contains allegations directed to American General, those allegations are denied.

21.    Paragraph 21 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is required.  To the extent paragraph 21 contains allegations directed to American General, those allegations are denied.

22.    American General admits that the Sasoni Trusts were created and the policies of insurance obtained for the express purpose of unknown investors wagering on the life Michael Sasoni.  American General denies the remaining allegations in paragraph 22 of the Amended Complaint.

23.    American General denies the allegations in paragraph 23 of the Amended Complaint.

24      The documents referenced in paragraph 24 of the Amended Complaint speak for themselves.  American General denies the remaining allegations in paragraph 24 of the Amended Complaint.

25.     American General denies the allegations in paragraph 25 of the Amended Complaint.

26.     American General denies the allegations in paragraph 26 of the Amended Complaint.

27.     American General denies the allegations in paragraph 27 of the Amended Complaint.

28.     American General denies the allegations in paragraph 28 of the Amended Complaint.

29.     American General denies that Michael Sasoni established the Trusts for the purpose of purchasing and maintaining life insurance policies on his life.  Otherwise, American General is without knowledge sufficient to admit or deny the remaining allegations contained in paragraph 29 of the Amended Complaint.

30.     American General is without knowledge sufficient to admit or deny the allegations contained in paragraph 30 of the Amended Complaint.

31.     The documents referenced in paragraph 31 of the Amended Complaint speak for themselves.

32.     American General admits that on or about August 3, 2007, it issued Policy No. UM0044158L with a face amount of $10,000,000 on the life of Michael Sasoni and that the owner and beneficiary was the Michael Sasoni 2007-1 Insurance Trust.

33. American General admits that on or about August 3, 2007, it issued Policy No. UM0044159L with a face amount of $10,000,000 on the life of Michael Sasoni and that the owner and beneficiary was the Michael Sasoni 2007-2 Insurance Trust.

34. The documents referenced in paragraph 34 of the Amended Complaint speak for themselves.

35. The documents referenced in paragraph 35 of the Amended Complaint speak for themselves.

36. Upon information and belief, American General admits the allegations in paragraph 36 of the Amended Complaint.

37. American General denies that the policies are valid and enforceable. Otherwise, American General is without knowledge sufficient to admit or deny the allegations contained in paragraph 37 of the Amended Complaint.

38. American General is without knowledge sufficient to admit or deny the allegations contained in paragraph 38 of the Amended Complaint.

39. American General denies the allegations in paragraph 39 of the Amended Complaint.

40. Paragraph 40 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is required. To the extent paragraph 40 contains allegations directed to American General, those allegations are denied.

41. American General denies the allegations in paragraph 41 of the Amended Complaint.

42.     Paragraph 42 of the Amended Complaint contains allegations of law or statements of a general nature that are not directed at American General and to which no response is required.  To the extent paragraph 42 contains allegations directed to American General, those allegations are denied.

43.     American General denies the allegations in paragraph 43 of the Amended Complaint.

44.     American General admits that it filed a lawsuit against Plaintiffs and others on July 31, 2009 in the Circuit Court of Miami-Dade County, Florida and that the Parties have mutually agreed to move forward with the claims asserted against Plaintiff in this lawsuit. American General otherwise denies the remaining allegations in paragraph 44 of the Amended Complaint.

45.     Insofar as the allegations contained in paragraph 45 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 45 of the Amended Complaint.

46.     Insofar as the allegations contained in paragraph 46 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 46 of the Amended Complaint.

47.     Insofar as the allegations contained in paragraph 47 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 47 of the Amended Complaint.

48.     American General denies the allegations in paragraph 48 of the Amended Complaint.

49.     Insofar as the allegations contained in paragraph 49 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 49 of the Amended Complaint.

50.     Insofar as the allegations contained in paragraph 50 of the Amended Complaint constitute conclusions of law, no response is necessary.   American General denies that the Sasoni Trusts have dealt with American General fairly.

51.     Insofar as the allegations contained in paragraph 51 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 51 of the Amended Complaint.

52.     The documents referenced in paragraph 52 of the Amended Complaint speak for themselves.   Otherwise, American General denies the allegations in paragraph 52 of the Amended Complaint.

53.     Insofar as the allegations contained in paragraph 53 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 53 of the Amended Complaint.

