# EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:15-cv-00192-EAK-AEP

AMERICAN GENERAL LIFE INSURANCE COMPANY,

       Plaintiff,

VS.

KEVIN H. BECHTEL, et al,

       Defendants.

| | |
|---|---|
| DEPOSITION OF: | JANA KLOTZ |
| TAKEN BY: | RICHARD MILLIAN, ESQUIRE |
| TAKEN: | January 18, 2017 |
| TIME: | 10:00 a.m. - 12:00 p.m. |
| PLACE: | Verbatim Professional Reporters<br>2202 N. Westshore Boulevard<br>Suite 200<br>Tampa, FL 33607 |
| REPORTED BY: | CHARLENE M. EANNEL, RPR<br>Court Reporter, Notary Public |

PAGES 1 - 62

VERBATIM PROFESSIONAL REPORTERS, INC.
601 CLEVELAND STREET, SUITE 380
CLEARWATER, FL 33755
(727)442-7288

1   Q.   Yes?
2   A.   So, no.
3   Q.   Okay.
4   A.   It is not.
5   Q.   So contracting paperwork for a company would be
6   the same contracting paperwork for an individual?
7   A.   The forms completed would be the same.
8   Q.   Okay. And then who decides or what determines
9   whether a person needs to assign their either commissions
10  or their contract to the corporation that they're an
11  officer of?
12  A.   That's really between that agent or officer and
13  their recruiter, so we would just be the receiver of that
14  information and then code it as such.
15  Q.   Are there times when an agent is simply assigned
16  commissions to a company?
17  A.   Yes.
18  Q.   Are there times when an agent would assign his
19  complete contract or her contract to the company?
20  A.   There are times, but truly an assignment of a
21  contract would imply that there's some type of sale or
22  merger that existed for that contract to be sold or
23  assumed by someone else.
24  Q.   Okay. Are those the only times that you're
25  aware of that that's happened at American General?

```
 1       A.    That's what happened.
 2       Q.    An assignment of a contract, of the individual
 3  contract?
 4       A.    Yes, so for an actual true assignment of
 5  contract that is the result of a sale or merger.
 6       Q.    Okay.  And that's the only time that you're
 7  aware of that happening in American General?
 8            MR. DONAHUE:  Object to the form.
 9            THE WITNESS:  I know -- I'll say it this way to
10       you -- I guess restate the question for me.
11  BY MR. MILLIAN:
12       Q.    I'm only asking you what you're aware of, not
13  the possibility that it happened because, of course,
14  there's always the possibility.
15            Are you aware of any other circumstances in
16  which an individual assigned his or her contract to a
17  corporation --
18       A.    Um --
19       Q.    -- other than a sale?
20       A.    Sure.  So I can tell you that the assignment of
21  agent contract form has been our practice, or I would say
22  we did not consistently utilize that form in regards to
23  only a sale or a merger.  It could also be used to only
24  assign commissions.
25       Q.    Okay.  But there are two different forms, right?
```

```
 1   There's an assignment of contract and an assignment of
 2   commission form?
 3        A.   Yes.
 4        Q.   And who provides those forms?
 5        A.   The recruiter would provide those forms to us
 6   for coding.
 7        Q.   Where do they get those forms from?
 8        A.   They should receive it from the same -- either
 9   online through our forms depot to where they're receiving
10   their agency agreement and other contracting paperwork.
11        Q.   But from American General?
12        A.   Correct.
13        Q.   Okay.  Does American General have to approve an
14   assignment of a contract?
15        A.   By approve, we do execute that assignment,
16   meaning that we review it and just place our signature on
17   it and, of course, code it as such.
18        Q.   Okay.  Have you guys ever rejected an assignment
19   of a contract that you're aware of?
20        A.   When you say assignment of contract, do you mean
21   for the sole purpose of a sale or merger or if it was
22   based -- our practice used also to assign commissions?
23        Q.   I just mean an assignment of a contract.
24        A.   Sure.  So an assignment of agent's compensation
25   we would not reject.  We would accept the instructions
```

```
 1   provided to us.
 2        Q.   Okay.  What about an assignment of a contract?
 3        A.   If it was an assignment of contract as the
 4   result of a sale or merger, we definitely ask for the
 5   additional information to show proof of that sale or