54.     Insofar as the allegations contained in paragraph 54 of the Amended Complaint constitute conclusions of law, no response is necessary.  To the extent a response is deemed necessary, American General denies the allegations in paragraph 54 of the Amended Complaint.

<u>COUNT I</u>

55.     American General adopts and incorporates its responses to paragraphs 1-54 as if fully set out herein.

56.     American General admits that an actual controversy exists between the Parties. American General denies that Plaintiffs are entitled to any of the relief they seek.

8

57.     American General denies the allegations in paragraph 57 of the Amended Complaint.

58.     American General denies the allegations in paragraph 58 of the Amended Complaint.

59.     American General denies that Plaintiffs are entitled to any of the relief they seek in paragraph 59 of the Amended Complaint.

60.     American General denies that Plaintiffs are entitled to any of the relief they seek in paragraph 60 of the Amended Complaint.

61.     American General denies that Plaintiffs are entitled to any of the relief they seek in paragraph 61 of the Amended Complaint.

62.     American General admits that an actual controversy exists between the Parties. American General denies that Plaintiffs are entitled to any of the relief they seek in paragraph 62 of the Amended Complaint.

63.     American General admits that an actual controversy exists between the Parties. American General denies that Plaintiffs are entitled to any of the relief they seek in paragraph 63 of the Amended Complaint.

64.     American General denies that Plaintiffs are entitled to any of the relief they seek in paragraph 64 of the Amended Complaint.

## **PRAYER FOR RELIEF**

American General denies that Plaintiffs are entitled to any of the relief they seek in paragraphs 1-4 under the Prayer for Relief section of the Amended Complaint.

## AFFIRMATIVE DEFENSES

1.      The Amended Complaint fails to state facts sufficient to constitute a cause of action for which relief can be granted.

2.      The Amended Complaint should be dismissed or limited based upon the doctrines of unclean hands, waiver, estoppel, equitable estoppel, failure to mitigate damages, avoidable consequences and laches.

3.      The Amended Complaint should be dismissed because the Policies are void *ab initio* and unenforceable by virtue of fraud in the inducement committed by Plaintiffs and/or third parties.

4.      The Amended Complaint should be dismissed because the Policies are void *ab initio* and unenforceable due to a lack of insurable interest.

5.      If and to the extent that American General failed to perform any obligation owing to Plaintiffs, which American General categorically denies, such performance was prevented or made impossible as a result of acts or omissions of Plaintiffs and/or third parties.

6.      The Amended Complaint should be dismissed because of the failure of one or more of the conditions precedent to coverage contained within the Policies, including but not limited to: the obligation of utmost good faith and fair dealing in connection with the applications of the Policies; the requirement that all statements and answers in the application for the subject Policies be true and complete as of the date of delivery of the Policies to the policy owners.

7.      American General avers that the Policies of insurance at issue in this case are due to be rescinded based upon material misrepresentations made at the time the Policies were underwritten.

8.      American General avers that Plaintiffs are not entitled to an award of attorneys'

fees.

9.      American General is entitled to set off the expenses that it has incurred in connection with the issuance of the Policies against any benefits that may be adjudged due under the Policies.

10.      Plaintiffs' claims are barred or limited to the extent that the insured failed to perform its obligations and comply with the terms, conditions and provisions of the insurance contracts at issue.

11.      Any damages Plaintiffs have allegedly suffered were caused by Plaintiffs' wrongful acts, described in American General's Counterclaims.

12.      The Plaintiffs' claims and damages, to the extent Plaintiffs are entitled to any damages, which American General denies, are barred or limited by the existence of the insurance contracts at issue and/or the provisions, terms, exclusions, definitions, limitations and conditions contained therein.

13.      American General presently has insufficient knowledge or information on which to form a belief as to whether they may have additional, yet unstated affirmative defenses. American General reserves the right to assert additional affirmative defenses in the event discovery or further investigation indicates that asserting additional affirmative defenses would be warranted.

## COUNTERCLAIMS

Defendant American General Life Insurance Company (American General"), for its Counterclaims against Plaintiffs Michael Sasoni 2007-1 Insurance Trust and Michael Sasoni 2007-2 Insurance Trust (hereinafter collectively "Plaintiffs" or the "Sasoni Trusts") alleges:

## INTRODUCTION

1.      This is an action for declaratory judgment under 29 U.S.C. § 2201.  American General seeks a declaration relative to its rights and obligations under two policies of life insurance issued on the life of Michael Sasoni (the "Insured")  procured by fraudulent means and for improper and undisclosed purposes.