 6   merger and, of course, if that was not provided, then the
 7   contract would not be assigned.
 8        Q.   Okay.  And is that your experience from now
 9   being the vice president, or is that your experience over
10   21 years at American General?
11        A.   That's my experience with being in L&C for nine
12   years.
13        Q.   Okay.  In 2003, you weren't in licensing and
14   commissions, correct?
15        A.   Correct.
16        Q.   Do you know if American General's position on
17   accepting assignment of contracts was different in 2003?
18        A.   In 2003, I don't know, you know, if it was
19   different or not.  I don't.
20        Q.   Do you know if there's anybody at American
21   General that would know the answer to that?
22        A.   Yes.  In 2003, it's my understanding that -- let
23   me restate it for you so I apologize.
24             In 2003, it's my understanding that there --
25   that form was used interchangeably with an assignment of
```

```
 1   commissions.
 2       Q.   Is it your belief as we sit here today that an
 3   assignment of a contract is the same as an assignment of
 4   commissions?
 5            MR. DONAHUE:  Object to the form.
 6            THE WITNESS:  Yes.  Restate it for me.
 7   BY MR. MILLIAN:
 8       Q.   As we sit here today --
 9       A.   Uh-huh.
10       Q.   -- is it your belief that an assignment of
11   contract is the same thing as an assignment of
12   commissions, not -- not in connection with the sale of the
13   businessman?
14            MR. DONAHUE:  Same objection.
15            THE WITNESS:  Sure.  So I would say today in our
16       current practice which, of course, is not, you know,
17       the same practice that was used back then.  Today
18       there are two very different forms with two very
19       different purposes, but as I've stated before,
20       previously those forms were used interchangeably with
21       the purpose to only assign commissions.
22            MR. MILLIAN:  Okay.  I'm going to show you what
23       we're going to mark as Exhibit 2.
24            (Whereupon, a document entitled  "American
25       General Assignment of Agent Contract," was
```

```
 1          marked as Exhibit 2 for identification, as of this
 2          date.)
 3   BY MR. MILLIAN:
 4       Q.   This is titled, "American General Assignment of
 5   Agent Contract."  What does this document do?  Do you know
 6   what this document is?
 7       A.   Yes.
 8       Q.   Okay.  What is it?
 9       A.   This document, as I've said, when used in '03
10   would allow an agent to assign his commissions to whoever
11   he chooses.
12            So in this example here, it's telling me that
13   Kevin Bechtel is assigning his compensation to Life
14   Brokerage Equity Group.
15       Q.   So that's what that document says to you?
16       A.   Yes.
17       Q.   It doesn't say anything else to you?
18            MR. DONAHUE:  Object to the form.
19            THE WITNESS:  So this document, that's -- this
20       is what this document says to me and how it was
21       interpreted and used within our system, yes.
22   BY MR. MILLIAN:
23       Q.   Well, as we sit here today?  Because you
24   testified a little bit earlier you didn't know how it was
25   done in 2003.
```

```
1              MR. DONAHUE:  Is that a question?
2              MR. MILLIAN:  Correct?
3    BY MR. MILLIAN:
4        Q.   Now it's a question.
5        A.   So as I said, when I responded, I said, "My
6    apologies," and I wanted to correct myself.
7        Q.   Correct.
8        A.   So in '03, this form was used interchangeably
9    with the assignment of commissions.
10       Q.   Okay.  But you weren't involved with this
11   transaction between Kevin Bechtel, Life Brokerage Equity
12   Group and American General back in 2003, correct?
13       A.   I was not in L&C in 2003.
14       Q.   So we as we sit here today, you don't know what
15   the intent was personally?
16       A.   So I can only speak to how the agent was coded
17   in the system in reviewing the record, and I can tell you
18   if this was a true agent contract, Kevin Bechtel would
19   have been terminated when this was received because,
20   essentially, he would have had no contract, and that is
21   not the case.  He was active, and that's why I can deduce,
22   then, that this was used as I thought, as an assignment of
23   commissions.
24       Q.   Within American General, correct?
25       A.   Correct.
```