2.      The Sasoni Trusts submitted documents to American General as part of a fraudulent scheme developed by investment companies commonly referred to as "STOLI" transactions - - which stands for "stranger-originated life insurance."  This scheme is designed to: a) procure life insurance policies on individuals for which there are no insurable interests; and b) sell the policies to investors who are unrelated to the insureds and who are wagering on the lives of the insureds.

3.      The scheme is conducted as follows:

      a. First, the investment company contracts with insurance brokers to find relatively older and high-net worth individuals (or persons willing to fraudulently inflate their financial status) willing to participate in the transactions.

    b.  Next, a false or misleading application is submitted for one or more insurance policies. A shell corporation or trust bearing the insured's name is identified as the owner and beneficiary of the policy. This permits the strangers to acquire an interest in this holding entity -- and, most importantly, in the death benefit that later will be disbursed -- while hiding their ownership from the insurance company.

    c.  Once a policy is issued, the investors pay the insured a fee. A typical fee is 3% of the face value of the policy.

    d.  Additionally, the insurance company pays the insurance brokers a monetary commission which is often shared with the investors.

    e.  The investors pay all of the costs of the policy including premium payments and wait for the insureds to die to collect on their investment.

4.    In furtherance of this scheme, the Sasoni Trusts and others submitted documents to American General containing misrepresentations about the financial background of the insured and about the intent for ownership of the policies. American General relied on these representations when issuing the policies.

## JURISDICTION AND VENUE

5.    Defendant, American General, is a Texas corporation with its principal place of business in Houston, Texas.

6.    Upon information and belief, the Sasoni Trusts, which own and are the beneficiaries of the Policies, are Domestic Statutory Trusts pursuant to Del. Code Ann. tit. 12, §3801, *et seq*. with their principal place of business in Greenville, Delaware.

13

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest as costs, and there is complete diversity between Plaintiff and Defendant.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events giving rise to the claim occurred herein.

### FACTS

9.     During the time of the transactions described herein, Stephen Wechsler and Kevin Bechtel (hereinafter, the "Brokers") were appointed as independent brokers authorized to procure and submit applications from prospective insureds for the issuance of life insurance policies by American General, subject to underwriting and approval by American General.

10.     In and around August 2007, the Brokers procured and submitted an application for life insurance seeking life insurance policies on behalf of Michael Sasoni, a Florida resident, (hereinafter, the "Insured"), which resulted in American General's issuing two (2) policies on the life of the Insured for a combined face amount of $20 million.

11.     On August 3, 2007, American General issued Policies numbered UM0044158L and UM0044159L (the "Policies") for a combined face amount of $20 million, as a result of an application dated on or about August 1, 2007 submitted to American General by the Brokers, naming The Michael Sasoni 2007-1 Insurance Trust as the ostensible owner and beneficiary of Policy number UM0044158L and Michael Sasoni 2007-2 Insurance Trust as the ostensible owner and beneficiary of Policy number UM0044159L.   The application indicated that the purpose of the insurance was "financial planning."   American General relied upon this information in determining whether to issue the Policies.   These representations were false or misleading.

14

12.     The Insured was 70 years old at the time the Policies were issued.

13.     On the application for the Policies and during the application process, the Insured, Brokers and the Sasoni Trusts represented the Insured's annual income to be $3.27 million, and his net worth to be $65.5 million.  Upon information and belief, these representations were false or misleading.  American General justifiably relied upon this information in determining whether to issue the Policies.

14.     The Brokers, Sasoni Trusts and/or third parties solicited the Insured to take part in a fraudulent STOLI scheme whereby the Insured would apply to American General for life insurance for which he would not pay and would not keep but, instead, would sell -- through the aid of the Brokers and Sasoni Trusts -- to investors who have no insurable interest in the life of the Insured.

15.     The Sasoni Trusts, though the ostensible original owners of the Policies, are not the true owners of the Policies but, instead, are pass-through entities designed to deliver ownership and interest in the Policies to the true owners of the Policies who are named and or unnamed investors with no insurable interest in the life of the Insured.  As a result, the Sasoni Trusts and/or other unnamed investors have invested in and are wagering on the lives of other persons. These STOLI transactions violate state law and public policy.