1   Q.   But if for some reason recruiter didn't print
2   out everything or just a fax mistake happened and all the
3   pages didn't get to the agent, the agent wouldn't know of
4   all the pages, whether it's terms and conditions or some
5   other page -- it could be a missed application page,
6   unless they were able to get onto the system?
7           MR. DONAHUE:  Object to the form.
8           THE WITNESS:  So today I would say that the
9       agent, once granted an agent number, would have
10      access to the same information that the recruiter did
11      from a contractual standpoint, and I can't speak to
12      whether an agent would sign a single-page document
13      with no additional questions or not.
14  BY MR. MILLIAN:
15  Q.   Okay.  What does the recruiter of those -- I
16  think you said five to seven pages -- seven to ten pages
17  and a one-page assignment, if there is an assignment --
18  and I'm not holding you to specific numbers.  If you add
19  those up, it comes out to about sixteen, seventeen pages.
20          Does the recruiter -- once that's all filled out
21  by either the agent or the recruiter, does he or she
22  submit that entire packet back to American General?
23  A.   It varies.  It's more common than not that we'll
24  receive just the signature page of the agreement.
25  Q.   Okay.

1  A.  Because it is, like I said, I believe ten,
2  thirteen pages, maybe more, and typically, you know,
3  they'll send just the signature page.
4  Q.  Is there anything on the signature page that on
5  its face would indicate that there's additional lawyer
6  language?
7       MR. DONAHUE:  Object to the form.
8       THE WITNESS:  Yes.  Just from memory, I'm not
9    aware.  I -- from memory, I'm not aware.
10      MR. MILLIAN:  All right.  I'm going to mark the
11   next document as Exhibit 4.  I'm not going to ask you
12   to go through the Request for Admissions.  I'm using
13   this because the two contracts that are being sued
14   upon in this case by American General happened to be
15   contained in this document.
16      (Whereupon, Exhibit 4 was marked for
17  identification.)
18  BY MR. MILLIAN:
19  Q.  So if you will turn to -- if you look at the
20  bottom, that's AGL Bechtel, and then a bunch of zeros,
21  then 1.
22  A.  Okay.
23  Q.  Is there anything on the face of that document
24  that indicates to you that there are additional terms and
25  conditions to this document?

```
 1        A.   It was, I believe, prior to '07, and he left and
 2   went to another agency and, I believe, is now retired.
 3        Q.   Okay.  Do you know where he's retired, what
 4   state?
 5        A.   I don't.
 6        Q.   Do you know what his position was when he did
 7   retire from American General or when he left American
 8   General, I should say?
 9        A.   He was a senior distribution officer, but I'm
10   not sure of his exact title.
11        Q.   Turn to Bates label, at the bottom, 57.
12        A.   (Witness complies.)
13        Q.   Who does this agency agreement appear to be
14   between?
15        A.   Life Brokerage Partners, LLC and American
16   General.
17        Q.   And what indicates to you that it's Life
18   Brokerage Partners and American General?
19             MR. DONAHUE:  Object to the form.
20             THE WITNESS:  So it's definitely American
21        General because it's our agreement, and then the Life
22        Brokerage Partners corporate name is there listed at
23        the top.
24   BY MR. MILLIAN:
25        Q.   Okay.  So if we went back to page 1 -- you don't
```

```
 1  have to go back -- if Life Brokerage Equity Group was
 2  written before Kevin Bechtel's name, that would indicate
 3  to you that it was a Life Brokerage Equity Group contract?
 4           MR. DONAHUE:  Object to the form.
 5           THE WITNESS:  I think if Life Brokerage Equity
 6      Group was included on the agency agreement, then,
 7      yes, I would have thought that it would have been
 8      between them and American General.
 9  BY MR. MILLIAN:
10      Q.   Okay.  If you look at -- if you're still on 57,
11  do you see it has the markings on the right side of the
12  pages again for scanning?
13      A.   Yes.
14      Q.   If you turn to the next couple of pages through
15  64, they don't have any of the markings on the right side.
16  Does that indicate to you that those pages were not
17  scanned into the system?
18           MR. DONAHUE:  Object to the form.
19           THE WITNESS:  Yes, they are missing the spray
20      marks.
21  BY MR. MILLIAN:
22      Q.   Does everything that gets scanned into the
23  system get some sort of spray marks?
24      A.   Yes.
25      Q.   Have you ever seen a document at American
```

```
 1              Life Brokerage Partners, only the signature page was
 2         submitted.
 3   BY MR. MILLIAN:
 4         Q.   Okay.  If you look through all of the pages of
 5   the two agreements, the two agency agreements, is there
 6   any way that you could sit here today and testify that
 7   either Kevin Bechtel or Life Brokerage Equity -- I could
 8   break it up, if you want, but --
 9              MR. DONAHUE:  Just ask the question.
10   BY MR. MILLIAN:
11         Q.   -- Life Brokerage Equity Group or Life Brokerage
12   Partners saw the lawyer language that were attached to
13   each of the agency agreements?
14         A.   Can you ask the beginning part of your question
15   again?
16         Q.   As we sit here today --
17         A.   Uh-huh.
18         Q.   -- can you testify with certainty that either
19   Life Brokerage Partners, Kevin Bechtel or Life Brokerage
20   Equity Group saw the lawyer language attached to the two
21   agencies agreements we just reviewed?
22         A.   I, of course, cannot comment on what they saw or
23   did not see.  I know that in '07 the contracts, the full
24   contracts were available online, and I know that as Life
25   Brokerage Partners they had recruiting ability to recruit
```

1  downline agents, so I would assume they would be very
2  familiar with the contracting language as they onboarded
3  new people.
4      Q.  Does the contracting language ever change?
5      A.  I'm sure it could change, but it's usually
6  pretty static for many years.
7      Q.  Who would be in a better position to testify as
8  to whether the terms of the lawyer language changes on a
9  more frequent basis?  Either yourself or somebody that's a
10 national marketing organization?
11         MR. DONAHUE:  Object to the form.
12         THE WITNESS:  I would say if you want to know if
13    American General's contract language is changing, you
14    would need to go to someone in legal who would be
15    responsible for changing the language.
16         MR. MILLIAN:  Okay.
17 BY MR. MILLIAN:
18     Q.  Do you know John Ekberg?
19     A.  I know him in preparation for today.
20     Q.  Okay.  I think we did it for 01 but for 57, is
21 there any language on that agency agreement page that
22 indicates that there is additional lawyer language to this
23 agency agreement?
24         MR. DONAHUE:  Object to the form.
25         THE WITNESS:  I don't see that additional