16.     The Insured's and the Sasoni Trusts' intent for these Policies, from the beginning of these transactions, was to transfer and/or sell the Policies or beneficial interests in them to companies, investors, investor groups, or other third parties who are strangers with no insurable interest in the life of the Insured.

17.     The Insured and the Sasoni Trusts represented to American General that the Insured's designated beneficiaries, through the Sasoni Trusts, were the Policies' true

beneficiaries. These representations were false or misleading. Instead, the true applicants for, and owners and beneficiaries of, the Policies were and are other named and/or unnamed investors who have no insurable interest in the life of the Insured.

18.    The Insured, the Brokers, and the Sasoni Trusts swore to the truthfulness of the representations contained in the application by their signatures.

19.    As part of the underwriting process, the Brokers also represented that: (a) premium financing was not involved; and (b) the policyholders had not been given any advice to transfer the ownership of the Policies to a life settlement company or any other entity associated with STOLI transactions. Upon information and belief, these representations were false or misleading.

20.    Upon information and belief, the Insured did not make, and has not made, any premium payments on the Policies. The funds advanced to pay for the Policies were loaned and/or procured by the Brokers, the Sasoni Trusts, and/or unnamed investors.

21.    In connection with the issuance of the Policies, the Brokers and other unnamed parties received substantial monetary commissions.

22.    Upon information and belief, the Brokers acted on behalf of unnamed third parties as part of this investment scheme. Upon information and belief, the Brokers were forced to perform certain duties for the benefit of the investors and make certain representations to the investors as part of the subject insurance transactions. These actions by the Brokers on behalf of the investors were not disclosed to American General.

23.    Upon information and belief, when the Insured dies, the proceeds from the Policies will ultimately rest in the hands of investors who have no insurable interest in the life of the Insured.

24.     Notwithstanding their representations during the application process to the contrary, the intent of the Insured and the Sasoni Trusts from the beginning of the transactions, was to transfer and/or sell the Policies or beneficial interests in them to companies, investors, investor groups, or other third parties who are strangers with no insurable interest in the life of the Insured.

<h3 style="text-align:center">COUNT ONE: DECLARATORY<br>JUDGMENT BASED ON LACK OF INSURABLE INTEREST</h3>

25.     American General hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein fully.

26.     The Policies were issued to, at the behest of, and/or in accordance with a plan initiated by a party or parties possessing no insurable interest in the life of the Insured under applicable law.

27.     The purpose of the transaction was to wager upon the life of the Insured.

28.     As such, American General is entitled to a judicial declaration that the Policies lacked an insurable interest at inception and is therefore void *ab inito*.

### COUNT TWO:  DECLARATORY JUDGMENT BASED ON MISREPRESENTATION

29.     American General hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein fully.

30.     The Insured, the Sasoni Trusts and/or others made material misrepresentations to American General in the application concerning the Insured's income and net worth.  The application contained representations that the Insured's annual income was $3.27 Million and his

17

net worth was $65 Million. These representations were false and failed to disclose the true financial condition of the Insured.

31.    The Insured, the Sasoni Trusts and/or others also made material misrepresentations to American General in the application concerning the reason for insurance. The application indicated that the reason for obtaining the insurance was "financial planning." This representation was false and failed to disclose the true reason for obtaining the insurance – to obtain the Policies on behalf of investors with no insurable interest in the life of the Insured.

32.    The Insured, the Sasoni Trusts and/or others knew of the falsity of the representations concerning the Insured's finances and the reason for the insurance.

33.    American General justifiably relied on these misrepresentations. Had American General known the Insured's true financial condition or the true reason for procuring the insurance, it would not have issued the Policies.

34.    American General has been damaged by virtue of these material misrepresentations and has incurred damages, expenses and costs in connection with, among other things, its underwriting and issuance of the Policies, payment of commissions and fees in connection with issuance of the Policies, administration and servicing of the Policies, investigation of the misrepresentations, fraud and concealment outlined above, and commencement of the present litigation to enforce its rights.

35.    The Policies are void or voidable pursuant to and in accordance with applicable law.

## RELIEF REQUESTED

WHEREFORE, American General respectfully requests an entry of an Order by the Court as follows:

A.      Declaring whether the Policies are void or voidable due to a lack of insurable interest at their inception;

B.      Declaring whether the Policies are void or voidable due to material misrepresentations in the application;

C.      Declaring whether American General may retain some or all of the premiums paid on the Policies and/or recover damages as an off-set to the costs and expenses American General has incurred as a result of the issuance of the Policies;

D.      Declaring whether American General is entitled to attorneys' fees and costs, as determined by the Court and associated with seeking this judgment; and

E.      Awarding such further relief as this Court deems appropriate.


COOLEY MANION JONES LLP

Jason A. Cincilla (DE Bar ID #4232)
Amaryah K. Bocchino (DE Bar ID #4879)
Peter J. Faben (DE Bar ID #5163)
1105 N. Market Street, Suite 200
Wilmington, Delaware 19801
(302) 657-2100
jcincilla@cmjlaw.com
abocchino@cmjlaw.com
pjfaben@cmjlaw.com

*Attorneys for Defendant*
*American General Life Insurance Company*

OF COUNSEL
MAYNARD, COOPER & GALE, P.C.
Michael D. Mulvaney, Esq
David P. Donahue, Esq.
1901 Sixth Avenue North, Suite 2400
Birmingham, Alabama 35203
Telephone: 205-254-1000
Facsimile: 205-254-1999

Dated: December 3, 2012

# EXHIBIT N

**(to Exhibit 1: Lohman Affidavit)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICHAEL SASONI 2007-1 INSURANCE<br>TRUST, a Delaware statutory trust, and<br>MICHAEL SASONI 2007-2 INSURANCE<br>TRUST, a Delaware statutory trust,<br><br>Plaintiffs,<br>v.<br><br>AMERICAN GENERAL LIFE INSURANCE<br>COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 09-cv-00979-GMS |

### ORDER OF FINAL JUDGMENT
### AND DISMISSAL WITH PREJUDICE AND WITHOUT COSTS

THIS MATTER, having been brought to the Court upon the joint application of the undersigned parties, by and through their counsel, Potter Anderson & Corroon LLP, Attorneys for Plaintiffs, the Michael Sasoni 2007-1 Insurance Trust and the Michael Sasoni 2007-2 Insurance Trust (the "Insurance Trusts"), and Manion Gaynor & Manning, Attorneys for Defendant, American General Life Insurance Company, seeking entry of this Order;

This Court having previously approved and executed the parties' proposed Scheduling Order and form of Notice [D.I. 168]; and

Having received no objections pursuant to the Notice and Scheduling Order;

IT IS HEREBY ORDERED this 22 day of Jan , 2015, that:

1. Final Judgment is hereby entered declaring that, pursuant to 28 U.S.C. § 2201, Life Insurance Policies UM0044158L and UM0044159L, issued by American General Life Insurance Company, are rescinded, void ab initio, and of no force and effect whatsoever from inception;

Case 8:15-cv-00932-AEP Document 128-1 Filed 05/04/17 Page 143 of 149 PageID 1882
Case 1:09-cv-00979-GMS Document 171 Filed 01/22/16 Page 143 of 149 PageID 5239
Case 1:09-cv-00979-GMS Document 170-1 Filed 01/14/15 Page 7 of 8 PageID #: 5025

2.      The Court having been advised that prior Notice has been given to Michael Sasoni; Anna Sasoni; and their heirs at law, Alizza Asiiag, Ilan Asiiag and Michael Sasoni, Jr.; as well as to any executor, administrator, guardian, conservator, or similar fiduciary acting on behalf of any other minor, incapacitated, unborn person, or person whose identity or location is unknown and not reasonably ascertainable, as to any heirs at law of Michael Sasoni and Anna Sasoni, the Court finds that good and proper notice of the entry of this Order of Final Judgment and Dismissal with Prejudice and Without Costs has been given, and such Order is binding upon all such persons;

3.      Having received no objections pursuant to the Scheduling Order and Notice, all persons or entities receiving or deemed to have received prior Notice of the entry of this Order of Final Judgment, including all persons referenced in Paragraph 2 herein, are deemed to have waived any and all objections to this Order and are forever barred from raising such objections in this Action or in any other action or proceeding;

4.      Having received no objections pursuant to the Scheduling Order and Notice, no person or entity, including but not limited to, all persons or entities receiving or deemed to have received prior Notice of the entry of this Order of Final Judgment, including all persons referenced in Paragraph 2 herein: (i) has, had, or will hereafter have any rights under Life Insurance Policies UM0044158L and UM0044159L issued by American General and (ii) is forever barred from filing any claim or action against Plaintiffs or Defendant with respect to any matter related to or arising out of Life Insurance Policies UM0044158L and UM0044159L;

5.      No party hereto admits to any liability, misrepresentation, or other wrongdoing; and

6.   This Action is dismissed in its entirety with prejudice and without costs against

any party, with each party bearing its own attorneys' fees and costs.

DISTRICT JUDGE GREGORY M. SLEET

3

Case 8:15-cv-00192-AEP   Document 48-1   Filed 02/09/16   Page 144 of 149 PageID 708

# EXHIBIT O

**(to Exhibit 1: Lohman Affidavit)**

© 1993-2010 EZ-Filing, Inc. [1-800-998-2424] • Forms Software Only

**B1 (Official Form 1) (4/10)**     **Page 1**

| United States Bankruptcy Court<br>Southern District of New York | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Wechsler, Stephen B** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete<br>EIN (if more than one, state all): **3939** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete<br>EIN (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>**505 East 79th Street<br>Apt. 19BC<br>New York, NY**    ZIPCODE **10075-0709** | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br><br>ZIPCODE |
| County of Residence or of the Principal Place of Business:<br>**New York** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br><br>ZIPCODE | Mailing Address of Joint Debtor (if different from street address):<br><br>ZIPCODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br><br>ZIPCODE | |

| Type of Debtor<br>(Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box.) |
|---|---|---|
| ☑ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☐ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11<br>U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Other | ☐ Chapter 7    ☐ Chapter 15 Petition for<br>☐ Chapter 9      Recognition of a Foreign<br>☑ Chapter 11    Main Proceeding<br>☐ Chapter 12   ☐ Chapter 15 Petition for<br>☐ Chapter 13      Recognition of a Foreign<br>           Nonmain Proceeding |
| | **Tax-Exempt Entity**<br>(Check box, if applicable.)<br>☐ Debtor is a tax-exempt organization under<br>Title 26 of the United States Code (the<br>Internal Revenue Code). | **Nature of Debts**<br>(Check one box.)<br>☑ Debts are primarily consumer   ☐ Debts are primarily<br>debts, defined in 11 U.S.C.      business debts.<br>§ 101(8) as "incurred by an<br>individual primarily for a<br>personal, family, or house-<br>hold purpose." |

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ☑ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (Applicable to individuals<br>only). Must attach signed application for the court's<br>consideration certifying that the debtor is unable to pay fee<br>except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (Applicable to chapter 7 individuals<br>only). Must attach signed application for the court's<br>consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts owed to non-insiders or affiliates are less<br>than $2,343,300 (*amount subject to adjustment on 4/01/13 and every three years thereafter*).<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in<br>accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|
| ☑ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for<br>distribution to unsecured creditors. | |

**Estimated Number of Creditors**

| ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | Over<br>100,000 |

**Estimated Assets**

| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001<br>to $50 million | $50,000,001 to<br>$100 million | $100,000,001<br>to $500 million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

**Estimated Liabilities**

| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001<br>to $50 million | $50,000,001 to<br>$100 million | $100,000,001<br>to $500 million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

B1 (Official Form)

| **Voluntary Petition** *(This page must be completed and filed in every case)* | Name of Debtor(s): **Wechsler, Stephen B** |
|---|---|

## Prior Bankruptcy Case Filed Within Last 8 Years (If more than two, attach additional sheet)

| Location Where Filed: **None** | Case Number: | Date Filed: |
|---|---|---|
| Location Where Filed: | Case Number: | Date Filed: |

## Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)

| Name of Debtor: **None** | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| **Exhibit A** (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | **Exhibit B** (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by § 342(b) of the Bankruptcy Code.<br><br>X */s/ Fred S. Kantrow*           11/08/10<br>Signature of Attorney for Debtor(s)          Date |
|---|---|

## Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

☑ No

## Exhibit D

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☑ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐ Exhibit D also completed and signed by the joint debtor is attached a made a part of this petition.

## Information Regarding the Debtor - Venue
(Check any applicable box.)

☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

## Certification by a Debtor Who Resides as a Tenant of Residential Property
(Check all applicable boxes.)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord or lessor that obtained judgment)

_____
(Address of landlord or lessor)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

© 1993-2010 EZ-Filing, Inc. [1-800-998-2424] • Forms Software Only

B1 (Official Form 1) (4/10)

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Wechsler, Stephen B |
|---|---|

| **Signatures** | |
|---|---|

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under Chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United State Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).<br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. | I declare under penalty of perjury that the information is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br>(Check only **one** box.)<br>☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.<br>☐ Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. |
| X */s/ Stephen B Wechsler*        **Stephen B Wechsler**<br>   Signature of Debtor<br><br>X<br>   Signature of Joint Debtor<br><br>   Telephone Number (If not represented by attorney)<br><br>**November  8, 2010**<br>   Date | X<br>   Signature of Foreign Representative<br><br>   Printed Name of Foreign Representative<br><br>   Date |

| **Signature of Attorney\*** | **Signature of Non-Attorney Petition Preparer** |
|---|---|
| X */s/ Fred S. Kantrow*<br>   Signature of Attorney for Debtor(s)<br><br>**Fred S. Kantrow<br>Law Offices of Avrum J. Rosen<br>38 New Street<br>Huntington, NY  11743<br>(631) 423-8527<br>fkantrow@avrumrosenlaw.com**<br><br><br>**November  8, 2010**<br>   Date<br>\*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | I declare under penalty of perjury that: 1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; 2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h) and 342(b); 3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.<br><br>   Printed Name and title, if any,  of Bankruptcy Petition Preparer<br><br>   Social Security Number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>   Address |

| **Signature of Debtor (Corporation/Partnership)** | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X<br>   Signature of Authorized Individual<br><br>   Printed Name of Authorized Individual<br><br>   Title of Authorized Individual<br><br>   Date | X<br>   Signature of Bankruptcy Petition Preparer or officer, principal, responsible person, or partner whose social security number is provided above.<br><br>   Date<br><br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.* |

© 1993-2010 EZ-Filing, Inc. [1-800-998-2424] • Forms Software Only

# EXHIBIT P

**(to Exhibit 1: Lohman Affidavit)**

# BRESSLER, AMERY & ROSS

### A PROFESSIONAL CORPORATION

2001 Park Place North ▪ Suite 1500 ▪ Birmingham, AL 35203

205.719.0400 ▪ fax 205.719.0500

www.bressler.com

David P. Donahue                                                                                      direct: 205-820-8244
Member                                                                                                  ddonahue@bressler.com

February 5, 2015

**VIA OVERNIGHT MAIL**

Kevin H. Bechtel
Life Brokerage Partners, LLC
3488 East Lake Road, 102A
Palm Harbor, FL 34685

### RE:    Return of Commissions

Dear Mr. Bechtel:

Please be advised that I have been retained by American General Life Insurance Company with regard to commission payments paid pursuant to the sale of two policies of insurance issued on the life of Michael Sasoni (Policy Nos. UM0044158L and UM0044159L). As you are likely aware, those policies have been rescinded and premiums received by American General have been returned. Under the terms of your agreement with American General, those commissions (including bonus commissions) are now due to be returned to the Company. Moreover, in light of American General's inability to collect commission payments made to Stephen Wechsler for these policies, the amounts paid to him for these policies has been rolled to you and/or Life Brokerage Partners, LLC as Wechsler's upline. The company has recently processed a charge back to your commission account in the amount of $1,093,008.00.

In order to protect the interests of the company, my firm has filed a lawsuit against you and Life Brokerage Partners, LLC in the Middle District of Florida. However, as of this date, we have not taken steps to complete service of process. It is the company's desire to attempt to resolve this matter before incurring further litigation expenses.

If you would like to discuss a resolution, please feel free to give me a call. Otherwise, if we do not hear from you by February 13th, we will have no choice but to complete service of process and litigate this matter.

Sincerely,

David P. Donahue

DPD/cgs

New Jersey  ▪  New York  ▪  Florida  ▪  Alabama